UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF | : | |
| | : | |
| v. | : | Criminal No. 19-CR-324 (BAH) |
| | : | |
| | : | Chief Judge Beryl A. Howell |
| JOSEPH SMITH, | : | |
| | : | Trial Date: October 26, 2020 |
| Defendant. | : | |

**SUPPLEMENTAL MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. STEPHANIE WOLF AND REQUEST FOR *DAUBERT* HEARING**

Joseph Smith, through undersigned counsel, hereby moves this Honorable Court, pursuant to Rules 16(a)(1)(G) and (d)(2)((C) of the Federal Rules of Criminal Procedure, and Rules 401, 402, 403, 702, and 703 of the Federal Rules of Evidence, *Daubert v. Merrell Dow, Pharmaceuticals, Inc.*, 509 U.S. 589 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), to exclude the Government's proposed expert testimony of Dr. Stephanie Wolf, J.D., Ph.D., or conduct a *Daubert* hearing prior to its admission. In support of this motion, Mr. Smith states the  following:

### I. Procedural and Factual Background

Mr. Smith is before the Court charged by way of Indictment with one count of Production of Child Pornography, in violation of 18 U.S.C. § 2251(a), one count of Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(4), one count of Enticing a Minor, in violation of 18 U.S.C. § 2242, thirteen counts of First Degree Child Sexual Abuse (with Aggravating Circumstances), in violation of 22 D.C. Code §§ 3008, 3020(a)(2), two counts of Second Degree Child Sexual Abuse (with Aggravating Circumstances), in violation of 22 D.C. Code §§ 3009,

3020(a)(2), and one count of Misdemeanor Sexual Abuse of a Child, in violation of 22 D.C. Code § 3010.01.

On March 24, 2020, the government filed a Notice of Intent to Introduce Expert Testimony of Dr. Stephanie Wolf. *See* ECF No. 28. On May 5, 2020, counsel filed a Motion to Exclude Dr. Wolf's Expert Testimony, *see* ECF No. 36, and requested and an evidentiary hearing. *See* Def. Mot. at 6.[1]  On June 9, 2020, at the motions hearing counsel requested an opportunity to supplement Mr. Smith's request for an evidentiary *Daubert* hearing.

## II. The Proposed Expert Testimony

In a letter dated March 24, 2020, the government provided notice that they intend to call Dr. Stephanie Wolf, whom they characterize as "an expert on patterns and symptoms of child sexual abuse, including mental health symptoms and effects, disclosure of child sexual abuse, memory around child sexual abuse, and the complex clinical needs of victims of child sexual abuse." *See*, ECF No. 28. The government seeks to introduce "expert" testimony in a myriad of areas

The government seeks to have Dr. Wolf testify that:

1. "Sexual abuse has a far greater chance of being committed by someone the child knows, such as a family member or close friend, versus a stranger.
    a. One of the bases for this opinion is that the proximity of a person closer to the child, has more opportunities to be alone with the child, and the caregiver's lowering of their guard around the individual.
    b. When a caregiver or close family member is a perpetrator, a child may be even less likely to disclose due to worries about destroying the family unit or wondering if others will even believe that the trusted person would do such an act.
2. When a parent was a victim of child sexual abuse themselves, they may display behavior or parenting practices that lead to greater risk of their own child being sexually abused.
    a. They may be more likely to have children who are perpetrated against.
    b. Past unresolved abuse may lead to inadequate monitoring of their children, unresolved trauma symptoms which encourage family dysfunction, poor boundaries, and difficulty in protecting the child from sexual perpetrators.
3. Non-disclosure of child sexual abuse is the norm versus the exception. That the

---

[1] Counsel requests that the Court incorporate ECF No. 36 into this request for a *Daubert* hearing.

