## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Action No. 19-324 (BAH) |
| JOSEPH SMITH, | Chief Judge Beryl A. Howell |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

The defendant, Joseph Smith, stands charged in a 19-count indictment with child sexual abuse, production and possession of child pornography, and enticing a minor, based on allegations that between May 2016 and April 2017 he sexually abused his stepdaughter, A.S. Indictment at 4, ECF No. 13.  Pending before the Court are three government motions and two defense motions.  The government seeks to admit A.S.'s prior statements, Gov't Mot. *In Limine* ("MIL") to Admit A.S.'s Prior Statements ("Gov't's Prior Statements Mot."), ECF No. 24, and evidence of defendant's other bad acts, under Federal Rule of Evidence ("FRE") 404(b), Gov't's MIL to Admit Evid. Pursuant to Fed. R. Evid. 404(b) ("Gov't's 404(b) Mot."), ECF No. 31, and to preclude introduction of evidence about A.S.'s sexual history under FRE 412, Gov't's MIL to Bar Evid. Regarding the Sexual History of Victim and to Exclude Evid. Offered to Prove the Victim's Sexual Predisposition ("Gov't's 412 Mot."), ECF No. 32.  For his part, defendant moves to exclude the government's proposed child sexual abuse expert, Def.'s Mot. to Exclude Testimony of Gov't's Proposed Expert ("Def.'s Mot. to Exclude"), ECF No. 36, and, relatedly, asks for a *Daubert* hearing, Def.'s Suppl. Mot. to Exclude Expert Testimony of Dr. Stephanie Wolf and Req. for *Daubert* Hearing ("Def.'s *Daubert* Mot."), ECF No. 63.  For the reasons

explained below, the government's motion to admit A.S.'s prior statements is granted in part and

reserved in part, its motion to admit evidence under Rule 404(b) is granted, its motion to bar

evidence regarding A.S.'s sexual history or predisposition is granted in part and denied in part,

and the defendant's motions to exclude the government's child sex abuse expert and for a

*Daubert* hearing are denied.

## I.   BACKGROUND

### A.   Government's Proffered Factual Background

In approximately August of 2015, A.S. and her younger sister moved with their mother to

live with defendant.  Gov't's 404(b) Mot. at 2.  At the time, A.S. was twelve years old.  *Id*.  In

June of 2016, just before A.S.'s thirteenth birthday, defendant allegedly began forcing A.S. to

perform oral sex on him, abuse that allegedly continued for almost a year.  *Id*.  All the while,

defendant allegedly sent A.S. sexually explicit text messages and announced his plan to

"vaginally and anally penetrate [her] on her 14th birthday."  *Id*.  Defendant also allegedly took

nude and semi-nude photographs of A.S. on his cell phone and demanded that she take similar

pictures on her own phone and send them to him.  *Id*.  If she did not comply, "defendant told

A.S. that he would hurt her sister or her mother" or throw them out of the house.  *Id*.  A.S.

witnessed defendant physically abusing her mother and, according to the government, was

frightened that if she reported the abuse, defendant would "assault her in return."  *Id*.

Following a domestic violence incident between A.S.'s mother and defendant on April

15, 2017, A.S.'s mother and her two daughters fled defendant's home to stay with a family friend

named Jennifer and her children.  *Id*.  Before they left, defendant took A.S.'s and her mother's

cell phones.  *Id*.  A few days later, on April 18, 2017, A.S.'s mother told her daughters that they

were going to return to defendant's home.  Gov't's Prior Statement Mot. at 3.  Upon hearing the

news, A.S. became extremely upset.  *Id*.  That day, speaking with Jennifer's 15-year-old

daughter, A.S. divulged that defendant had been sexually abusing her.  *Id*.  Soon thereafter, A.S. recounted the abuse to Jennifer, and finally, to her mother.  *Id*.  On April 19, 2017, A.S.'s mother took her to the police station to report the abuse.  *Id*.

That evening, A.S. and her younger sister were both interviewed at "Safe Shores, a Child Advocacy Center ['CAC'] by a child forensic examiner."  *Id*.  In her interview, A.S. described the abuse she said she had suffered.  Tr. of A.S.'s CAC Interview ("CAC Tr."), ECF No. 49.[1] She explained how, in May of 2016, her mother was hospitalized.  After putting her younger sister in the bath that day, defendant "came up to [A.S.] slowly" and "made [her] put [her] mouth to his penis."  *Id*. at 16:1–8.  She said that defendant would do this every time her mother was hospitalized.  *Id*. at 16:23–25.[2]  A.S. told the interviewer that defendant threatened that if she told her mother about his actions, her mother would "never . . . forgive [her]" and would put A.S. "in a foster home."  *Id*. at 17:2–8.  Eventually, A.S. explained, defendant's abuse began to include his "connecting his mouth to [her] vagina."  *Id*. at 17:9–12.  She told the interviewer that defendant would also ask her to send him pictures when she was taking a bath.  *Id*. at 40:1–10. Sometimes, she said, he would "crack the door open and take a picture of [her] while [she was] in the bathtub."  *Id*. at 40:13–16.  She explained that he would take pictures with his "iPhone 6s Plus."  *Id*. at 40:23.  On at least one occasion, defendant apparently used that phone to show A.S. a pornographic video.  *Id*. at 41:7–13.  She also described how defendant would "abuse [her] mother" and, as a result, she was "scared that if [she told] the police" that he would "come at [her]."  *Id*. at 42:20–25.

---

[1]     The transcript of A.S.'s CAC interview contains the minor victim's identifying information and therefore is filed under seal.  While A.S.'s identifying information remains sealed, other portions of the transcript relied on in this Memorandum Opinion are unsealed as necessary to explain the opinion's reasoning.  *See United States v. Reeves*, 586 F.3d 20, 22 n.1 (D.C. Cir. 2009).

[2]     The government explains that A.S.'s mother suffered with "complications from severe asthma" and was frequently hospitalized.  Gov't Mem. Supp. Pretrial Detention ("Gov't Det. Mem.") at 3, ECF No. 5.

Two days later, on April 21, 2017, law enforcement executed a search warrant at defendant's home and seized a Lenovo PC computer and a black Motorola cell phone the government asserts belonged to defendant.  Gov't's 404(b) Mot. at 3; Rough Transcript of Hearing (June 9, 2020) ("Hr'g Tr. (Rough)") at 12:12–16.[3]  Law enforcement was also able to recover A.S.'s phone.  Hr'g Tr. (Rough) at 4:25–5:3.[4]  They were unable to locate defendant's iPhone that A.S. had mentioned in her CAC interview.  *Id*. at 12:1.  The District of Columbia Department of Forensic Sciences ("DFS") conducted an initial forensic examination of the seized computer and found that it had been used to search for pornographic material.  Gov't's 404(b) Mot. at 3.  The search terms used included "free black anal sex step daddy n step daughter" and "free black teen anal sex."  *Id*.  Examination of the Motorola phone revealed that "similar search terms" had been used in web searches conducted on that device.  *Id*. at 4.

At the time, DFS was unable to access deleted files on the seized Motorola phone.  Gov't's Mem. Supp. Pretrial Detention ("Gov't's Det. Mem.") at 6, ECF No. 5.  Eventually, DFS obtained the software necessary to access deleted files and, after law enforcement secured "a second round of search warrants," conducted further forensic analysis of defendant's Motorola phone.  Hr'g Tr. (Rough) at 10:8–9.  Among the extracted deleted files, DFS located sexually explicit images believed to be A.S. along with text messages between A.S. and the defendant.  *Id*. at 10:24–11:3; Gov't's Det. Mem. at 7; Gov't's Expert Discovery Ltr. to Counsel 2 ("Gov't's Disc. Ltr.") at 2, ECF No. 30-1.  DFS was also able to perform a more thorough review of A.S.'s phone and located deleted text messages between A.S. and a phone number labeled as "Step

---

[3]      The transcript that appears on the docket, *see* Transcript of Hearing (June 9, 2020) ("Hr'g Tr."), ECF No. 62, contains, at the parties' request, only the testimony of the witness who appeared that day, *id*. at 1.  Unless the relevant portion of the hearing has been transcribed in that document, the Court will rely on the rough transcript of the entire day's proceedings prepared by the court reporter.
[4]      Although A.S. gave law enforcement the password to her phone, "for unknown reasons [they] did not use the passcode . . . and therefore" her phone "was not forensically analyzed" immediately following the April 21, 2017 search.  Gov't's Det. Mem. at 5 n.1.

Dad," and between A.S. and an unknown sender describing past and future intended sexual activity.  Gov't's Disc. Ltr. at 2.[5]

With this new evidence in hand, D.C. police arrested defendant on May 10, 2019, and he was charged in D.C. Superior Court with one count of First Degree Sexual Abuse and four counts of Misdemeanor Sexual Abuse.  Gov't's Det. Mem. at 6.  On June 11, 2019, A.S. testified before a grand jury and "adopt[ed] her CAC interview and provid[ed] additional details about [defendant's] sexual assaults, threats, and production and possession of sexually explicit images of her."  Gov't's Prior Statement Mot. at 3.  On June 17, 2019, defendant was charged in this Court by criminal complaint, Complaint, ECF No. 1, and on September 25, 2019, he was indicted in the pending 19-count indictment.[6]

### B.    Relevant Procedural History

This matter was initially set for trial on June 8, 2020, Min. Order (Nov. 19, 2019), but that schedule was disrupted by the global COVID-19 pandemic.  *See In re: Fourth Further Extension of Postponed Court Proceedings Due to Ongoing Exigent Circumstances Caused by COVID-19 Pandemic* ¶ 1, Standing Order No. 20-68 (BAH) (Aug. 10, 2020) (postponing "[a]ll civil and criminal . . . jury trials scheduled to commence before **November 9, 2020**" (emphasis

---

[5]    The government explained that, because the messages had been deleted, sender information for some of the text messages had been lost.  Hr'g Tr. (Rough) at 7:15–25.  The government intends to show through "context" and A.S.'s testimony, however, that the sexually explicit text messages uncovered on A.S.'s phone were sent by defendant.  *Id*. at 6:24–7:2.

[6]    Specifically, defendant is charged with one count of Production of Child Pornography, in violation of 18 U.S.C. § 2251(a), one count of Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(4)(B), one count of Enticing a Minor, in violation of 18 U.S.C. § 2422(b), seven counts of First Degree Child Sexual Abuse with Aggravating Circumstances, in violation of 22 D.C. Code §§ 3008, 3020(a)(2), six counts of First Degree Sexual Abuse with Aggravating Circumstances, in violation of 22 D.C. Code §§ 3002(a)(1), 3020(a)(2), two counts of Second Degree Child Sexual Abuse with Aggravating Circumstances, in violation of 22 D.C. Code §§ 3009, 3020(a)(2), and one count of Misdemeanor Sexual Abuse of a Child, in violation of 22 D.C. Code § 3010.01.  *See generally*, Indictment.

in original))[7]  As a result, at the parties' request, the trial in this matter is now scheduled for May

3, 2021.  Min. Order (Aug. 19, 2020); Joint Status Report re Proposed Trial Dates, ECF No. 83.

Litigation over pretrial matters, however, has been ongoing and extensive.  The parties

completed submitting their pretrial motions on April 7, 2020, Min. Order (Mar. 24, 2020), and

briefing on those motions was set to conclude on May 19, 2020, Min. Order (Apr. 22, 2020).  A

motions hearing was scheduled for June 9, 2020, but disputes arose concerning the scope of that

hearing and the necessity of witness testimony.  *See, e.g.*, Joint Pretrial Statement at 1–2, ECF

No. 50.  Specifically, defendant took the position that testimony from Kate Myers, the forensic

interviewer who conducted A.S.'s CAC interview, was required to determine the propriety of the

government's attempts to admit any statement A.S. made in that interview.  *Id*.  Defendant

formalized this request in his Motion to Conduct a Taint Hearing, in which he explained his

intent to probe whether A.S.'s statements in the CAC interview "were the product of suggestive

and coercive interview techniques."  Def.'s Motion to Conduct a Taint Hr'g ("Def.'s Taint Hr'g

Mot.") at 2, ECF No. 57 (internal quotation marks omitted) (quoting *State v. Michaels*, 642 A.2d

1372, 1375 (N.J. 1994)).  That motion was granted and Myers was made available for testimony

on the morning of June 9, 2020.  Hr'g Tr. at 2:21–24.  At that hearing, conducted via video

teleconference with defendant's consent, *id*. at 3:8–14, both parties were given an opportunity to

probe the techniques employed by Myers in conducting A.S.'s CAC interview, *see generally id.*

After Myers's testimony concluded, the parties addressed the other pending motions.

Hr'g Tr. (Rough) at 163–95.  Those discussions raised several new issues and the parties were

given the opportunity to supplement their briefing.  Hr'g Tr. (Rough) at 193:5–7; Min. Order

---

[7]        Available at https://www.dcd.uscourts.gov/sites/dcd/files/COVID%2019%20Standing%20Order%202020-68%20Fourth%20Further%20Extension%20of%20Postponed%20Court%20Proceedings.pdf.

(June 9, 2020).  That supplemental briefing having concluded, each of the pretrial motions is

now ripe for consideration.

## II.  LEGAL STANDARD

The Supreme Court has recognized that, "[a]lthough the Federal Rules of Evidence do

not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district

court's inherent authority to manage the course of trials."  *Luce v. United States*, 469 U.S. 38, 41

n.4 (1984).  Pretrial motions *in limine* help to ensure that, "[t]o the extent practicable," trials are

conducted in a manner such that "inadmissible evidence is not suggested to the jury by any

means."  FED. R. EVID. 103(d).  They also aid courts in administering proceedings "fairly . . . to

the end of ascertaining the truth and securing a just determination."  FED. R. EVID. 102.  Pretrial

rulings like this one thus "may generally be the better practice, for [they] permit[] counsel to

make . . . necessary strategic determinations" before the jurors are in their seats.  *United States v.*

*Jackson*, 627 F.2d 1198, 1209 (D.C. Cir. 1980).