2

majority of children do not disclose immediately following abuse and that a high percentage of children do not disclose until adulthood.
   a. Survivors average approximately 5-16 years from onset of the abuse to the disclosure.
4. Delayed disclosure results from a multitude of barriers from within the child (for example, internalized victim-blaming, mechanisms to protect oneself, and immature development at time of abuse);
   a. Barriers in relation to others (for example, violence and dysfunction in the family, power dynamics, awareness of the impact of telling, and fragile social network); and
   b. Barriers in relation to the social world (for example, labeling, taboo of sexuality, lack of services available, and culture or time period).
5. Additional factors may substantially contribute to delayed disclosure: younger age at the onset of abuse, being financially or otherwise dependent on the perpetrator, and wanting to protect the non-offending family members from harm or distress.
   a. Fear of consequences (for example, punishment by a parent, whether physical, verbal, or loss of privileges) may lead to delayed disclosure.
6. Child sexual abuse victims do not display a "one size-fits all" pattern of symptoms.
   a. Some child victims are highly-successful at masking the outward appearance of victimhood; other child victims are more evidently symptomatic, displaying symptoms of anxiety, depression, and post-traumatic stress disorder.
   b. They may have regression in their development and lose skills they have mastered. Some child victims also have disruptions in their functioning both at school and at home.
   c. At school, they may no longer be able to concentrate, may be inattentive, hyperactive, get into trouble and fight with peers, as well as exhibit sexual behaviors.
   d. At home, they may have problems with sleep, may lose interest in relationships with friends and family and become so distressed that they engage in self-harming behaviors such as cutting or suicidal ideation or attempts.
   e. As a result of the abuse, they may also engage in more risky behaviors, including rule-breaking.
7. For children aged 5-13, the most common recipient of disclosure are peers and mothers, and that most children who disclosed told more than one individual.
   a. Many factors contribute to the decision to disclose to a certain person. For example, many children go through a conscious selection phase, in which they consider the expected response of peers and/or family members and whether that person can provide support.
   b. Children may try to choose a person to disclose to who they perceive is able to stop the abuse.
8. The disclosure of child sexual abuse is not an event, but rather, a process, and that a neat, coherent, and timely disclosure should be regarded as the exception, rather than the rule.
   a. A child reporting abuse may not disclose all of the details of their abuse at once. Rather, certain aspects of trauma can be punctuated in a child victim's brain due to the fear response and hormonal release that encodes some of these memories differently than others.

      b. In addition, the child's memory of the abuse may not be linear and may blend fewer events than the victim actually experienced. It is also not unusual for a child to have difficulty pinpointing the exact date or dates on which the abuse occurred.

      c. Disclosures of child sexual abuse can also be brought about by a trauma trigger or reminder. It is also not uncommon for victims of child sexual abuse to experience gaps in their memories that they cannot account for.

9. "Grooming" is often a key component of child sexual abuse. Grooming is defined in the government's notice as "a systematic way of gaining a child or parent's trust, filling a need of the child or his caregivers, isolating the victim, sexualizing the relationship, and maintaining control, often through the use of secrecy and shame."

*See generally*, ECF No. 28.

The Notice also states that another aspect of grooming is "gradually exposing the child to increasingly more violating and sexual contact, which is intended to increase the child's level of comfort with invasions in their privacy and shame from the act they have been a part of. *Id.*

The bases for Dr. Wolf's opinions are "her education, training, and experience," as outlined in a *curriculum vitae* attached to the expert notice. No other sources of information have been provided or disclosed.

### III. The Standard for Admissibility of Scientific Evidence

The admissibility of expert analysis and testimony is governed by the Federal Rules of Evidence as well as the Supreme Court's decision in *Daubert v. Merrell-Dow Pharms. Inc*., 509 U.S. 579 (1993), and its progeny.

Fed. R. Evid. 702 provides that: A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case. Fed.

R. Evid. 702.

In the case of a challenge, the district court should evaluate an expert's qualifications and proposed testimony in advance of trial. *Daubert*, 509 U.S. at 597. The proponent of the expert testimony bears the burden of proving that it is based on reliable principles and methods. *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1120 (10th Cir. 2006); *see also* Fed. R. Evid. 702 Advisory Committee's Notes, 2000 Amendments ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").

In *Daubert*, the Supreme Court affirmed that Rule 702 requires the trial judge to assume the role of "gatekeeper" with the task of ensuring "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert,* 509 U.S. at 597; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999) (extending *Daubert's* holding on scientific expert testimony to all expert testimony).

"The subject of an expert's testimony," the Court observed, "must be scientific knowledge," which "implies a grounding in the methods and procedures of science" and "more than subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 589-90. Evaluating the reliability of a prospective expert's scientific testimony requires a preliminary evaluation of "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592.