## III.  DISCUSSION

Several of the government's pretrial motions have already been resolved.[8]  This leaves

the following motions: the government's three motions *in limine* to admit prior statements made

by A.S. in a number of circumstances as well as evidence of defendant's other bad acts involving

his alleged domestic violence against A.S.'s mother and his Internet search history, under FRE

---

[8]      The government's MIL to Preclude Defense from Referencing Potential Punishment or Other Adverse
Consequences of Conviction, ECF No. 25, and its Request for Child Victim Witness Accommodations, ECF No. 24,
were granted as conceded.  Min. Order (May 27, 2020).  The government initially also moved to admit evidence of
what it believed were defendant's two prior misdemeanor convictions, under FRE 609.  Gov't's Fed. R. Evid. 609
Notice of Intent to Introduce Impeachment Evid. of Prior Convictions, ECF No. 26.  In response to the Court's
query at the June 9, 2020 motions hearing, however, the government indicated that it had been unable to obtain any
detail regarding those convictions beyond certified copies of the judgments.  Hr'g Tr. (Rough) at 164:5–9.
Subsequently, on June 10, 2020, the government withdrew its Rule 609 motion.  Gov't Withdrawal of Its MIL
Regarding Rule 609 Admissibility of Two Fraud Convictions at 1, ECF No. 59 ("[G]iven that the government will
not likely be able to gather sufficient additional details about the defendant's two misdemeanor fraud convictions,
the government withdraws its motion . . . .").

404(b), and to bar evidence regarding A.S.'s sexual history and sexual predisposition, under FRE 412; and defendant's motions to exclude the government's proposed child sexual abuse expert, and for a *Daubert* hearing. Each motion is addressed in turn.

### A. The Government's Motion to Admit A.S.'s Prior Statements Is Granted in Part and Reserved in Part

The government moves to admit statements made by A.S. on five separate occasions: 1) in her April 19, 2017 CAC interview; 2) during an April 18, 2017 conversation with "Jennifer," the friend of A.S.'s mother with whom they were staying after they fled defendant's home; 3) during an April 18, 2017 conversation with Jennifer's then-15-year-old daughter; 4) during one or more conversations with her younger sister between 2016 and 2017; and 5) during her June 11, 2019 testimony before the grand jury in D.C. Superior Court. Gov't's Prior Statement Mot. at 1. The government also indicates it may seek to admit statements A.S. made to two other so-called "outcry" witnesses. Gov't's Reply Supp. Prior Statement Mot. ("Gov't's Prior Statement Reply") at 1 n.1, ECF No. 43 (explaining that "[i]n the course of trial preparation, the government identified" both Jennifer's "then 13-year-old son" and A.S.'s mother as "additional witnesses to whom A.S. made prior statements about the defendant's sexual abuse"); Hr'g Tr. (Rough) at 13:20–14:7 (government counsel mentioning only A.S.'s conversation with Jennifer's son as an additional possible prior statement for which the government seeks admission). The government's motion attempts to fend off a potential objection that any of these statements are inadmissible hearsay, arguing that all of A.S.'s prior statements are admissible under FRE 801(d)(1)(B) and, alternatively, that A.S.'s CAC interview is admissible under FRE 807.

1.    *Applicable Legal Principles*

The Federal Rules of Evidence broadly prohibit the admission of hearsay, *see* FED. R. EVID. 802, which is defined as an out-of-court statement that "a party offers in evidence to prove the truth of the matter asserted in the statement," FED. R. EVID. 801(c).  FRE 801(d), however, declares that several categories of out-of-court statements are, by fiat, "not hearsay."  FED. R. EVID. 801(d).  Among these non-hearsay statements are those made by a "declarant [who] testifies and is subject to cross-examination about [the] prior statement[s]" so long as the statement in question "is consistent with the declarant's testimony [at trial] and is offered" either "(i) to rebut an express or implied charge that the declarant recently fabricated" her in-court statement, or "(ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground."  FED. R. EVID. 801(d)(1)(B).  Once a statement meets those conditions, its use is not limited to rehabilitating the witness-declarant's credibility, but may be used as "substantive evidence."  FED. R. EVID. 801, Advisory Comm. Notes on 1972 Proposed Rules, Note to Subdivision (d)(1)(B).

Aside from labeling certain statements "not hearsay," the rules of evidence also create a slew of exceptions to the general hearsay ban.  *See* FED. R. EVID. 803–04, 807.  Although Rules 803 and 804 create numerous specific hearsay exceptions, Rule 807, the so-called "residual exception," contains a catch-all exception that "hearsay statement[s] [are] not excluded by the rule against hearsay" if 1) "the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement" and 2) "it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts."  FED. R. EVID. 807.

In 2019, Rule 807 was significantly streamlined. FED. R. EVID. 807, Advisory Comm. Note on 2019 Amendments. In the past, the rule required that the proffered hearsay statement "have 'equivalent circumstantial guarantees of trustworthiness' comparable to those found in Rule 803's and Rule 804's enumerated hearsay exceptions." *United States v. Slatten*, 865 F.3d 767, 806 (D.C. Cir. 2017). Courts, however, had "difficulty" applying the rule's command to locate "equivalent" circumstantial guarantees of trustworthiness. FED. R. EVID. 807, Advisory Comm. Note on 2019 Amendments. Rather than compare the proffered statement to those excepted from the hearsay prohibition by the multiple varied hearsay exceptions in Rules 803 and 804, the amended Rule 807 requires courts to "proceed directly to a determination of whether the hearsay is supported by guarantees of trustworthiness." *Id*.[9]

The rule is intended to be a last resort. Indeed "[t]he amendment does not alter the case law prohibiting parties from proceeding directly to the residual exception, without considering the admissibility of the hearsay under Rules 803 and 804." *Id*. The 2019 changes to Rule 807 leave some doubt, however, as to whether the residual hearsay exception remains "extremely narrow." *Slatten*, 865 F.3d at 807 (quoting *United States v. Washington*, 106 F.3d 983, 1001 (D.C. Cir. 1997) (per curiam)); *see, e.g.*, Daniel J. Capra, *Expanding (or Just Fixing) the Residual Exception to the Hearsay Rule*, 85 Fordham L. Rev. 1577 (2017) (discussing the effort to amend Rule 807 which culminated in the 2019 amendments and stating that one of the aims was "to allow the admission of *more* hearsay if it is reliable" (emphasis added)). Nevertheless, the Rule's continued and express insistence that the proffered hearsay be more probative on the point for which it is offered than any other reasonably attainable evidence means the out-of-

---

[9]       The advisory committee also eliminated the rule's previous requirements that the proffered "hearsay must be evidence of a material fact and that its admission [would] best serve the purposes of" the Federal Rules of Evidence, as it found those requirements "superfluous." FED. R. EVID. 807, Advisory Comm. Note on 2019 Amendments.

court-statement must still "be very important and very reliable" to be admitted under the rule. *Slatten*, 865 F.3d at 807 (internal quotation marks omitted) (quoting *Washington*, 106 F.3d at 1001, itself quoting *United States v. Kim*, 595 F.2d 755, 766 (D.C. Cir. 1979)).

### 2.  *Discussion*

The government's motion to admit all of A.S.'s prior statements under FRE 801(d)(1)(B) is addressed first, followed by discussion of the admissibility of A.S.'s CAC interview under FRE 807.

### *(a) FRE 801(d)(1)(B)*

Defendant argues that any ruling as to the admissibility of A.S.'s prior statement under Rule 801(d)(1)(B) is at least premature.  He points out that, under Rule 801(d)(1)(B)(i), in order to admit a declarant-witness's prior consistent statement "to rebut an express or implied charge that the declarant recently fabricated" her in-court statement, it must first be shown that the prior consistent statement was made *before* any alleged motive to fabricate that statement arose. Def.'s Opp'n to Gov't's Prior Statements Mot. ("Def.'s Prior Statement Opp'n") at 3, ECF No. 37 (citing *Tome v. United States*, 513 U.S. 150 (1995)).  The government responds that this argument "ignores" Rule 801(d)(1)(B)(ii), Gov't's Reply Supp. Gov't's Prior Statement Mot. ("Gov't's Prior Statement Reply") at 2, ECF No. 43, which declares prior consistent statements "not hearsay" so long as they are introduced "to rehabilitate the declarant's credibility as a witness when attacked on another ground," FED. R. EVID. 801(d)(1)(B)(ii).

Defendant's focus on Rule 801(d)(1)(B)(i) makes his point by highlighting the central flaw in the government's bid to admit A.S.'s prior statements under Rule 801(d)(1)(B) at this stage.  The rule has three requirements: (1) the declarant must testify and be subject to cross-examination; (2) the out-of-court statement must be consistent with the declarant's in-court testimony; and (3) the statement must be offered to rebut a charge that her in-court testimony has

been fabricated or her credibility has otherwise been called into question.  At this procedural juncture, whether *any* of those conditions will be met is merely anticipated.  Although the government asserts that "A.S. will testify and be available for cross-examination," her appearance is not certain until it occurs.  Gov't's Prior Statement Mot. at 6.  More importantly, until she does testify, whether the prior statements at issue are in fact consistent with her testimony cannot be determined.  Finally, until defendant cross-examines A.S., whether he will attack her credibility is unknown.  The government explains that only "a *conditional* ruling" is requested now "that if, at trial, the victim testifies in a certain manner and if the defense cross-examines her in a certain manner, A.S.'s prior consistent statements will be admissible pursuant to . . . [Rule] 801(d)(1)(B)."  Gov't's Prior Statement Reply at 3.  In other words, the government seeks a ruling that A.S.'s prior statements will be admissible if they meet Rule 801(d)(1)(B)'s conditions.  A ruling that evidence will be admissible if and when it meets the requirements for admissibility is no ruling at all.  The Court thus reserves ruling on the propriety of admitting A.S.'s statements under Rule 801(d)(1)(B) until after she testifies and is cross-examined when it will be in a better position to determine whether the rule's conditions have been met.[10]

---

[10]     The government points to state and federal cases in which "[c]ourts have admitted forensic interviews of victims as well as statements previously made by victims to rehabilitate those witnesses after cross-examination."  Gov't's Prior Statement Reply at 2.  Many of those decisions expound on the propriety of admitting prior consistent statements only after the declarant has testified.  *Id.* (citing, *e.g.*, *United States v. J.A.S., Jr.*, 862 F.3d 543, 545 (6th Cir. 2017) ("KV's description of the rape" in her out-of-court statement "was largely consistent with her description of it during her testimony at trial."); *United States v. Finch*, 78 M.J. 781, 790 (A. Ct. Crim. App. 2019) ("[W]e conclude that the defense cross-examination of AH opened the door for the government to introduce prior consistent statements.")).  In one case the government cites, the court elected to "defer[] ruling unless and until such time as the defendant attack[ed] the testimony of the child witnesses."  *United States v. Counts*, Case No. 3:18-cr-00141, 2020 WL 598526, *3 (D.N.D. Feb. 7, 2020); *but see Berry v. Beauvais*, Civ. Action No. 13-cv-2647-WJM-CBS, 2015 WL 5244892, *3 (D. Colo. Sept. 9, 2015) (granting a motion *in limine* under Rule 801(d)(1)(B) only "assuming . . . an attack" on the declarant's credibility "takes place"); *United States v. Drift*, No. 14-cr-208 (PAM/LIB), 2014 WL 4662505, *1 (D. Minn. Sept. 19, 2014) (similar).  This Court also chooses to defer ruling.

### (b) FRE 807

Having set aside the government's motion for admission of all A.S.'s statements for now, the government's alternative basis for admitting A.S.'s CAC interview must be addressed. Specifically, the government contends that the interview is "admissible under [Rule] 807." Gov't's Prior Statement Mot. at 8.  This argument succeeds only if the statements made in the interview are "supported by sufficient guarantees of trustworthiness" and are "more probative on the point for which [they are] offered than any other evidence that the" government can reasonably obtain.  FED. R. EVID. 807.  In determining whether a particular statement has "sufficient guarantees of trustworthiness" as required for admission under Rule 807, "the focus . . . is on circumstantial guarantees surrounding the making of the statement itself, as well as any independent evidence corroborating the statement." FED. R. EVID. 807, Advisory Comm. Note on 2019 Amendments; *see also Slatten*, 865 F.3d at 807 (directing courts to "look to the 'totality of circumstances . . . that surround the making of the statement and that render the declarant particularly worthy of belief'" (quoting *Idaho v. Wright*, 497 U.S. 805, 819 (1990)).  A central task for a court evaluating a Rule 807 motion is thus to "gauge whether the declarant was 'highly unlikely to lie'" in making their out-of-court statement.  *Slatten*, 865 F.3d at 807 (quoting *Wright*, 497 U.S. at 820).  To make that determination, the rule requires consideration of whether there is "evidence . . . corroborating the statement," FED. R. EVID. 807(a)(1), but courts have also considered other factors including whether the declarant had the incentive to speak truthfully and whether the declarant has been consistent in her story.  *Slatten*, 865 F.3d at 808; *see also* 30B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 7063 (2020 ed.) (cataloging the "laundry list of factors" other circuits have employed).

Here, both parties point to caselaw from the Eighth Circuit applying the residual exception to the specific context of child victims of sexual abuse. Gov't's Prior Statement Mot. at 9 (citing *United States v. Thunder Horse*, 370 F.3d 745, 748 (8th Cir. 2004)); Def.'s Prior Statement Opp'n at 4 (citing *United States v. N.B.*, 59 F.3d 771, 776 (8th Cir. 1995)). In that context, the Eighth Circuit encourages courts to consider "the training and experience of the interviewer; whether the child was interviewed using open-ended questions; the age of the child and whether the child used age-appropriate language in discussing the abuse; the length of time between the incident of abuse and the making of the hearsay statement; and whether the child repeated the same facts consistently to adults." *Thunder Horse*, 370 F.3d 745. Although the "training and experience" of the person to whom the declarant made the statement typically has "little bearing on the trustworthiness of" an adult's out-of-court statements, because children may be particularly susceptible to "suggestiveness and pressure exerted by [an] interviewer," a forensic interviewer's sensitivity to such concerns may affect the trustworthiness of the child's statements. *United States v. Halk*, 634 F.3d 482, 489 (8th Cir. 2011).[11]

For that reason, defendant has trained his sights on whether the "techniques employed by the CAC interviewer were leading and suggestive rendering [A.S.'s] CAC statement untrustworthy." Def.'s Prior Statement Opp'n at 4. He thus argued that a hearing was necessary to question the CAC interviewer, Kate Myers. *Id*.; *see also generally* Def.'s Taint Hr'g Mot. Over the government's objection that Myers's testimony was not required, Gov't's Opp'n to

---

[11]     The Supreme Court has identified several factors relevant to whether "hearsay statements made by a child witness in child sexual abuse cases are reliable" in the related inquiry into whether such statements carry "particularized guarantees of trustworthiness" such that their admission does not run afoul the Confrontation Clause. *Wright*, 497 U.S. at 821–22 (1990). Those factors include "spontaneity and consistent repetition," the "mental state of the declarant," the "use of terminology unexpected of a child of similar age," and the "lack of motive to fabricate." *Id*. (citations omitted). The Court also noted that, in determining whether a child sex abuse victim's statement had guarantees of trustworthiness required to withstand a Confrontation Clause challenge, consideration of whether the interview of the child was conducted in a "suggestive manner" was appropriate. *Id*. at 826.