The *Daubert* Court sets forth a list of factors for courts to consider in assessing the reliability of scientific expert testimony:

> (a) whether the theory or technique underlying the testimony can be and has been

5

> tested;
>
> (b) whether the theory or technique has been subject to peer review and publication;
>
> (c) the technique's known or potential error rate;
>
> (d) the existence and maintenance of standards controlling the technique's operation; and
>
> (e) whether the technique has gained general acceptance within the relevant scientific community.

*Daubert*, 509 U.S. at 593-94.

The *Daubert* factors apply to both established and novel techniques. *Id.* at 592 n.11 ("Although the Frye decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 701 to apply specially or exclusively to unconventional evidence."); *see also United States. v. Williams*, 506 F.3d 151, 162 (2d Cir. 2007) ("[E]xpert testimony long assumed reliable before Rule 702 must nonetheless be subject to the careful examination that *Daubert* and *Kumho Tire require*.").

The *Daubert* factors are "meant to be helpful, not definitive," and the trial court retains the discretion to determine how to evaluate proffered scientific evidence on a case-by-case basis. *Kumho Tire*, 526 U.S. at 151-52. The principal consideration is whether the evidence is sufficiently reliable for presentation to the jury through expert testimony, and to assist the jury in its effort to determine facts. See Fed. R. Evid. 702 (a). Proper application of *Daubert* ensures that jurors, who are likely to give great weight to expert testimony, will not be "confounded by absurd and irrational pseudoscientific assertions." *Daubert,* 509 U.S. at 595.

The inquiry envisioned by Rule 702 is also a flexible one. *Id.* at 594. "[S]ubmission to the

scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected." *Id*. at 593.

Fed. R. Evid. 104(c) requires the court to conduct an evidentiary hearing on whether a witness is qualified or evidence is admissible when "justice so requires." Fed. R. Evid. 104(c). The Second Circuit has stated that *Daubert* hearings are "highly desirable to enable the parties to present expert evidence and to test credibility through cross-examination." *Borawick v. Shay*, 68 F.3d 597, 608 (2d Cir. 1995).

## ARGUMENT

### I. The Proposed Testimony Should Be Excluded Because There is No Scientific Validation to Ensure Reliability

The government seeks *inter alia*, to admit Dr. the testimony of Dr. Wolf related to grooming, the psychological reasons for children's responses to child abuse, and the specific symptoms exhibited by child victims of sexual abuse. The basis for Dr. Wolf's testimony is her education and experience as a treating psychologist. However, Dr. Wolf's experience is not a substitute for scientific methods and is not a reliable basis for the Court to allow her testimony as an 'expert' opinion.

There is no information related to the sexual abuse claims made by Dr. Wolf's patients[2] to assess whether their claims are accurate or verifiable, and thus whether the symptoms they exhibit are related to child sexual abuse. Furthermore, there is no information about how interviews were conducted, the circumstances of the interviews, or the motivation on the part of the interviewee. Based on the information provided by the government, there were no controls or protocols in place for gathering the data related to the interviews. It is possible that child sexual

---

[2] Counsel assumes that Dr. Wolf actually treats patients who claim to have been sexually abused.

abuse victims would not have presented for treatment if they were not experiencing any psychologically distressing symptoms. It is also possible that child abuse victims who did not present for treatment, experienced symptoms different from those observed by Dr. Wolf.

The government has not provided in its expert notice any scientific, observational, or research studies in this field utilizing controls, such as, allowing for the examination of child patients who were never sexually abused--but made false reports of sexual abuse. This type of scientific method might permit a valid and reliable opinion regarding which behaviors and symptoms-or lack thereof-appear more frequently in accurate reports of child sexual abuse than in children who have never been abused. Such a method might also illuminate which symptoms and behaviors are consistent with accurate, versus false or inaccurate reports of child sexual abuse.[3]

However, none of the factors identified in *Daubert* to assess the reliability of the methods utilized is present here. Dr. Wolf's theories have not been subject to peer review and have not and cannot be tested. There are no known or potential error rates, and there are no control standards to ensure standardization of results, reliability, or validity. "The subject of an expert's testimony must be scientific knowledge," which "implies a grounding in the methods and procedures of science" and "more than subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 589-90. Evaluating the reliability of a prospective expert's scientific testimony requires a preliminary evaluation of "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592.