Def.'s Request to Conduct a "Taint Hearing" at the June 9, 2020, Pretrial Mots. Hr'g at 2, ECF No. 56, she was made available for the hearing.  Hr'g Tr. at 2:24.  Over the course of several hours, both the government and defense counsel inquired into, among other things, Myers's qualifications and training, the techniques she did or did not employ during A.S.'s CAC interview, the questions she did or did not ask, and even her word choices.  *See generally* Hr'g Tr.

Following the hearing, defendant was given the opportunity to point to specific aspects of the interview he believed rendered it untrustworthy.  *See* Supp. Opp'n to Gov't's Prior Statement Mot. ("Def.'s Supp. Prior Statement Opp'n"), ECF No. 70.  His filing attacks Myers's credibility and asserts that she used "improper questioning and interrogation tactics," failed to adequately follow up on answers A.S. gave, and failed to "explore[] alternate theories" for A.S.'s story.  *Id*. at 1–4.  Taken together, he contends, these defects render the CAC interview "unreliable and therefore inadmissible."  *Id*. at 4.  Close examination of defendant's various critiques of the CAC interview show that he makes a mountain range out of a few anthills.

### (i) Defendant's Criticism of Interviewer's C.V.

To begin, defendant attempts to call Myers's credibility into question by pointing to an admitted mistake in the C.V. she provided to the government and that was made available to both the Court and defendant.  Myers C.V., ECF No. 53-1.  In the section describing her employment at Safe Shores, where she interviewed A.S., she wrote that she had "[t]estifed in civil and criminal court proceedings as appropriate or required."  *Id*. at 1.  At the hearing, Myers clarified that she had indeed "testified in civil court," but she had only "prepared to testify in criminal court."  Hr'g Tr. at 15:1–2.  On cross-examination, she stated that, although testifying in criminal proceedings "as appropriate or required" was part of her job description at Safe Shores, she

"didn't actually end up having to testify in criminal court." *Id*. at 49:19–20.  When she was

creating the C.V. in question, she had simply copied a "list of [her] duties" and neglected to

make this small change to clarify which duties she actually was called on to perform.  *Id*. at 50:9.

Despite defendant's protestations that "[t]here is no reasonable explanation for why 'testified in

criminal trials' appeared on Ms. Meyers [sic] resume," Def.'s Supp. Prior Statement Opp'n at 2,

Myers's explanation and forthright correction in open court present no reason to believe that she

made "intentional misrepresentations," *id*., or that her testimony is unworthy of credence.  Her

candor, after all, prompted her to bring the mistake to the government's attention and

subsequently alerted both the defendant and the Court.  Gov't's Response to Def.'s Supp. Prior

Statement Opp'n at 10 ("Gov't's Supp. Prior Statement Reply"), ECF No. 71.

### (ii) Defendant's Criticism of Interviewer's Techniques

Next, defendant takes aim at Myers's interview techniques, asserting that they were

"suggestive and coercive."  Def.'s Supp. Prior Statement Opp'n at 2 (quoting *Michaels*, 642

A.2d at 1375).  Defendant points to several alleged defects in how Myers conducted the

interview: 1) Myers used "leading questions"; 2) Myers had a "flawed understanding of [A.S.'s]

initial disclosure"; and 3) Myers "improperly introduced the subject of Mr. Smith's use of drugs"

during the interview.  *Id*. at 2–3.  Defendant's filing, submitted after a transcript of the hearing

had been available for nearly a month and after the transcript of A.S.'s CAC interview had been

on the docket for almost two, cites to neither.  The Court is thus left to surmise from defendant's

prior filings and his questions at the hearing which questions employed by Myers he believes

were "leading."  In both an earlier filing and over several pages of the hearing transcript,

defendant homed in on two exchanges that occurred early in the CAC interview when Myers

gives A.S. some instructions.  She explained to A.S. "if I ask you a question when we talk today

and you don't know the answer, you don't have to guess.  You can just say I don't know."  CAC

Tr. at 3:11–13.  She then asked A.S. to "practice that" with her:

> [Myers]: So if I asked you . . . what's my dog's name, what would you say?
>
> [A.S.]: I don't know.
>
> [Myers]: Yeah, because you don't even know if I have a dog.  But if I ask you, do you
>
> have a dog, what would you say?
>
> [A.S.]: No.
>
> [Myers]: Okay, because that's something you do know.

*Id*. at 3:11–23.  Myers next explained to A.S. that "if I use a word that you don't know or if you

just don't know what I'm trying to say because I'm being confusing . . . [j]ust tell me and I'll try

to say it in a better way."  *Id*. at 3:24–4:2.  The pair then practiced that, too:

> [Myers]: So if I said something like what is your ocular hue, what would you say?
>
> [A.S.]: What that mean?
>
> [Myers]: Yeah, because those are really hard words.  So instead I'll ask you what color
>
> are your eyes.
>
> [A.S.]: Brown.
>
> [Myers]:  Okay, so your eyes are brown.

*Id*. at 4:2–8.

These two instructional exercises, according to defendant, "set the tone for the remainder

of the interview."  Def.'s Taint Hr'g Mot. at 4.  He asserts that, instead of saying "yeah, because

you don't even know if I have a dog," Myers should have asked "why would you say, I don't

know" and instead of saying "those are really hard words," she should have asked "why did you

ask what that meant."  *Id*. at 4–5.  Defendant rightly notes that the literature concerning forensic

interviews of children places an emphasis on guarding against "unduly leading or suggestive" interview techniques.  Chris Newlin *et al.*, *Child Forensic Interviewing: Best Practices* ("OJJDP White Paper") at 6, OFFICE OF JUVENILE JUSTICE AND DELINQUENCY PREVENTION JUVENILE JUSTICE BULLETIN (Sept. 2015), ECF No. 57-2.  Being "as open ended and nonsuggestive as possible," however, is most essential "when introducing the topic of suspected abuse."  *Id.* at 9.  As Myers explained at the hearing, the "practice examples" about which defendant complains "are a part of establishing the interview instructions."  Hr'g Tr. at 77:3–4.  The exercises are designed to ensure the child understands she can say "I don't know" and ask for clarification when she does not understand.  A.S. successfully did just that.  Myers was simply reinforcing the purpose of the exercises and did not ask leading questions after A.S. successfully demonstrated that she was capable of admitting she did not know an answer or did not understand a question.

Turning to the so-called "substantive phase" of the interview—when A.S. described the alleged abuse—defendant identifies two moments he contends "rendered [A.S.'s] statements unreliable."  Def.'s Supp. Prior Statement Opp'n at 3.  First, he notes that Myers at one point asks A.S. "How do you feel about everything that happened since you told your oldest niece?"  CAC Tr. at 15:13–14.  As Myers admitted at the hearing, however, A.S. had not indicated that she had at any point disclosed the alleged abuse to her oldest niece.  Hr'g Tr. at 87:3–4.  Myers explained that she had "made a mistake" when she "erroneously said that she disclosed to her oldest niece instead of the other family or the other person that she had disclosed to."  *Id.* at 87:13–17.  A bit of context helps explain how this mistake likely occurred.  During the initial phase of the interview, Myers engaged A.S. in an exercise designed both to get an idea of A.S.'s ability to provide a detailed narrative and to allow A.S. to practice giving detailed narrative descriptions.  *Id.* at 32:18–33:10.  Specifically, Myers asked A.S. to tell her about the last time

18

she "had a really good time."  CAC Tr. at 8:20.  A.S. responded by describing a trip to Orlando

with her "sisters and [her] nieces."  *Id*. at 8:22.  She talked about how she and her "oldest niece"

always "stuck around each other" on that trip.  *Id*. at 11:3–4.  Immediately after completing this

narrative practice, Myers transitioned to asking A.S. about the reason she had come to Safe

Shores.  *Id*. at 13:21–23.  A.S. explained that, while she, her mother, and her younger sister were

staying with a family friend Jennifer, she disclosed defendant's alleged abuse to Jennifer's "older

daughter."  *Id*. at 14:12–15:9.  After A.S. had finished explaining how the story had come out,

Myers asked the question about which defendant complains.  That Myers mistakenly referred to

an "oldest niece," when she likely intended to refer to the "older daughter" A.S. had referenced,

is thus entirely plausible.

Defendant attempts to transform this likely slip of the tongue into the "linchpin" of his

argument.  Def.'s Supp. Prior Statements Opp'n at 3.  He says that "from that point on, [A.S.]

knew that she could give Ms. Meyers [sic] untrue information that would remain unchallenged."

*Id*.  Her failure to correct Myers, defendant says was "a direct result of Ms. Meyer's [sic] use of

improper interviewing techniques."  *Id*.  How *Myers's* mistaken reference to A.S.'s oldest niece

indicates that *A.S.* was likely to provide untrue information in the interview is unclear.

Moreover, as the government points out, the thrust of Myers's question was simply to ascertain

how A.S. was feeling after disclosing that she had been abused.  The transcript indicates that

A.S. grasped this meaning, as she promptly explained how "the first time I told it . . . I was like

crying . . . but then after that, I was . . . calm."  CAC Tr. 15:15–17.  Myers's mistake about a

matter ancillary to A.S.'s statements thus in no way tainted the interview.

### *(iii) Defendant's Criticism of Questions About Defendant's Drug Use*

Defendant next argues that Myers "improperly introduced the subject of Mr. Smith's use of drugs" during the interview despite the fact that A.S. had not previously mentioned defendant's drug use.  Def.'s Supp. Prior Statements Opp'n at 3.  During the hearing, Myers explained that common practice is to ask so-called "polyvictimization" questions, which are questions that "screen for other types of abuse" than what the child has reported.  Hr'g Tr. at 26:20–24.  Earlier in the interview, A.S. had volunteered, in response to the question "Is there anything else that happened with him that you think I should know about?" CAC Tr. at 42:18–19, that defendant would sometimes abuse and yell at her mother and "say[] that she do drugs and stuff."  *Id*. at 43:9–10.  Near the end of the interview, Myers circled back to this claim and asked whether defendant "do[es] drugs" or "drink[s] alcohol."  *Id*. at 50:11–14.  When A.S. answered in the affirmative, Myers said "[t]ell me about that" and, later, "[t]ell me about the worst time that he was drinking."  *Id*. at 50:11–23.  A.S. responded that defendant "actually don't drink that much, but when he gets high . . . we all know to stay away from him."  *Id*. at 50:24–51:1.  She explained that sometimes defendant would get "really, really high on the weekends" and "mess with" her.  *Id*. at 51:4–5.  Given that A.S. had already brought up potential drug use in the home, and given Myers testimony that screening questions "for polyvictimization are considered good practice" among forensic interviewers, Hr'g Tr. at 26:13–14, more directly probing whether A.S. had been exposed to other potentially abusive or dangerous behavior by defendant appears perfectly appropriate and consistent with best practices.  *Cf.* OJJDP White Paper at 10 ("Once the child's narrative account of an alleged incident(s) has been fully explored, the interviewer can then follow with focused questions, asking for sensory details, clarification, and other missing elements.")

### (iv) Defendant's Criticism of Questions Not Asked

Contrary to defendant's strenuous argument, nothing in the CAC interview transcript suggests that Myers conducted the interview in a leading or suggestive manner.  Indeed, perusal of the transcript reveals that during the substantive portion of the interview Myers used open-ended questions and prompts, simply asking the victim to tell her story.  For instance, when Myers transitioned to the substantive phase of the interview, she prompted A.S. "tell me why you came here to talk with me today."  CAC Tr. at 13:23; *cf.* OJJDP White Paper at 9 (explaining that the interview should introduce the topic of suspected abuse by "using a prompt such as 'What are you here to talk to me about today?'").  A.S. then starts in on a mostly uninterrupted narrative of the abuse, with Myers only occasionally asking for more detail with prompts like "So tell me everything that happened with you and him.  Start at the beginning to the middle to the end," CAC Tr. at 15:20–23, or "And so the place where the first time that it happened, tell me about that house," *id*. 23:24–25.  Nothing in the transcript suggests that Myers was attempting to or in fact did influence A.S.'s recounting of her alleged abuse.

For this reason, perhaps, the remainder of defendant's arguments focus on what is *not* in the transcript.  Namely, defendant takes issue with Myers's failure "to administer an oath or require the complainant to promise to tell the truth" and to follow up on particular aspects of A.S.'s story.  Def.'s Supp. Prior Statement Opp'n at 3–4.  Both the literature on child forensic interviews to which defendant points and Myers in her hearing testimony recognize that some "research indicates that children may be less likely to make false statements if they have promised to tell the truth before the substantive phase of the interview."  OJJDP White Paper at 8; Hr'g Tr. at 41:14–21 (Myers stating "[t]here is some research, and this research is predominantly with younger children, . . . that suggests eliciting a soft promise to tell the truth

might increase the likelihood of true statements").  Myers testified, however that in her training

and experience the administration of an "oath" was unnecessary and not considered a best

practice in the field.  Hr'g Tr. at 66:3–7; *see also* OJJDP White Paper at 8 (noting only that

"[s]ome states . . . mandate that children take a developmentally appropriate oath before the

substantive phase of the interview").  When a state or municipality does not mandate such an

oath, as in Washington, D.C., the literature recognizes that interviewers should have "autonomy

regarding the techniques they use to encourage truth telling."  OJJDP White Paper at 8.  In any

event, Myers did ask A.S. for something like a promise to tell the truth.  Early in the interview,

Myers stated "I'll be honest with you if you have questions for me about the things we talk

about, and so I just ask that you're honest with me too.  Okay?"  CAC Tr. at 4:20–22.  A.S.

responded affirmatively.  *Id.* at 4:23.  Myers exercised discretion in determining how best to

encourage A.S.'s truthful responses and elicited from her a commitment to be "honest."  The

lack of an oath does not undermine the reliability of the interview.