Because Dr. Wolf's testimony is based on her experience in a treatment context, she has

---

[3] Self-reporting still presents a problem in this type of analysis, but the presence of a control group would provide a baseline comparison. Without such a control group, the bases of these opinions are based on an unreliable sample.

no basis to opine which symptoms she observes in her patients, happen in cases of actual sexual abuse and which do not. She further has no basis to testify to what symptoms actual victims of sexual abuse experience or how they react to such abuse, based on her experience *solely* with those people who sought treatment. Because there is no data related to the interviews conducted by Dr. Wolf, the Court cannot determine whether the reasoning or methodology underlying her testimony is scientifically valid. As such, any testimony by Dr. Wolf that A.S.'s specific symptoms are *consistent with* being sexually abused would be scientifically invalid, incorrect, and improper.

## II. The Proposed Testimony Should Be Excluded Because Dr. Wolf has Not Reliably Applied Principles and Methods to the Facts of This Case

Even if this witness's opinion is based on research using a scientifically reliable method in principle, the government would be unable to meet its burden under Rule 702(d) of demonstrating that proffered research can be reliably applied in this case.

Based on the government's notice, Dr. Wolf has never interviewed any of the witnesses, A.S., or any member of her family. She has not reviewed any medical, psychiatric, educational, psychological, or therapeutic records related to A.S., or any member of her family. Dr. Wolf has no direct information about the culture in which A.S. is being raised, the views imparted to her by her family members, her beliefs about sexuality and sex, or the dynamics between her and peers, witnesses, or adults. Dr. Wolf has no factual basis to testify about the complainant's internal feelings experiences, thoughts, fears, beliefs, reactions, relationships, behavior at home or at school, or about any of her psychological symptoms. Indeed, many of the symptoms Dr. Wolf's proposed testimony attributes to people who report child sexual abuse have never been reported by A.S.

Here, there are no facts known to Dr. Wolf to which she would be able to apply a

scientifically reliable method. Rather, based upon Dr. Wolf's experience treating her patients, she will testify about symptoms, behaviors, and reactions a person who reports sexual abuse (that may or may not have occurred), may (or may not) display as a result of the alleged abuse. However, Dr. Wolf has no scientific or reliable bases for these opinions. There is no way of knowing how many patients who presented with symptoms had falsely reported sexual abuse or had been influenced by others to report abuse that never actually occurred.[4] Similarly, there is no way of knowing how common these symptoms are in actual cases of sexual abuse, cases of false or coerced reporting, or in individuals who have never been sexually abused.

 Dr. Wolf cannot use her experience examining patients to render an opinion about the behavior of the complainant in this case. Without any information as to error rates and specific statistics as to how often these findings are present in this population, the defense is unable to effectively challenge the basis of Dr. Wolf's opinions. The opinions proffered by the government are based on speculation and conjecture and should not be admitted at trial. Not only does the lack of a scientific foundation render these opinions unreliable, it also affords them insulation from an effective cross-examination, in violation of Mr. Smith's Sixth Amendment rights.

 If the Court finds this witness may testify generally regarding her experience and observations, the Court should nevertheless preclude a specific opinion regarding A.S. There is no scientific basis for the witness to opine that certain psychological symptoms are present in A.S. or that any psychological symptoms present in A.S. are consistent with the sexual abuse alleged here. The government should not be allowed to improperly bolster their complainant and

---

[4] As noted previously, the government has not provided any information as to the breadth of the witness's experience examining patients who claim to be victims of sexual abuse. Moreover, the government has not provided any information as to how often these types of behaviors are observed in patients claiming sexual abuse. Specifically, the government has not established whether it is 100%, 51% or something less than a majority of patients examined. In excluding the witness's testimony the Court should consider the possibility that the witness is incapable of providing the occurrence rate and is instead giving an unreliable ballpark figure..

their theory with "expert testimony" that is misleading, potentially inaccurate, and has no basis in science--despite being presented as scientific testimony.

### III. The Proposed Testimony Should Be Excluded Because it is an Improper Expert Opinion

Even if the Court finds the methodology scientifically valid, reliable and admissible under *Daubert*, the proposed testimony regarding "**a parent who was a victim of child sexual abuse themselves, may display behavior or parenting practices that lead to greater risk of their own child being sexually abused**" is not the proper subject of expert testimony, nor does Dr. Wolf—as a treating psychologist have the proper education, training, or experience to discuss this subject matter.