　　　Defendant next takes issue with Myers failure to "explore[] alternate theories" that might

explain A.S.'s allegations.  Def.'s Supp. Prior Statement Opp'n at 4.  He contends that Myers

asked only "one question" in an attempt to "determine whether the child ha[d] been coached."

*Id*.  The literature certainly suggests that interviewers "test[] alternative hypotheses, when

appropriate."  OJJDP White Paper at 7.  Such questions are employed to "[a]llow the child to

explain apparently contradictory information," to address "concerns about possible coaching,"

or, "particularly with a young child or one with limited abilities," to "explore the circumstances

surrounding the targeted event to distinguish abuse from caregiving activities."  OJJDP White

Paper at 10.  Again, however, the literature to which defendant points recognizes that the

propriety, number, and type of questions will always depend on "child characteristics, contextual

settings, allegations, and case specifics." *Id*.  Myers explained that she "inquired about possible

coaching," Hr'g Tr. at 99:3–4, by asking "[i]s there anything that you are not supposed to talk

about today, or [i]s there anything you are supposed to talk about today," *id*. at 132:11–13

(internal quotation marks omitted); *see also* CAC Tr. at 48:15–20.  She "explored [A.S.'s]

thoughts and cues about the disclosure" of her abuse in part to suss out any potential "motivation

to make an outcry or seek out an adult to talk about the allegation."  Hr'g Tr. at 99:4–7; CAC Tr.

15:13–14 (asking how A.S. felt "about everything that happened since" she disclosed the abuse).

She also inquired into whether A.S. had witnessed the sexual abuse of anyone else, CAC Tr. at

46:8–10, which, as Myers explained, might help explore the alternative hypothesis that the abuse

the child is reporting did not actually happen to her, but happened to someone else, Hr'g Tr. at

99:18–22.  Although Myers may not have explored every potential alternative theory, she

exercised her professional judgment and chose how best to elicit information that might bring to

light alternative explanations for her allegations.

### (v) Trustworthiness of CAC Interview

Against defendant's many attempts to cast small potential defects in the CAC interview

as fatal flaws, the evidence in both the transcript of the interview itself and elicited from Myers's

testimony shows that the interview bears "sufficient guarantees of trustworthiness."  FED. R.

EVID. 807.  Prior to A.S.'s interview, Myers had conducted approximately 700 to 800 forensic

interviews over three years.  Hr'g Tr. at 12:5–9.  She estimated that 95 to 98 percent of those

were of children.  *Id*. at 12:12.  She had, by that time, undergone significant training both on-the-

job and off.  *Id*. at 9–11.  She displayed an understanding of industry best practices.  *Id*. at 17:8–

18:19.  Myers instructed A.S. that it was okay to say she did not know the answer to a question

and could ask for clarification if she did not understand.  CAC Tr. at 3:9–4:8.  She also asked

A.S. to commit to being "honest" during the interview.  *Id.* at 4:21–22.  Myers used open-ended

questions to elicit the details of A.S.'s allegations.  In describing the alleged abuse A.S. used, in

Myers's experience, age-appropriate language.  Hr'g Tr. at 103:21–107:17.  In short, Myers

hewed closely to national best practices, and defendant has done little to undermine the

reliability of the interview.

The above discussion of the circumstances surrounding the CAC interview is only one

part of the Rule 807 analysis.  As noted, the rule also requires courts to consider "evidence, if

any, corroborating the" out-of-court statement in determining whether it is "supported by

sufficient guarantees of trustworthiness."  FED. R. EVID. 807(a)(1).  Here the government has

proffered corroborating evidence.  For instance, in the interview A.S. says that defendant took

nude pictures of her and made her send him nude pictures.  CAC Tr. at 40.  According to the

government, forensic analysis of defendant's phone has uncovered at least five sexually explicit

photos of A.S.  Hr'g Tr. (Rough) at 10:2–4.  Moreover, A.S. stated that defendant sent her

sexually explicit text messages, CAC Tr. at 37:15–19, and the government proffers that those too

have been located, Gov't's Det. Mem. at 8–9.  This corroborative evidence further supports

admission of the CAC interview under the residual hearsay exception.

### *(vi) Probative Value of CAC Interview*

Rule 807's final requirement, that the proffered hearsay be "more probative on the point

for which it is offered than any other evidence that the proponent can obtain through reasonable

efforts" is also met in this case.  FED. R. EVID. 807.  The government explains that it intends to

admit the interview under Rule 807 in the event A.S. is "unable to recall specific details

regarding the abuse, unable to offer clear testimony about specific dates," or gives testimony that

is "inconsistent" or "unclear."  Gov't's Supp. Prior Statement Reply at 8 (internal quotation

marks omitted). As the government also rightly points out A.S.'s statements in the CAC interview were made far closer in time to the alleged abuse than any potential trial testimony.  To the extent A.S. is unable to remember the details of the abuse she related to Myers, the interview will be more probative than any other evidence the government could procure on those points.  *Cf. United States v. Peneaux*, 432 F.3d 882, 893 (8th Cir. 2005) (admitting hearsay under Rule 807 when a child witness's in-court testimony "was inconsistent and at times unclear").  As to the CAC interview, the government's motion to admit A.S.'s prior statements is thus granted.[12]  As to A.S.'s other prior statements put forward by the government, the Court will reserve ruling until the propriety of their admission under Rule 801(d)(1)(B) can more readily be determined.[13]

### B.       The Government's 404(b) Motion Is Granted

The government next seeks to admit evidence of defendant's alleged "physical abuse of [A.S's] mother" as witnessed by A.S. and "certain sexually explicit [i]nternet search terms and website domain names found on a computer and a cellular phone that are associated with the defendant."  Gov't's 404(b) Mot. at 1.  That evidence, it says, is admissible under Rule 404(b) and is not barred by Rule 403.  *Id*. at 1, 8.  Defendant opposes admission of both sets of evidence.  Def.'s Opp'n to Gov't's 404(b) Mot. ("Def.'s 404(b) Opp'n") at 1, ECF No. 39.

---

[12]       As noted above, the government also seeks to admit A.S.'s statements in the CAC interview insofar as they are consistent with her in-court testimony should defendant seek to undermine A.S.'s credibility under FRE 801(d)(1)(B).  If that is the route the government ultimately takes, Rule 807's requirements would be irrelevant— prior consistent statements used to rehabilitate a witness's credibility are "not hearsay," and thus would not require an exception from the Rules' hearsay ban.  FED. R. EVID. 801(d)(1)(B).

[13]       Defendant also mentions in passing that he believes admission of A.S.'s prior statements would "violate[] the Confrontation Clause."  Def.'s Prior Statement Opp'n at 1.  He provides no argument in support of that contention.  When asked at the hearing to elaborate, defense counsel stated "with respect to the Confrontation Clause, I don't have anything further."  Hr'g Tr. (Rough) at 19:18–19.  As the Supreme Court has noted, the "[Confrontation] Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it."  *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004).  As of now, the government plans to call A.S. to testify at trial and she will therefore be subject to cross-examination.  The Clause thus places "no constraints at all on the use" of her out-of-court statements.  *Id*.

### 1.    *Applicable Legal Principles*

Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  FED. R. EVID. 404(b)(1).  So-called "propensity" evidence is excluded not because it is irrelevant, but because "it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge."  *Michelson v. United States*, 335 U.S. 469, 475–76 (1948).  Rule 404(b) thus attempts to head off the risk that, presented with such evidence of a defendant's uncharged bad conduct, "a jury [might] convict for crimes other than those charged—or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment."  *Old Chief v. United States*, 519 U.S. 172, 181 (1997) (quoting *United States v. Moccia*, 681 F.2d 61, 63 (1st Cir. 1982)).  Nevertheless, although such propensity evidence may not be used to "prov[e] that a person's actions conformed to his character," *United States v. Crowder*, 141 F.3d 1202, 1206 (D.C. Cir. 1998) (en banc), it may be used for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident,"  FED. R. EVID. 404(b)(2).  "In other words, under Rule 404(b), any purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered solely to prove character."  *United States v. Miller*, 895 F.2d 1431, 1436 (D.C. Cir. 1990).  As the rule merely prohibits evidence of a defendant's other acts "in but one circumstance," the D.C. Circuit has characterized it as "a rule of inclusion rather than exclusion." *United States v. Machado-Erazo*, 901 F.3d 326, 333 (D.C. Cir. 2018) (first quoting *Crowder*, 141 F.3d at 1206 and then quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)).

That evidence withstands scrutiny under Rule 404(b) does not mean it must be admitted, however, as it may nonetheless be excludable under Rule 403.  That rule explains that "[t]he

court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. Notably, Rule 403 renders relevant evidence inadmissible only upon a showing that it presents a risk of "unfair prejudice," i.e. prejudice that is "compelling or unique," *United States v. Mitchell*, 49 F.3d 769, 777 (D.C. Cir. 1995) (quoting *United States v. Washington*, 969 F.2d 1073, 1081 (D.C. Cir. 1992)), or has "an undue tendency to suggest decision on an improper basis," *United States v. Ring*, 706 F.3d 460, 472 (D.C. Cir. 2013) (quoting FED. R. EVID. 403, Advisory Comm. Note to 1972 Proposed Rules). Moreover, the danger of any potential unfair prejudice must substantially outweigh the evidence's probative value in order to exclude evidence under Rule 403.

In undertaking the Rule 403 analysis, the district court must "take account of the full evidentiary context of the case as the court understands it when the ruling must be made." *Old Chief*, 519 U.S. at 182. A calculation of the probative value and risk of prejudice is thus "affected by the scarcity or abundance of other evidence on the same point." *Id*. at 185 (quoting 22 C. WRIGHT & K. GRAHAM, FED. PRACTICE AND PROCEDURE § 5250, 546–47 (1978)). That is, when there is "less risky alternative proof going to the same point," the probative value of evidence that presents a greater danger of unfair prejudice may be "discount[ed]." *Id*. at 183. Given the trial court's familiarity with this full evidentiary context, district judges generally have "broad discretion to weigh the extent of potential prejudice against the probative force of relevant evidence." *Athridge v. Aetna Cas. & Sur. Co*., 604 F.3d 625, 633 (D.C. Cir. 2010) (quoting *Fredrick v. District of Columbia*, 254 F.3d 156, 159 (D.C. Cir. 2001)).

2.    *Discussion*

Application of these legal principles to the two categories of defendant's alleged other bad acts proffered by the government is discussed next, starting with evidence of defendant's alleged physical abuse of A.S.'s mother and then evidence of the internet search history found on defendant's electronic devices.

a.    ***Defendant's Alleged Physical Abuse of A.S.'s Mother***

In its case in chief, the government plans to show that defendant "ordered A.S. to take and provide to him, nude and semi-nude photographs of herself using her cell phone."  Gov't's 404(b) Mot. at 2.  The government alleges that to ensure A.S.'s compliance, defendant told her that "he would hurt her sister or her mother, or put them out of the house," unless she sent him the pictures and submitted to his demands for sex.  *Id.*  To show why A.S. would have taken that threat seriously, the government intends to present evidence that A.S. witnessed defendant physically abusing her mother.  *Id.*  Apart from providing a possible explanation for A.S.'s compliance with defendant's demands, the government asserts that the evidence is also "relevant to explain why A.S. delayed" disclosing defendant's sexual abuse to her family and the authorities.  *Id.* at 5.  Finally, the government argues that detailing incidents of defendant's abuse of the victim's mother is essential to explain the timing of and reason for A.S.'s disclosure of defendant's abuse.  *Id.* at 6.  After all, A.S., her mother and her sister "left the residence following a domestic violence incident between the defendant and A.S.'s mother."  *Id.*  That context, says the government, is necessary to understand "why A.S. was forced to leave her cell phone in the defendant's possession" and why that "key piece of evidence . . . was found at [defendant's] residence days later, with evidence deleted from it."  *Id.*

Notwithstanding these numerous proffered non-propensity uses for the evidence, defendant argues that the government "has failed to identify a legitimate purpose for introducing

the evidence and has not set forth an appropriate basis for its admission."  Def.'s 404(b) Opp'n at

3.  He claims that "[t]he government must identify which of the matters listed in Rule 404(b)—

'motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or

accident'—it is intending to prove" through the evidence it seeks to admit.  *Id.*  The rule,

however, does not exhaustively list the permissible uses of "other bad acts" evidence, but instead

carves out a single prohibited use.  *United States v. Bell*, 795 F.3d 88, 99 (D.C. Cir. 2015)

("[T]he purposes listed in Rule 404(b)(2) are illustrative, not exhaustive." (citing *Miller*, 895

F.2d at 1435)).  So long as the evidence is not proffered solely "to prove a person's character in

order to show that on a particular occasion the person acted in accordance with the character," it

does not run afoul Rule 404(b).  FED. R. EVID. 404(b); *see also Miller*, 895 F.2d at 1436.  As

detailed above, the government has described several ways in which the abuse of A.S.'s mother

as witnessed by A.S. is relevant and probative of why defendant's demand for secrecy from A.S.

would be perceived as threatening and compel her compliance, none of which invoke the only

inference forbidden by the rule—that the "other acts" prove defendant has a certain character and

acted in accordance with it.  Rule 404(b) thus does not bar the admission of evidence that A.S.

witnessed defendant abusing her mother.[14]

   Nor must that evidence be excluded under Rule 403.  First, the evidence's probative

value is high.  Although evidence that A.S. witnessed defendant abuse her mother is not direct

evidence of any element of any charged offense, defendant is wrong to assert that it "has no

---

[14]   The parties spill much ink discussing *United States v. Powers*, 59 F.3d 1460 (4th Cir. 1995), an out-of-circuit case, in which the court concluded that evidence of a defendant's physical violence against a child sexual abuse victim "and her family members was admissible to explain [the victim's] submission to the acts and her delay in reporting the sexual abuse," *id.* at 1465.  Defendant attempts to distinguish that case because the evidence concerned an "assault [that] was committed by a defendant on the complainant," whereas in this case "the alleged physical assault was *not* of the complainant."  Def.'s 404(b) Opp'n at 3.  Putting aside that the evidence in *Powers* concerned the abuse of both the sexual assault victim "and her family members," the defendant's attempt to find slight differences in this non-binding caselaw does nothing to undermine the fact that the government has shown that it seeks to admit the evidence in question for non-propensity purposes.

bearing on whether he committed the acts alleged in the indictment."  Def.'s 404(b) Opp'n at 6.