The government has proposed introducing testimony through Dr. Wolf that victims of sexual abuse may engage in dozens of different behaviors, emotional responses, and symptoms. However, it is not beyond the ken of a layperson that based on personalities and life experiences individuals react differently in different situations. Expert testimony is unnecessary to explain to a jury that some people are calm and in stressful situations while others panic. Rather, it is for the jury to determine whether the complainant's reaction is consistent with her claims or not.

### IV. The Proposed Testimony Should Be Excluded Because it is an Improper Expert Opinion on the Ultimate Issue

Allowing an expert to testify that specific reactions are consistent with child sexual abuse improperly usurps the jury's role to assess the credibility of the complainant. Not only does it improperly bolster the complainant's testimony, but it also allows the government to elicit expert testimony on the ultimate issue—that is whether or not sexual abuse occurred.

Unlike in other cases involving children or complainants who have lost memory, A.S. can explain her statements, reactions, and behaviors.  A.S. has already testified in the grand jury and

provided the kind of information that Dr. Wolf will discuss.  Given that A.S. recalls the events in question and can provide explanations for her delay in reporting or inconsistent statements, Dr. Wolf's testimony would simply be improper expert bolstering of the central witness's credibility. Dr. Wolf would essentially be telling the trier of fact that A.S's explanations and behaviors are legitimate and therefore credible, which amounts to an endorsement of A.S.'s credibility. Such expert testimony is improper.  *See United States v. Aplesa*, 690 F. App'x 630, 636 (11th Cir. 2017) (citing *Snowden v. Singletary*, 135 F.3d 723 (11th Cir. 1998) (holding expert's testimony "that cooperating witnesses often initially lie to law enforcement for various reasons" was improper even without direct comment on witness's credibility because "the clear import of his testimony was that she was telling the truth at trial.")); *see generally United States v. Magnan¸* 756 F. App'x 807 (10th Cir. 2018) (finding impermissible credibility bolstering when an expert discussed studies that child victims lie between 2 to 5 percent).

## VI. The Minimal Probative Value of the Testimony is Substantially Outweighed by the Unfair Prejudice to Mr. Smith

The Government's proffered expert testimony should also be excluded because the marginal probative value of the evidence, if any at all, is substantially outweighed by the prejudicial effect.  The probative value of Dr. Wolf's testimony also must be weighed against "the danger of unfair prejudice, confusion of the issues, or misleading the jury" as well as "considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

Here, the government cannot demonstrate that the testimony would be relevant or helpful in this case.  *United States v. Delgado*, 677 F. App'x 84 (3d Cir. 2017).  In *Delgado,* the Third Circuit addressed an interlocutory appeal after the district court excluded an expert on the "culture of sex trafficking."  The Circuit upheld exclusion of the expert because the evidence did

not relate to an element of the charged offense, reasoning "the offered testimony would not help the trier of fact in determining the defendants' guilt as to the offenses charged." *Id.* at 86.

Similarly, here Dr. Wolf's testimony would not aid the trier of fact in determining Mr. Smith's guilt or innocence. Dr. Wolf's testimony will only serve to confuse the factfinder on its role with her accredited opinion that A.S. is telling the truth. Combined with its lack of any discernable probative value, the admission of Dr. Wolf's testimony would violate Rule 403.

WHEREFORE, for the reasons set forth above and for any other reason that may appear to the Court at an evidentiary hearing, Joseph Smith respectfully requests that this Motion be granted and that this Court preclude the testimony of the government's proposed witness.

Respectfully submitted,

_____/s/_____

Brandi Harden
Bar No. 470706
Counsel for Joseph Smith
Harden|Pinckney, PLLC
400 7th Street Suite 604
Washington, DC 20004
hardenpinckney@gmail.com
(202) 390-0374

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been served by via ECF to the Office of the United States Attorney, attn: AUSA Caroline Burrell, Esq. and AUSA Mona Sedky Esq., 555 Fourth Street, N.W., Washington, DC 20530 on this 19th day of June 2020.

*Brandi Harden*
_____
Brandi Harden