Public understanding of why victims of sexual crimes might delay reporting their abuse has

grown substantially in recent years.  Nevertheless, the government reasonably anticipates that a

prospective juror may wonder, after listening to A.S. recount her allegations, why, if the abuse

was so severe, A.S. did not report it for almost a year.  Evidence that helps explain that delay is

relevant to the veracity of A.S.'s claims and thus highly probative.  Defendant is doubtless

correct that evidence of his alleged physical abuse of the victim's mother carries a risk of unfair

prejudice as evidence of uncharged violent conduct poses a risk the jury may make a "decision

on an improper basis."  *Ring*, 706 F.3d at 472.  Given, however, that neither defendant nor the

government has pointed to any "less risky alternative" evidence that could help explain why A.S.

did not report the abuse, its probative value is quite high.  *Old Chief*, 519 U.S. at 183.  Moreover,

to the extent any risk of unfair prejudice exists, it can be at least somewhat mollified through the

use of a limiting instruction.  *Bell*, 795 F.3d at 100 (noting that "limiting instructions" serve "to

mitigate the danger of undue prejudice or improper inferences").

In sum, the potential for prejudice from evidence that A.S. witnessed defendant

physically abusing her mother does not "substantially" outweigh the evidence's probative value

and Rule 403 therefore does not bar its admission.[15]

---

[15]    Defendant again makes a passing reference to the Confrontation Clause, arguing that if A.S.'s "mother does
not testify, evidence that an 'assault' occurred would violate" his rights under the Clause.  Def.'s Supp. Opp'n to
Gov't's 404(b) Mot. ("Def.'s Supp. 404(b) Opp'n") at 2, ECF No. 69 (footnote omitted).  This argument lacks merit.
The Confrontation Clause gives defendant the right "to be confronted with the witnesses against him."  U.S. CONST.,
Amend. VI.  The government explains that A.S. "is expected to testify only as to actions that she witnessed and how
those actions affected her reaction to the defendant's threats."  Gov't's Reply to Def.'s Supp. 404(b) Opp'n
("Gov't's Supp. 404(b) Reply") at 1, ECF No. 72.  It does not intend to admit any statement "made by the victim's
mother regarding the abuse."  *Id*. at 2.  Defendant will thus have the opportunity to confront and cross-examine the
only relevant witness—A.S.

### b. Defendant's Alleged Internet Search History

Next, the government alleges that as defendant's abuse of the victim was ongoing, he "threatened to vaginally and anally penetrate A.S. on her 14th birthday." Gov't's 404(b) Mot. at 2. The government plans to substantiate this and other aspects of the alleged abuse by pointing to evidence derived from electronic devices seized from defendant's home during an April 21, 2017 search. In analyzing the web browsing history on both the Lenovo PC and Motorola cell phone that were seized during that search, DFS located evidence that the laptop had been used to search for, among other things, the following: "free black anal sex step daddy n step daughter"; "free black step father n step daughter anal sex"; "free black step father nstep daughter"; "can anal make you pregnant"; and "how many people get pregnant from anal sex." *Id*. at 3. The web browsing history also indicated that websites "with titles indicating similar depictions of stepfather-stepdaughter sexual conduct" and "teen pornography" had been visited. *Id*. (internal quotation marks omitted). The government asserts that "[s]imilar search terms and website urls were found on the Motorola phone, as well as text messages linking the phone to the defendant." *Id*. at 4. Both devices, the government proffers, are associated with defendant. Gov't's Reply Supp. Gov't's 404(b) Mot. ("Gov't's 404(b) Reply") at 3 n.1 (explaining that "a forensic examination of the computer revealed that it was associated with the user name of 'joseph' and full name Joseph Smith" and noting that "[t]he Motorola phone was registered to the defendant's phone number and contained numerous text messages linking the phone to the defendant"). Finally, contrary to defendant's argument at the motions hearing that the web history fails to show that the user of the devices was actively seeking the pornographic materials, Hr'g Tr. (Rough) at 170:19–23 (defense counsel stating "[i]t's not that these things are searched on a search engine" or show that the user "went to a website and asked for that"), the government

asserts that the web history shows "purposeful search conduct," Gov't's Supp. 404(b) Reply at 7 (explaining how the browser history shows that an individual used the search feature on a website called Pornhub.com to search for the terms "black step dad fucks step daughter").

According to the government, this evidence does not implicate Rule 404(b). The browsing history "is not evidence of an 'other' act at all" but rather is "inextricably intertwined with the charged conduct." Gov't's 404(b) Mot. at 7. In other words, the government believes that the evidence is "intrinsic, not extrinsic" to its allegations. *Id*. True, "[t]he law is clear in principle that "[a]cts 'extrinsic' to the crime charged are subject to Rule 404(b)'s limitations" while "acts 'intrinsic' to the crimes are not." *Machado-Erazo*, 901 F.3d at 333–34. The D.C. Circuit has explained that acts are intrinsic when they are "part of the charged offense" or when they are "performed contemporaneously with the charged crime . . . if they facilitate [its] commission." *Bowie*, 232 F.3d at 929. At the same time, the Circuit has cautioned that acts that merely "complete the story" or "explain the circumstances" of the alleged offenses are not necessarily intrinsic. *Id*. Intrinsic acts, moreover, are more typically ones "offered . . . 'as direct evidence of a fact in issue.'" *United States v. Mahdi*, 598 F.3d 883, 891 (D.C. Cir. 2010) (quoting *United States v. Alexander*, 331 F.3d 116, 125–26 & n.13 (D.C. Cir. 2003)). Here, the government "does not claim that the search terms and website domain names show that the defendant searched or viewed child pornography," Gov't's Supp. 404(b) Reply at 2, nor could they constitute the charged sexual abuse, so they are not "part of the charged offense," *Bowie*, 232 F.3d at 929. At the same time, this evidence may show defendant's interest in sexual activity between step fathers and step daughters, and the government has proffered that defendant made A.S. watch videos as part of his grooming of her to comply with his sexual demands. Gov't's Reply to Supp. Gov't's MIL to Bar Evid. Regarding the Sexual History of the

Victim and to Exclude Evidence Offered to Prove the Victim's Sexual Predisposition at 8, ECF No. 45 (A.S. "has stated in both her forensic interview and her grand jury testimony that she watched pornography on multiple occasions with the defendant at his suggestion."). Nevertheless, the relevancy of the browsing history to a fact in issue is not direct, but requires at least one inference if not more.  Searching for or viewing videos about a particular thing is direct evidence only of an intent and desire to find and view videos on that subject.  To believe that the evidence is probative of defendant's intent or plan to perform acts featured in the videos on his teenage stepdaughter requires moving one or more links down the evidentiary chain, even if those links are fairly and logically obvious.  The government's proffered evidence of defendant's internet activities is thus extrinsic and subject to Rule 404(b)'s limitations.

The government argues that "[e]ven assuming the defendant's web history does fall within the ambit of [Rule] 404(b)," the evidence serves several non-propensity purposes. Gov't's 404(b) Reply at 4.  First, the government contends that "[t]he fact that the defendant was searching for sexually explicit pornography depicting the precise type of abuse that he threatened to perform on A.S. significantly corroborates her account" of the abuse and threats.  Gov't's 404(b) Mot. at 7.  The government also explains that the search terms are probative of defendant's "motive," "plan," and "intent."  *Id*.  Defendant counters that the search terms do not "establish" that he had a "'plan' to sexually abuse" A.S.  Def.'s 404(b) Opp'n at 4.  Of course, Rule 404(b) does not require that any particular piece of evidence "establish" anything. Evidence need only be relevant to a non-propensity purpose.  While the evidence that defendant was searching for and viewing pornography depicting sexual activity between step fathers and their step daughters does not establish defendant's plan to engage in sexual behavior with his step daughter unequivocally, this evidence certainly has a "tendency to make" that plan "more

. . . probable." FED. R. EVID. 401 (defining relevance).[16]  This clear non-propensity purpose for

the evidence means that Rule 404(b) does not preclude its admission.

Likewise, Rule 403 is no barrier to the admission of defendant's internet history.

Defendant again asserts that the government's proffered evidence has "no bearing" on the

allegations in this case, Def.'s 404(b) Opp'n at 6, but, as already explained, the search terms help

corroborate A.S.'s story by providing evidence of defendant's interest in the very things A.S.

claims he demanded from her.  The evidence is thus highly probative of defendant's intent and

plan to engage in sexual activity with his step daughter.  Although the sexually explicit nature of

the search terms and browsing history presents some risk of prejudice from their admission, that

prejudice does not outweigh the evidence's probative value, much less "substantially" so.  FED.

R. EVID. 403.  The government's motion *in limine* to admit evidence under Rule 404(b) is thus

granted.

### C.     The Government's Rule 412 Motion Is Granted

The final remaining government motion seeks to bar "defendant from introducing any

evidence or testimony regarding" A.S.'s sexual history or sexual predisposition under FRE 412.

Gov't's 412 Mot. at 8.  Defendant opposes that motion and has noticed his intent to introduce

such evidence.  Def's Opp'n to Gov't's 412 Mot. and Notice of Intent to Offer Evidence of the

Complainant's Sexual Predisposition ("Def's 412 Not.") at 1, ECF No. 38.

---

[16]     Defendant points out that the web histories found on the two devices also contain a large amount of pornographic material that is not related to sexual activity between a step father and step daughter.  Def.'s Supp. 404(b) Opp'n at 3–4; *see also* Hr'g Tr. (Rough) at 171:8–9 (defense counsel stating that the government "cherry-pick[ed]" certain pieces of the browsing history and arguing that "[t]he rule of completeness" requires allowing him to "establish" that those searches are a handful out of "27,000 searches").  While the fact that defendant also searched for and viewed other kinds of pornography may lessen the weight of the proffered evidence, it does nothing to undermine the fact that the government has identified a clear non-propensity use for it.  Similarly, defendant's argument that "other individuals" may have had access to "both devices" on which the evidence was found relates not to the evidence's admissibility, but to its weight.  Def.'s Supp. 404(b) Opp'n at 4.

1.    *Applicable Legal Principles*

Rule 412 provides that, in a "civil or criminal proceeding involving alleged sexual misconduct," both "evidence offered to prove that a victim engaged in other sexual behavior" and "evidence offered to prove a victim's sexual predisposition" is "not admissible." FED. R. EVID. 412(a).  Three exceptions to this broad proscription are provided in criminal cases.  First, a court "may" admit "evidence of specific instances of a victim's sexual behavior," if the evidence is "offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence." FED. R. EVID. 412(b)(1)(A).  Second, "evidence of specific instances of a victim's sexual behavior with respect to the person accused of the sexual misconduct" is admissible if such evidence is "offered by the defendant to prove consent or if offered by the prosecutor." FED. R. EVID. 412(b)(1)(B).  Finally, the court may admit any "evidence whose exclusion would violate the defendant's constitutional rights." FED. R. EVID. 412(b)(1)(C).

In order to introduce evidence under one of these exceptions, a party must follow the procedure outlined in the rule.  Specifically, the party that "intends to offer evidence under Rule 412(b) . . . must: (A) file a motion that" both "specifically describes the evidence and states the purpose for which it is to be offered." FED. R. EVID. 412(c)(1)(A).  That motion must be filed "at least 14 days before trial unless the court, for good cause, sets a different time," FED. R. EVID. 412(c)(1)(B), and "serve[d] . . . on all parties," and the "victim or, when appropriate, the victim's guardian or representative" must be notified, FED. R. EVID. 412(c)(1)(C)–(D).  "Before admitting" evidence under Rule 412, "the court must conduct an in camera hearing and give the victim and parties a right to attend and be heard." FED. R. EVID. 412(c)(2).  When the bill proposing Rule 412 was brought to the floor of the House of Representatives, one of its sponsors explained that the mandated hearing is the defendant's "opportunity to demonstrate to the court why certain evidence is admissible and ought to be presented to the jury."  124 Cong. Rec.

34,913 (1978) (statement of Rep. James Mann); *see also* 124 Cong. Rec. 34,913

(Congresswoman Elizabeth Holtzman, the rule's drafter, explaining that the "hearing in

chambers" is when "the court must determine" whether "the evidence falls within one of the

exceptions").[17]

### 2.  *Discussion*

At the outset, the Court notes that the government's motion, which kicked off this dispute

spawning seven separate filings, was somewhat unnecessary.  In it, the government sought to

"preclude the defendant from introducing any evidence or testimony regarding any other alleged

sexual act, sexual conduct or sexual predisposition of the victim at any point in trial."  Gov't's

412 Mot. at 8.  Rule 412, of course, already does that.  FED. R. EVID. 412.  At the time of that

initial filing, the government acknowledged that it was "unaware of any evidence of the victim's

prior sexual acts or sexual predisposition" that the defendant intended to admit, and was only

---

[17]     Rule 412 also provides that "[u]nless the court orders otherwise, the motion, related materials, and the
record of the hearing must be and remain sealed."  FED. R. EVID. 412(c)(2).  Neither party, however, has followed
this mandate, but both have put their filings on the public docket.  The sealing requirement should not be taken
lightly.  *See, e.g., S.M. v. J.K.*, 262 F.3d 914, 919 (9th Cir. 2001) (holding, in the civil context, that a defendant's
"failure to file his motion under seal was 'a flagrant violation' . . . of Rule 412(c)(2)" and determining that exclusion
of all evidence proffered in that motion was a proper remedy).  After all, the sealing directive is integral to the
Rule's aim of "safeguard[ing] the alleged victim against the invasion of privacy, potential embarrassment and sexual
stereotyping that is associated with public disclosure of intimate sexual details."  FED. R. EVID. 412, Advisory
Comm. Notes to 1994 Amendments.  At the same time, in allowing courts to "order otherwise" regarding the sealing
mandate, the rule recognizes that maintaining the proceedings under seal will not be necessary or desirable in all
cases.  FED. R. EVID. 412(c)(2).  For instance, when a plaintiff's name is already masked, by dint of her status as a
minor or otherwise, the danger of an invasion of privacy is far less.  *S.M.*, 262 F.3d at 914 n.* (redacting, in an
opinion filed on the public docket, the "full names of the parties involved" in the suit "in accordance with the policy
expressed by" Rule 412(c)(2)).  Here, A.S.'s true name has been hidden in all public filings.  Moreover, a court must
be sensitive to the circumstances of the case.  *See, e.g., Sublette v. Glidden Co.*, No. Civ. A. 97-CV-5047, 1998 WL
964189, *1 n.1 (E.D. Pa. Oct. 1, 1998) (filing a memorandum and order on the public docket when "much of the
conduct [it] discussed" would "become public if a trial is held" and there was thus "little to be gained" through
sealing).  The risk of invading A.S.'s privacy posed by the public filing of this Memorandum Opinion and the
underlying filings pales in comparison to the invasion of her privacy the trial of this case will require.  The
"evidence" defendant has thus far proffered under Rule 412 is general in nature, merely alleging A.S. had a romantic
and possibly sexual relationship with a boy her own age, that she has been exposed to sexually explicit material, and
that she has engaged in sexually explicit conversations with other adolescents.  Compared with the details of the
alleged abuse provided in the statement of the case attached to the criminal complaint, for instance, those allegations
seem tame.  *See generally* Statement of Offense, ECF No. 1-1.  Given that A.S.'s name was and will remain masked
and that any invasion of privacy posed by the parties' Rule 412 dispute is comparatively small, the Court declines to
place those filings or this opinion under seal.

filing its motion out of "an abundance of caution."  Gov't's 412 Mot. at 1.  As with its motion for admission under Rule 801(d)(1)(B), the government thus seems initially to have sought a ruling that merely restates the relevant evidentiary rule.  In any event, defendant's response to the government's motion indicated his notice of intent to offer evidence of A.S.'s sexual predisposition or past sexual behavior, which will be construed as the required "motion" under Rule 412(c)(1).  Def.'s 412 Not. at 1.  The government opposes his attempt to introduce such evidence, placing the parties in the procedural posture Rule 412 seems to envision—movant invoking a Rule 412 exception, nonmovant in opposition.  *See* FED. R. EVID. 412(c).

The government raises four objections to defendant's effort to admit evidence of A.S.'s sexual predisposition or prior sexual conduct: 1)  defendant's notice fails to "specifically describe[]" the evidence he seeks to admit in violation of Rule 412(c)(1)(A); 2) the proffered evidence is not "offered to prove that someone other than defendant was the source of . . . *other physical evidence*," and thus does not fall into Rule 412(b)(1)(A)'s exception; 3) exclusion of the evidence would not violate defendant's constitutional rights and thus the evidence is not excepted by Rule 412(b)(1)(C); and 4) even if admissible under Rule 412, such evidence should be excluded under rule 403.  *See* Gov't's Reply Supp. Gov't's 412 Mot. ("Gov't's 412 Reply"), ECF No. 45.  These objections are addressed *seriatim*.

### a.      *Defendant's Motion Is Sufficiently Specific*

What exactly defendant intends to offer into evidence to show A.S.'s "sexual predisposition" has been a bit of a moving target.  Def.'s 412 Not. at 3.  Defendant first explained that he "intends to introduce evidence that prior to the allegations against [defendant], [A.S.] had engaged in sexual activity, viewed pornography, and participated in sexually explicit conversations."  *Id*.  Defendant's "purpose in offering this evidence is to establish that either [A.S.] or another individual is the 'source of'" both "the searches" for pornography referenced in

the government's motion under Rule 404(b), and the sexually explicit "images" of A.S. found on defendant's electronic devices. *Id*. at 3–4. In response to the government's contention that this notice was insufficiently specific, Gov't 412 Reply at 2, defendant submitted a supplemental notice with additional detail describing his intent to "introduce evidence that prior to the allegations made against Mr. Smith, [A.S.] engaged in sexual activity with adolescent males with whom she had a romantic relationship" and that "[i]n interacting with these young men, [A.S.] viewed pornography[,] participated in sexual acts and engaged in sexually explicit conversations." Def.'s Supp. Rule 412 Notice to Introduce Evid. of the Complainant's Sexual Predisposition ("Def.'s Supp. 412 Not.") at 3, ECF No. 52. Defendant pointed out that the government did "not dispute that pornographic web searches were uncovered on [A.S.]'s cell phone" and further explained that he "intends to introduce all of the web searches of pornography recovered from" that phone. *Id*. at 3–4. The government once again objects that "defendant's supplemental notice largely falls far short" of Rule 412's specificity requirement, though concedes that defendant's intent to introduce evidence of the pornography searches from A.S.'s phone was "sufficient[ly]" specific. Gov't's Reply to Def.'s Supp. 412 Not. at 3 & n.1, ECF No. 54. Following the June 9, 2020 motions hearing, defendant added still more detail. He now additionally intends to offer "evidence of [A.S.'s] sexual predisposition based on her exposure to sexually explicit content through social media, books and music." Def.'s Supp. Opp'n to Gov't's 412 Mot. ("Def.'s Supp. 412 Opp'n") at 4, ECF No. 68. Defendant further notes that he intends to introduce evidence of a romantic relationship between A.S. and "an adolescent boy named Johnathan." Def.'s Supp. 412 Opp'n at 5.

Putting this all together, defendant seeks to admit evidence of the following: 1) searches for pornographic material uncovered on A.S.'s cell phone; 2) A.S's relationship with "an

adolescent boy named Johnathan" or other young men, during which, defendant suggests, A.S. viewed pornography, engaged in sexual activity and was involved in sexually explicit conversations, *id.*; 3) A.S.'s exposure to sexually explicit content in books, which she discussed in her CAC interview, *id.*; CAC Tr. at 18:15–18, and through music and social media.  As to "the purpose[s] for which" the evidence "is to be offered," FED. R. EVID. 412(c)(1)(A), defendant believes the evidence will help show, first, that he is not the "source" of the pornographic searches and sexually explicit images located on his laptop and cell phone, and, second, that A.S. has had exposure to "sexually explicit content[] other than by Mr. Smith."  Def.'s Supp. 412 Opp'n at 6.

Published caselaw discussing what level of specificity is required under Rule 412(c)(1)(A) is nonexistent in this Circuit. The rule itself offers no guidance.  23 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 5377 (2d ed. 2020) ("What constitutes an adequate description of the evidence or its purpose is not made clear by the rule.").  Other circuits have observed generally that the Rule's "notice provision . . . is not arbitrary" and "works to protect both the victim and the prosecution against surprise and prejudice due to late disclosure of evidence."  *United States v. Ramone*, 218 F.3d 1229, 1235–36 (10th Cir. 2000) (examining whether exclusion of evidence after defendant failed to comply with Rule 412(c)'s procedures ran afoul the Sixth Amendment).  General statements about the provision's purpose, however, do little to clarify its practical requirements.

The Rule's other provisions, however, shed light on the role of the required notice.  As one court has explained, the specificity requirement serves "another of the Rule's procedural requirements," namely that "[b]efore admitting evidence under [Rule 412], the court *must* conduct an in camera hearing and give the victim and parties a right to attend and be heard."

*United States v. Chang Ru Meng Backman*, 817 F.3d 662, 669 (9th Cir. 2016) (emphasis added) (internal quotation marks omitted) (quoting FED. R. EVID. 412(c)(2)).  A hearing is only required, however, "before admitting" the evidence, which suggests that "no hearing need be held if the court can determine, based on the" notice and any opposition thereto, "that the evidence is not admissible."  WRIGHT & MILLER, § 5377; *see also* Hr'g Tr. (Rough) 191:20–192:7 (Court suggesting "I think I only have to have the *in camera* hearing if I am going to admit evidence under this rule as a procedural matter" and both defense and government counsel agreeing).

Given that the hearing provides an opportunity for the Rule 412 movant to detail the evidence he seeks to admit and for the parties to discuss the propriety of its admission, the notice requirement should be seen as serving two purposes: 1) aiding the Court in determining the threshold matter of whether a hearing is necessary; and 2) providing sufficient notice to the nonmovant and victim alike to prepare for and argue against the necessity of any *in camera* hearing.  As one commentator put it, the description of the evidence thus "must be sufficient to permit a court to determine if a hearing on the motion is required" and to "apply the terms of the applicable exception," while also "enabl[ing] opposing parties to investigate the alleged behavior and respond to the argument for admissibility."  WRIGHT & MILLER, § 5377.

Defendant's proffer, as supplemented over the course of his three filings, fits the bill.  As described above, he has provided sufficient information about both the evidence he wishes to produce at trial and the purposes of its production to allow the Court to examine the link between the evidence and the exceptions under which its admission is sought.  It also gives both the government and A.S. adequate notice of the contours of the evidence he hopes to place before the jury such that the government can marshal arguments against its admissibility and so both the government and A.S. can prepare for any potential *in camera* hearing.

### b.    Defendant is Entitled to a Rule 412 Hearing In Part

Defendant asserts that the evidence he describes is admissible under two of the rule's exceptions.  He first says that the evidence may come in under Rule 412(b)(1)(A), in order to show that someone other than him was the source of the pornographic internet browsing history and sexually explicit images of A.S. found on his electronic devices.  Second, he believes that the evidence must be admitted under Rule 412(b)(1)(C) to protect his constitutional rights.  He is wrong on the first count, but correct, at least in part, on the second.

### (i)    No Evidence is Admissible Under Rule 412(b)(1)(A)

Rule 412(b)(1)(A) contains two requirements: the evidence offered must 1) be of "specific instances of a victim's sexual behavior" and 2) must be "offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence." Defendant's theory is that A.S.'s alleged past viewing of pornography, alleged sexual relationships, and her general interest in sexual topics is evidence tending to show she could be the "source" of the browsing history and sexually explicit images on defendant's electronic devices.  That argument, however, falters on the exception's second requirement.[18]

---

[18]    Defendant's proffered evidence may even fail Rule 412(b)(1)(A)'s first requirement.  Rule 412(a) divides prohibited evidence about victims into two categories: 1) evidence that the "victim engaged in other sexual behavior," and 2) evidence regarding a "victim's sexual predisposition."  FED. R. EVID. 412(a)(1)–(2).  The exception in Rule 412(b)(1)(A), according to its text, applies only to the former and not to "sexual predisposition" evidence.  Throughout his filings, defendant seems to elide the distinction, muddying the Rule 412 waters and making more difficult the determination whether a viable path to admission of the evidence exists.  *See, e.g.*, Def.'s Supp. 412 Opp'n at 2 ("Counsel seeks to admit evidence of the complainant's sexual *predisposition* pursuant to Rule 412(b)(1)(A)." (emphasis added)).  Although A.S.'s alleged sexual relationships with other adolescents would clearly be considered evidence of "sexual behavior," whether other pieces of defendant's proffered evidence could properly be characterized as "evidence of specific instances of a victim's sexual *behavior*" is far from clear.  FED. R. EVID. 412, Advisory Comm. Notes to 1994 Amendments (explaining that "sexual behavior" includes "all activities that involve actual physical conduct" like "sexual intercourse," but also extends to "activities of the mind, such as fantasies" or "dreams"); *see also Wolak v. Spucci*, 217 F.3d 157, 160 (2d Cir. 2000) (concluding that "viewing pornography falls within Rule 412's broad definition of behavior").  Ultimately, given that defendant's proffered evidence fails the second requirement, this issue need not be addressed further.

Browsing history and digital images are not the kind of "other physical evidence" contemplated by Rule 412(b)(1)(A).  Although defendant attempts to isolate the words "physical evidence" in order to give them a definition broad enough to include browsing history and digital images, the words must be viewed in context.  Under the "commonsense canon" of interpretation *noscitur a sociis*, "a word is given more precise content by the neighboring words with which it is associated."  *United States v. Williams*, 553 U.S. 285, 294 (2008).  On its own, the phrase "other physical evidence" might sweep broadly, but preceded as it is by "semen" and "injury" the word has a far narrower meaning, namely physical evidence indicative of a sexual assault.

The history of the rule supports this reading.  Prior to 1994, Rule 412(b)(1)(A)'s predecessor permitted the admission of evidence "upon the issue of whether the accused was or was not, with respect to the alleged victim, the source of semen or injury."  An Act to Amend the Federal Rules of Evidence to Provide for the Protection of the Privacy of Rape Victims, Pub. L. No. 95-540, § 2(a), 92 Stat. 2046 (1978).  In ensuing years, some courts applied a cramped interpretation of the word "injury."  For example, in *United States v. Shaw*, 824 F.2d 601 (8th Cir. 1987), the government had introduced evidence regarding a minor victim's hymen "to establish that its condition was consistent with her having engaged in sexual intercourse."  *Id*. at 602.  The defendant sought to "rebut this evidence by showing that someone else was responsible for the condition of [the victim's] hymen."  *Id*. at 603.  The Eighth Circuit held that, absent "tearing," "bruising," or "unusual bleeding," the "physiological accommodation" evidenced by the condition of the victim's hymen fell "short of establishing an injury so as to trigger the applicability of Rule 412's injury exception."  *Id*. at 605.  Other cases highlighted glaring gaps in the rule.  *See, e.g.*, *United States v. Duran*, 886 F.2d 167, 168 n.4 (8th Cir. 1989) (explaining that evidence of a victim's past sexual behavior could not be admitted to show the

source of a pregnancy because "pregnancy is not included within this exception"). Commentators agree that the addition of the phrase "other physical evidence" was intended to remedy these problems.  WRIGHT & MILLER, § 5375 ("The purpose of this addition apparently was to reject the authorities that had given 'injury' an unduly restrictive meaning."); 3 MICHAEL H. GRAHAM, HANDBOOK OF FED. EVID. § 412:1 (8th ed. 2019) ("The language of 'other physical evidence' was added to amended Rule 412 to prevent . . . outrageous result[s]" like those in *Shaw*."); 2 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FED. EVID. § 4:79 (4th ed. 2020) ("The 1994 amendment added the phrase 'or other physical evidence,' so that it is no longer necessary to construe pregnancy as an 'injury.'").  While the amendment was certainly intended to expand the scope of the exception, it remains tethered to physical evidence of a sexual assault.  As neither the browsing history nor the explicit images found on defendant's phone and computer are the kind of physical evidence contemplated by Rule 412(b)(1)(A), none of defendant's proffered evidence about A.S. is admissible under that exception to show that defendant was not the "source" of the internet browsing history and explicit images found on his electronic devices.

### (ii)     *Some Evidence Is Admissible under Rule 412(b)(1)(C)*

Next, defendant asserts his proffered evidence about A.S. is admissible under Rule 412(b)(1)(C)'s exception for "evidence whose exclusion would violate the defendant's constitutional rights."  FED. R. EVID. 412(b)(1)(C).  Initially, he stated that exclusion of the evidence "would violate [his] constitutional right to present a defense, his right to counsel and his right to a fair trial," Def.'s 412 Not. at 4, but provided no argument in support of these contentions.  His final filing elaborates somewhat, explaining that if the evidence is excluded, "his defense will be severely prejudiced" insofar as without it "a jury will be less likely to believe that a person other than [defendant] is the 'source' of sexually explicit photographs and

pornographic internet searches."  Def.'s Supp. 412 Opp'n at 6.  Moreover, he says, evidence of

A.S.'s "exposure to sexually explicit material" is necessary to show it was that exposure, "rather

than sexual abuse by [defendant]," which led to her using vulgar language in her CAC interview.

*Id*. at 5.

Rule 412(b)(1)(C) allows defendants to introduce evidence that Rule 412(a) would

otherwise bar when the result of exclusion "would be to deny a criminal defendant the

protections afforded by the Constitution."  FED. R. EVID. 412, Advisory Comm. Notes to 1994

Amendments.  Among a defendant's rights is the Constitution's guarantee of "a meaningful

opportunity to present a complete defense."  *Nevada v. Jackson*, 569 U.S. 505, 509 (2013)

(quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986), itself quoting *California v. Trombetta*,

467 U.S. 479, 485 (1984)).  Although "federal rulemakers have broad latitude under the

Constitution to establish rules excluding evidence from criminal trials," a defendant's right to a

complete defense "is abridged by" application of rules of evidence that either "serve no

legitimate purpose or . . . are disproportionate to the ends that they are asserted to promote."

*Holmes v. South Carolina*, 547 U.S. 319, 324–326 (2006) (internal quotation marks omitted)

(quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)).  Whether exclusion under Rule

412 violates a defendant's right to present his defense "must be evaluated on a case-by-case

basis."  *LaJoie v. Thompson*, 217 F.3d 663, 669 (9th Cir. 2000).

Application of Rule 412(a) to the evidence of pornographic web history discovered on

A.S.'s phone would be disproportionate to the asserted purpose of Rule 412.  As explained above

in the discussion of the government's 404(b) motion, the government intends to introduce

portions of the web browsing history found on defendant's phone and computer to show that he

was looking for and watching pornography that involved sexual conduct between step fathers

and step daughters, or at least the simulation of such conduct. *See* Part III.B.2.b, *supra*. This evidence is probative in showing, as the government will likely argue to the jury, that defendant himself was interested in such conduct and that he may have had a plan to engage in sexual conduct with his own stepdaughter, A.S., and thereby provide strong corroboration of her testimony about defendant's alleged sex abuse of her. To undermine this inference and corroboration of A.S.'s testimony, defendant hopes to show that he is not responsible for the internet browsing history on his phone and computer. He believes showing that A.S. had pornographic browsing history on her own phone will aid in that dual effort to show another source for the damaging internet browsing history and undermine A.S.'s credibility.

The government concedes that "pornographic searches . . . were found on [A.S.'s] phone." Gov't's Supp. 412 Reply at 6 n.3. It explains, however, that A.S. has "testified under oath that she did not search for pornography on her phone, and that because her phone was linked to the defendant's" devices in some way, "the websites that . . . defendant searched for on his phone or his computer would sometimes show up on her phone." *Id*. A "preliminary [forensic] examination of [A.S.'s] phone" allegedly "shows that . . . the pornographic searches were not made on her phone but were 'synced' from another device." *Id*. Nevertheless, there is reason to believe that the browsing history on A.S.'s phone may mirror, at least in part, the browsing history the government intends to use against defendant. Preventing defendant from placing that fact before the jury would thus block what may be the most powerful piece of evidence substantiating his theory that he is not responsible for the browsing history on his devices.

Given the high probative value of the evidence in question, and its close relation to a central piece of evidence the government intends to introduce against defendant, its exclusion is

disproportionate to the purposes served by Rule 412.  The Supreme Court has recognized that the government's interest "in 'the protection of minor victims of sex crimes from further trauma and embarrassment' is a 'compelling' one."  *Maryland v. Craig*, 497 U.S. 836, 852 (quoting *Globe Newspaper Co. v. Superior Court of Norfolk Cnty.*, 457 U.S. 596, 607 (1982)).  Rule 412 also aims to "encourage[] victims of sexual misconduct to institute and to participate in legal proceedings against alleged offenders."  FED. R. EVID. 412, Advisory Comm. Notes to 1994 Amendments.  Allowing A.S. to be questioned about the browsing history on her phone and for evidence to be presented to the jury that her phone contained pornographic website searches doubtless carries some risk of embarrassment.  When viewed in light of the totality of evidence that is likely to be introduced at trial, including intimate details about the abuse A.S. suffered, the risk of embarrassment from introducing the pornographic websites that appear in A.S.'s browsing history is comparatively small.  Moreover, that a teenager has accessed pornographic websites, while perhaps embarrassing, is hardly surprising, as the government concedes.  Gov't's Reply to Def.'s Supp. 412 Not. at 5 ("[G]iven that the victim was approximately thirteen years old at the time of the offense, and went to school with other thirteen-year-olds, it would be unusual if she was unaware or uninterested in these topics").  In light of the high probative value of the pornographic browsing history on A.S.'s phone, and its centrality to defendant's attempt to undercut the government's argument that his own browsing history revealed a plan to abuse his step daughter and A.S.'s credibility, exclusion is a disproportionate tool to serve Rule 412's asserted aims.  This evidence of the pornographic browsing history on A.S.'s phone thus warrants an *in camera* hearing, as required under Rule 412(c)(2), unless the parties and victim waive the necessity of such a hearing.[19]

---

[19]     Given that the government concedes the web history is on A.S.'s phone, what would be gained from such a mandated hearing is unclear.  To the extent the government intends to argue that the evidence should not be

As for defendant's proffered evidence of A.S.'s relationship with "an adolescent boy named Johnathan" or other young men, during which, defendant suggests, A.S. viewed pornography, engaged in sexual activity and was involved in sexually explicit conversations, Def.'s Supp. 412 Opp'n at 5, no hearing is required.  Defendant asserts that this evidence will similarly aid him in his attempt to show that he did not visit the websites contained in his browsing history and provide further support for his theory that he is not the source of the sexually explicit images of A.S. found on his phone. Def.'s 412 Opp'n at 4.  The inferential link defendant seeks to draw between defendant's proffered evidence about A.S.'s relationship with young men and the browsing history or sexually explicit images found on defendant's devices is both attenuated and, to a far greater extent, presents the very risks Rule 412 is meant to forestall: namely, the unnecessary "infusion of sexual innuendo into the factfinding process." FED. R. EVID. 412, Advisory Comm. Notes to 1994 Amendments.  Defendant's filing appears to propose a wide-ranging investigation of A.S.'s sexual past and proclivities that bear only a distant relationship to the internet browsing history and images on defendant's devices.  It thus appears to be less an essential piece of his defense to the allegations and more an attempt to demean A.S.'s character.  This Rule 412 will not abide.  *Cf. United States v. Saunders*, 736 F. Supp. 698, 701 (E.D. Va. 1990) ("Fundamental to Rule 412 is the notion that the law protects women" and in this case young girls, "from forced sexual contact and that this protection extends to all persons even though their past sexual behavior or reputation suggests they are less than

---

admitted in light of A.S.'s denial of responsibility for the browsing history and its "preliminary examination," which may show the browsing history was the result of a "sync," Gov't's Supp. 412 Reply at 6 n.3, those arguments are for the jury to evaluate.  That the government can provide an alternative explanation for the provenance of the browsing history goes not to its admissibility, but to its weight.  Nevertheless, the Rule mandates that, "[b]efore admitting evidence under" Rule 412, "the court *must* conduct an in camera hearing and give the victim and parties a right to attend and be heard." FED. R. EVID. 412(c)(2) (emphasis added).  That hearing will be held on the day of the pretrial conference, unless the parties and victim submit, as part of the Joint Pretrial Statement, acknowledgment of the opportunity for, but waiver of the necessity of holding, such a hearing.

virtuous."). Defendant's proffered evidence of A.S.'s relationship with young men is therefore inadmissible under Rule 412.

### (iii)    Rule 412 Does Not Apply to Evidence A.S. Was Exposed to Other Sexually Explicit Materials

The final category of evidence defendant aims to introduce is A.S.'s exposure to sexually explicit material in books, music, and social media.  Although A.S. mentions reading books that concern sexual abuse, *see* CAC Tr. at 18:15–19 (A.S. describing her abuse and stating "And it hurts me because I got to deal with this and I read, like, so many books and every—and I'm like, well, I'm not shocked because some girls go through this, but I don't want to go through this"), defendant's reference to A.S.'s exposure to sexually explicit music and social media thus far seems to be speculation.  The purpose of admitting such evidence is again difficult to pin down. In his final filing related to Rule 412, he states that the evidence is necessary to "provide[] an alternate explanation for [A.S.'s] sexually explicit language" in her CAC interview and to avoid leaving the jury with the impression that her only exposure to sexually explicit content was through defendant.  Def.'s Supp. 412 Opp'n at 6.

Reading between the lines of defendant's filings, two possible explanations are possible for why providing such an alternate explanation might be necessary.  The first, and more obvious, is that he anticipates the government will attempt to show that A.S.'s use of sexually explicit terminology is evidence of his abuse.  The government, however, has announced that it does not intend to pursue such an argument.  Gov't's Supp. 412 Reply at 7 ("[T]he government does not intend to argue that the victim's knowledge of various sexual terms is evidence of the defendant's abuse.").  Second, defendant might hope to suggest that A.S. fabricated her allegations, and that the sexually explicit books, music, and social media were her source material.

In both of these potential uses, however, the evidence is not "offered to prove" A.S.'s sexual behavior or predisposition.  Instead, they are offered to prove A.S.'s knowledge of certain terms or to show she had access to materials that could have aided any alleged fabrication. These uses are not barred by Rule 412, and thus admission of this evidence need not pass through one of its exceptions.  WRIGHT & MILLER, § 5374 ("'Evidence' is excluded by Rule 412(a) only if it is 'offered to prove' sexual behavior or predisposition.").  No hearing will thus be necessary concerning this evidence.[20]

### D.     Defendant's Motion for a *Daubert* Hearing and Motion to Exclude Are Denied

Finally, the government has provided notice to defendant that it intends to "call Dr. Stephanie Wolf," who is described as "an expert on patterns and symptoms of child sexual abuse."  Gov't Not. of Intent to Call Child Sexual Abuse Expert Witness Dr. Stephanie Wolf and Summary of Testimony ("Gov't's Expert Not.") at 3, ECF No. 28.  Defendant has moved to exclude all or part of her testimony, or, at the very least, requests that the Court conduct a so-called *Daubert* hearing prior to admission of Dr. Wolf's testimony.  Def.'s Mot. to Exclude Testimony of Gov't's's Proposed Expert Witness ("Def.'s Mot. to Exclude"), ECF No. 36; Def.'s Supp. Mot. to Exclude Expert Testimony of Dr. Stephanie Wolf and Request for *Daubert* Hearing ("Def.'s Supp. Mot. to Exclude"), ECF No. 63.

---

[20]     The government contends that, should any of defendant's Rule 412 evidence make it through that Rule's strictures, it should nonetheless be barred by Rule 403.  Gov't's 412 Mot. at 7.  As noted already, the probative value of the web browsing history on A.S.'s phone is very high, and any risk of unfairness to A.S. is undercut somewhat by the government's assertion that it will be able to provide a plausible alternative explanation.  Any risk of prejudice thus does not substantially outweigh the probative value.  Similarly, should defendant pursue a defense of fabrication, he will need to provide the jury with an explanation of how A.S. came to concoct her story.  That will require providing at least some evidence that she had, at the age of thirteen, been exposed to sexually explicit materials.  Given that the government concedes that exposure to such topics at thirteen is hardly surprising, Gov't's Reply to Def.'s Supp. 412 Not. at 5, the risk of prejudice is minimal and does not outweigh the evidence's probative value.

1.      ***Applicable Legal Principles***

Before expert testimony may be admitted at trial, FRE 702 and the Supreme Court's

decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), require a district court

to act as "gatekeep[er]" by "ensur[ing] that any [such] testimony is based on" scientific,

technical, or other specialized knowledge that "will assist the trier of fact to understand or

determine a fact in issue."  *United States v. McGill*, 815 F.3d 846, 903 (D.C. Cir. 2016) (quoting

*Daubert*, 509 U.S. at 592); *see also* FED. R. EVID. 702; *United States ex rel. Miller v. Bill*

*Harbert Int'l Const., Inc.*, 608 F.3d 871, 894 (D.C. Cir. 2010) ("[T]rial judges must act as

gatekeepers to exclude unreliable expert testimony.").  Those rules require the party seeking to

introduce the expert testimony to establish, by a preponderance of the evidence, the

qualifications of the proffered expert and that: "(a) the expert's scientific, technical, or other

specialized knowledge will help the trier of fact to understand the evidence or to determine a fact

in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of

reliable principles and methods; and (d) the expert has reliably applied the principles and

methods to the facts of the case."  FED. R. EVID. 702; *see also United States v. Hite*, 769 F.3d

1154, 1168 (D.C. Cir. 2014) ("Expert testimony is admissible under Federal Rule of Evidence

702 if it will assist the jury 'to understand the evidence or determine a fact in issue.'" (quoting

FED. R. EVID. 702).  In other words, the party offering the expert need not prove that the expert's

opinions are correct but rather that the expert is a qualified person who has reached her opinions

in a methodologically reasonable manner.  *See Ambrosini v. Labarraque*, 101 F.3d 129, 133

(D.C. Cir. 1996) (explaining that courts "must focus 'solely on principles and methodology, not

on the conclusions that they generate'" (quoting *Daubert*, 509 U.S. at 595)); *see also Kumho Tire*

*Co. Ltd. v. Carmichael*, 526 U.S. 137, 152–53 (1999) (stating that the trial court's job "is to

make certain that an expert, whether basing testimony upon professional studies or personal

experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

Sometimes, as here, an expert does not "purport[] to apply principles and methods to the facts of the case" but instead aims simply "to educate the factfinder about general principles." FED. R. EVID. 702, Advisory Comm. Notes to 2000 Amendments.  "For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony 'fit' the facts of the case."  *Id.*; *see also Miller*, 608 F.3d at 894–95 (condoning the district court's adoption of this standard).

As for the decision whether to hold a *Daubert* hearing, "the law grants a district court the same broad latitude" in deciding "*how* to determine reliability as it enjoys in" making "its ultimate reliability determination."  *Kumho Tire*, 526 U.S. at 142.

> ### 2. *Discussion*

Defendant mounts a few attacks on Dr. Wolf's testimony as a whole and a few on specific aspects of her proposed testimony.  A brief summary of the testimony is thus in order. In general, the government anticipates that Dr. Wolf will testify concerning "patterns and symptoms of child sexual abuse," including "mental health symptoms and effects, disclosure of child sexual abuse, memory around child sexual abuse, and the complex clinical needs of victims of child sexual abuse."  Gov't Expert Not. at 3.  More specifically, Dr. Wolf "may" testify:

- "[T]hat sexual abuse has a far greater chance of being committed by someone the child knows, such as a family member."

- "[T]hat when a parent was a victim of child sexual abuse themselves, they may display behavior or parenting practices that lead to greater risk of their own child being sexually abused."

- "[T]hat non-disclosure of child sexual abuse is the norm versus the exception."

- That "delayed disclosure" may "result[] from a multitude of barriers" including "internalized victim-blaming," and "violence and dysfunction in the family."

- "[T]hat child sexual abuse victims do not display a 'one-size-fits-all' pattern of symptoms."

- "[T]hat for" school-aged children, "the most common recipient of disclosure are peers and mothers, and that most children who disclosed told more than one individual."[21]

- "[T]hat the disclosure of child sexual abuse is not an event, but rather, a process, and that a neat, coherent, and timely disclosure should be regarded as the exception, rather than the rule."

- "[T]hat cultural factors can affect disclosure."

- "[T]hat 'grooming,'" defined as "a systematic way of gaining a child or parent's trust," is "often a key component of child sexual abuse."

Gov't's Expert Not. at 3–5.

The government explains that these opinions will be based on Dr. Wolf's "education and training," along with "her knowledge of relevant professional literature, including articles by clinicians and scientifically-controlled studies."  *Id*. at 5.  Dr. Wolf's C.V. reveals that she earned a Ph.D. in Clinical Psychology in 2013, and a J.D. in 2001.  Wolf C.V. at 1, ECF No. 28-1.  For the past almost five years, she has served as Mental Health Director at "The Tree House Child Advocacy Center of Montgomery County," where she "[s]upervise[s] delivery of evidence[] based mental health services to maltreated children and their non-offending caregivers."  *Id*.  Simultaneously, she serves as the Program Developer and Clinical Supervisor of the Transitional Trauma Program at the Tree House Child Advocacy Center and provides "child therapy" at Wolf

---

[21]    The government's initial notice discussed "children aged 5-13," Gov't's Expert Not. at 4, but later amended that notice to read "school-aged children, Gov't's Supp. to Gov't's Expert Not. at 3, ECF No. 66.

Psychology LLC.  *Id*. at 1–2.  Before taking on her current roles, her C.V. indicates that she had ten years of experience serving in various positions at organizations in the field of child counseling and therapy.  *Id*. at 2–4.  She also has given numerous presentations on topics like trauma therapy for children.  *Id*. at 6.  Her dissertation was also on the topic of childhood trauma.  *Id*. at 4.

Defendant presents five bases for excluding Dr. Wolf's testimony: 1) the testimony has not been scientifically validated such that its reliability can be ensured; 2) Dr. Wolf has not "reliably applied principles and methods to the facts of this case," Def.'s Supp. Mot. to Exclude at 9; 3) aspects of the testimony is improper expert opinion; 4) the testimony would be "an improper expert opinion on the ultimate issue," *id*. at 11; 5) the testimony's minimal probative value is substantially outweighed by the risk it presents of unfair prejudice.  Each of these arguments is addressed in turn.

Defendant's first argument depends in part on his assumption that Dr. Wolf's testimony about behavior patterns in child abuse victims comes entirely from her "education and experience as a treating psychologist."  *Id.* at 7.  Operating on that assumption, he complains that "[t]here is no information related to the sexual abuse claims made by Dr. Wolf's patients to assess whether their claims are accurate or verifiable" and further that the "government has not provided in its expert notice any scientific, observational, or research studies . . . utilizing controls."  *Id*. at 7–8 (footnote omitted).  Defendant suggests that absent evidence of that nature, Dr. Wolf's proposed testimony fails to meet the factors identified in *Daubert* for assessing the reliability of expert testimony.  *See Daubert*, 509 U.S. at 593–94 (identifying four factors among "[m]any factors [that] will bear on the [relevant] inquiry": "whether [the] theory or technique . . . can be (and has been) tested"; "whether the theory or technique has been subjected to peer

review and publication"; "in the case of a particular scientific technique," the "known or potential rate of error"; and whether the theory or technique enjoys "general acceptance").

Not all expert testimony is alike, however, and the factors necessary to assess the reliability of such testimony will depend on its nature. *Kumho Tire*, 526 U.S. at 141 (stressing that "the test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case"). Whereas *Daubert* concerned an expert's application of a scientific methodology to determine whether a particular pharmaceutical product "cause[d] birth defects," *Daubert*, 509 U.S. at 583, the testimony here is more general in character. To ask about "error rates" and whether the technique has been "tested" would make little sense, as Dr. Wolf will not be applying a technique or method at all. Instead, as the government puts it, Dr. Wolf's testimony will be more akin to relaying the knowledge she gained from "her training" and the "relevant professional literature" in the field, and will be supplemented by her "extensive, firsthand experience treating child sexual abuse victims." Gov't's Opp'n to Def.'s Supp. Mot. to Exclude at 10, ECF No. 65. Evidence of this nature concerning the characteristics of sexually abused children has consistently been found reliable in courts around the country. *See, e.g.*, *United States v. Lukashov*, 694 F.3d 1107, 1116 (9th Cir. 2012) (permitting expert testimony from a pediatrician about "the characteristics that she looks for when assessing a child victim's story of sexual abuse"); *United States v. Charley*, 189 F.3d 1251, 1264 (10th Cir. 1999) (permitting expert to "inform the jury of characteristics in sexually abused children"). Defendant's charge that the evidence fails *Daubert's* inapposite four-factor test presents no bar to the admission of Dr. Wolf's testimony.

Next, defendant complains that Dr. Wolf "has never interviewed any of the witnesses, A.S., or any member of her family." Def.'s Supp. Mot. to Exclude at 9. Defendant thus may be

correct that "Dr. Wolf has no factual basis to testify about the complainant's internal feelings experiences, thoughts, fears, beliefs, reactions, relationships, behavior at home or at school, or about any of her psychological symptoms." *Id*.  As the government points out, however, Dr. Wolf will not be testifying about any of those subjects. Gov't's Opp'n to Def.'s Supp. Mot. to Exclude at 11.  Her testimony will be limited to "providing generalized information about the behaviors of child sexual abuse victims." *Id*.  Nothing in the rules requires direct application of the expert's specialized knowledge in the manner defendant imagines.  Indeed, the Advisory Committee's notes call the use of "expert testimony to educate the factfinder on general principles" a "venerable practice."  FED. R. EVID. 702, Advisory Comm. Notes to 2000 Amendments.

Defendant's third objection takes issue with the government's intent to have Dr. Wolf testify that "a parent who was a victim of child sexual abuse themselves, may display behavior or parenting practices that lead to grater risk of their own child being sexually abused."  Def.'s Supp. Mot. to Exclude at 11.  He argues that Dr. Wolf lacks "the proper education, training, or experience to discuss this subject matter," and, moreover, the opinion is not one the jury needs help understanding.  *Id*.  Dr. Wolf is certified as a "Parent Child Interaction Therapy Provider" and is certified in "Trauma Focused Cognitive Behavioral Therapy for Traumatized Children and Their Families."  Wolf C.V. at 7.  She also has given presentations entitled "Preventing Child Abuse: What Every Parent Should Know," *id*. at 6, and she "perform[s] forensic services including parenting capacity evaluations," *id*. at 2.  Dr. Wolf's experience and training is more than sufficient to qualify her to testify about the relationship between a parent's past trauma and its effects on the likelihood their children will be similarly abused.  The government also notes that the proffered testimony will be elicited "only if information about prior sexual abuse of

A.S.'s mother is presented at trial" and will be used to help contextualize what might otherwise come across as a counterintuitive reaction by A.S.'s mother to signs that defendant was abusing her daughter.  Gov't's Opp'n to Def.'s Supp. Mot. to Exclude at 13 & n.3.  This testimony would not merely be that "individuals react differently in different situations," Def.'s Supp. Mot. to Exclude at 11, but would provide "specialized information," Gov't's Opp'n to Def.'s Supp. Mot. to Exclude at 13, regarding, for instance, how a parent's "past unresolved abuse may lead to inadequate monitoring of their children, . . . encourage family dysfunction, poor boundaries, and difficulty in protecting the child from sexual perpetrators," Gov't's Expert Not. at 3.  These dynamics are not the kind of knowledge a layperson would be expected to have, and the evidence is thus helpful to a jury's understanding of the circumstances surrounding the alleged abuse in this case.

Fourth, defendant asserts that "[a]llowing an expert to testify that specific reactions are consistent with child sexual abuse improperly usurps the jury's role to assess the credibility of the complainant."  Def.'s Supp. Mot. to Exclude at 11.  He says that such testimony also "allows the government to elicit expert testimony on the ultimate issue—that is whether or not sexual abuse occurred."  *Id*.  In support he relies on three cases in which courts took issue with an expert's testimony regarding the general truthfulness of certain witnesses.  *Id*. at 12 (citing *United States v. Aplesa*, 690 F. App'x 630, 636 (11th Cir. 2017) (explaining that testimony regarding "cooperating witnesses often initially lie to law enforcement for various reasons" was a thinly veiled attempt to prove that a witness "was telling the truth at trial"); *Snowden v. Singletary*, 135 F.3d 732, 738 (11th Cir. 1998) (testimony that, in expert's experience, "99.5 percent of the children who report an incident of sexual abuse are telling the truth"); *United States v. Magnan*, 756 F. App'x 807, 814 (10th Cir. 2018) (holding that "an expert placing a

mathematical estimate on the rate of false accusations by victims" is "a form of impermissible credibility-bolstering testimony").  Although Dr. Wolf's proposed testimony certainly will aid the jury in making a credibility determination by potentially helping to explain some of A.S.'s behavior, it remains for the jury to determine whether Dr. Wolf's testimony is itself persuasive, applies to A.S.'s conduct, and ultimately whether or not to believe A.S.  The testimony is nothing like that in the cases on which defendant relies that essentially involve an expert insisting that a person in the witness's shoes would be highly likely to tell the truth.  Moreover, the Court fails to understand how Dr. Wolf's testimony about the general characteristics of sex abuse victims would amount to an opinion as to "whether or not sexual abuse occurred."  Def.'s Supp. Mot. to Exclude at 11.  Dr. Wolf does not intend to testify whether A.S. exhibits any behaviors typical of abuse victims, let alone whether she believes A.S. was in fact a victim of abuse.  Defendant's fourth objection thus fails.

Finally, defendant briefly asserts that Dr. Wolf's testimony should be excluded under Rule 403 because its "marginal probative value . . . is substantially outweighed by [its] prejudicial effect."  *Id*. at 12.  Defendant puts little meat on this bare-bones argument.  He does not explain what the prejudicial effect of Dr. Wolf's testimony would be, much less how any potential prejudice is "compelling or unique," *Mitchell*, 49 F.3d at 777.  He also wrongly asserts that the evidence "lack[s] any discernable probative value."  Def.'s Supp. Mot. to Exclude at 13.  As already described, the evidence will aid the jury in assessing A.S.'s conduct during and following the alleged abuse.  It therefore is highly probative and is not barred by Rule 403.

In sum, Dr. Wolf is qualified, her testimony will be of assistance to the factfinder, her proposed testimony is reliable, and it "fits" the facts of the case.  *Miller*, 608 F.3d at 895.  None of defendant's objections hold water and because they could be dealt with on the papers, no

hearing is necessary.  Dr. Wolf's proposed testimony is thus admissible under Rule 702, and

defendant's motions to exclude and for a *Daubert* hearing are denied.

## IV.    CONCLUSION

For the reasons explained below, the government's motions 1) to admit A.S.'s prior

statements is granted in part and reserved in part, 2) to admit evidence under Rule 404(b) is

granted, and 3) to bar evidence of A.S.'s sexual history and sexual predisposition is granted in

part and denied in part.  Defendant's notice of his intent to admit evidence under Rule 412,

construed as a motion under Rule 412(c)(1), is provisionally granted, pending the requisite *in

camera* hearing, as to the proffered evidence of pornographic browsing history on A.S.'s phone,

granted as to A.S.'s possible exposure to sexually explicit materials in books, music and social

media, as not subject to Rule 412, and otherwise denied as to his proffered evidence of A.S.'s

relationships with young men.  Defendant's motions to exclude the government's child sex abuse

expert and for a *Daubert* hearing are denied.

An appropriate Order accompanies this Memorandum Opinion.

Date:  October 9, 2020


_____
BERYL A. HOWELL
Chief Judge