UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 19-CR-324 |
| ) | |
| JOSEPH SMITH, ) | Chief Judge Beryl A. Howell |
| ) | |
| Defendant. ) | Trial Date: October 18, 20221 |
| ) | |

**DEFENDANT'S MOTION TO DISMISS THE INDICTMENT
PURSUANT TO THE FIFTH AND SIXTH AMENDMENTS
AND THE JURY SELECTION AND SERVICE ACT**

Mr. Smith respectfully moves this Court to dismiss the indictment against him pursuant to the Sixth Amendment to the U.S. Constitution and 28 U.S.C. §§ 1861-1869, and the Jury Selection and Service Act of 1968 ("JSSA"). The JSSA permits Mr. Smith to move to dismiss the indictment or stay the proceedings against him if he can demonstrate substantial failure to comply with the Juror Selection Plan. See 18 U.S.C. § 1867(a). Mr. Smith's jury selection is scheduled for October 18, 2021.

Mr. Smith states the following in support of this motion:

**INTRODUCTION**

Mr. Smith's ability to properly analyze jury selection records ensures a goal shared by all in the criminal legal system: petit juries that represent a fair cross-section of the community. Ensuring that petit juries represent a fair cross-section of the community is not simply about avoiding a constitutional violation. It is also essential to protecting the proper role of juries and ensuring that justice is fairly administered. Mr. Smith's request is not only authorized by the

Sixth Amendment and federal statutes, but also advances the interest all parties share in empaneling juries comprised of a fair cross-section of the community.[1]

Since Mr. Smith has been in custody, there has been a drastic change in circumstances as the novel COVID-19 coronavirus pandemic has taken ahold globally, resulting in over 240 million confirmed cases, and over 4.8 million deaths. See Johns Hopkins University & Medicine, Johns Hopkins Coronavirus Resource Center, available at: https://coronavirus.jhu.edu/map.html (last visited October 17, 2021). COVID-19 is an infectious disease that "has caused a worldwide pandemic of respiratory illness" that spreads from person to person. See Laura M. Sauer, What Is Coronavirus?, Johns Hopkins Medicine Conditions and Diseases, available at: https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus (last visited October 17, 2021).

Globally, nationally, and locally, we are living through a rapidly evolving and exponentially deteriorating public health emergency. This public health emergency threatens the lives of Americans, especially those most at risk of contracting the virus or those unable to meet social distancing recommendations.

## ARGUMENT

The Sixth Amendment provides a criminal defendant with the "right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. Amend. VI. The Supreme Court has long held the Sixth Amendment "secures to criminal defendants the right to be tried by an impartial jury drawn from sources

---

[1] Social science research has demonstrated an important relationship between diverse juries and the quality of deliberations. *See* Samuel R. Sommers & Phoebe C. Ellsworth, *How Much Do We Really Know About Race and Juries? A Review of Social Science Theory and Research*, 78 Chi.- Kent L. Rev. 997, 1027-28 (2003). The study revealed that, "[c]ompared to all-White juries, racially mixed juries tended to deliberate longer, discuss more case facts, and bring up more questions about what was missing from the trial (e.g. physical evidence that was not presented, witnesses who did not testify)." *Id*. at 1028

reflecting a fair cross section of the community." *Berghuis v. Smith*, 559 U.S. 314, 319 (2010). The fair cross- section requirement enhances the Sixth Amendment's guarantee of an "impartial" jury because, as the Supreme Court has recognized, impartiality is more likely if the jury venire is broadly representative of all segments of a community. *Taylor v. Louisiana*, 419 U.S. 522, 530-31 (1975). "When juries are not selected from a fair cross-section of the community and thus fail to fairly and reasonably represent distinctive groups in the community like African-Americans and Hispanics, the defendant's Sixth Amendment right to an impartial jury is violated." Nina W. Chernoff, *Wrong About The Right: How Courts Undermine The Fair Cross-Section Guarantee By Confusing It With Equal Protection*, 64 Hastings L.J. 141, 144 (2012).

The JSSA, codified in 28 U.S.C. § 1861, was enacted to "assure all litigants that potential jurors will be selected at random from a representative cross section of the community and that all qualified citizens will have the opportunity to be considered for jury service." *United States v. Miller*, 116 F.3d 641, 656 (2d Cir. 1997) (quoting H.R. Rep. No. 90-1076 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1792.) The JSSA echoes the requirement that "grand and petit juries [be] selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861.

In order to establish a prima facie violation of the Sixth Amendment's fair cross-section requirement, a criminal defendant must show "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systemic exclusion of the group in the jury-selection process*." Duren v. Missouri*, 439 U.S. 357, 364 (1979). "[J]ury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude

distinctive groups in the community and thereby fail to be reasonably representative thereof." *Taylor*, 419 U.S. at 538.

The JSSA gives Defendant an "unqualified right" to jury selection records. In the JSSA, Congress codified its commitment to ensuring "the right to grand and petit juries selected at random from a fair cross section of the community." 28 U.S.C. § 1861. To enforce that right, the JSSA provides for expansive access to materials: "[t]he contents of records or papers used by the jury commission or clerk in connection with the jury selection process shall not be disclosed, except…as may be necessary in the preparation or presentation of a motion [challenging jury selection procedures under the JSSA]." 28 U.S.C. § 1867(f). When a party so moves, the JSSA empowers the parties to "inspect, reproduce, and copy such records or papers at all reasonable times during the preparation and pendency of such a motion." *Id*.

Here, counsel sought records, to "determine whether [there is] a potentially meritorious jury challenge" under the JSSA. *Test v. United States*, 420 U.S. 28, 30 (1975). On October 7, 2021, at the Defendant's request, the Jury Office provided counsel with the Master Wheels. Each list contained limited demographic data but did not include race. In the following days, counsel requested racial composition of the jury venire which was provided on October 15, 2021.[2] A brief review of the materials seems to indicate that Mr. Smith's jury venire is *approximately* 29% Black or African-American, 65% White and 6% other (including, Asian, Other and Mixed Races). *See* Attachment 1. This data is disproportionate with the U.S. Census Bureau data which

---

[2] Mr. Smith did not have sufficient time between October 15, and October 17, 2021, to secure an affidavit as required by the JSSA. Counsel therefore requests that the Court allow Mr. Smith the opportunity to supplement this Motion with the required affidavit.

estimates the Washington, D.C. African-American population to be 41.4%, White population to be 39.6%, and Hispanic population to be 11.3%.[3]

As the COVID-19 global pandemic surges throughout the nation, many jurors fear potential exposure to the virus and ignore the court's summonses, limiting the jury pool. A survey conducted by the National Center for State Courts ("NCSC") found that only "64% of Latino respondents and 58% of Black respondents said they'd report for jury duty, compared to 69% of whites." Cara Bayles, *Can You Get A Fair Jury Trial During The Pandemic*? Law 360 (August 30, 2020) available at: https://www.law360.com/articles/1305161 (last visited Oct. 17, 2021).

The poll found that Black and Latina women of all ages were least likely to report for jury duty. *Id*. Instead, their male counterparts – younger white men, conservative white men, and white men without a college degree – were most likely to show up for jury duty. *Id*. This is hardly surprising as COVID-19 disproportionately affects racial and ethnic minorities. Don Bambino Geno Tai, et al., *The Disproportionate Impact of COVID-19 on Racial and Ethnic Minorities in the United States*, *Infectious Diseases Society of America* (Jun. 20, 2020).

The recent Centers for Disease Control and Prevention (CDC) study reported that "21.8% of COVID-19 cases in the United States were African Americans and 33.8% were LatinX, despite the fact that these groups comprise only 13% and 18% of the US population, respectively." *Id*. at 1. The CDC study shows that diabetes mellitus, hypertension, and obesity are pre-existing conditions that increase an individual's risk of contracting COVID-19. *Id*. African Americans suffer from a disproportionately higher rate of diabetes, hypertension, and obesity, which contributes to the disproportionate deaths among African Americans with

---

[3] https://www.census.gov/library/stories/state-by-state/district-of-columbia-population-change-between-census-decade.html

COVID-19. *Id*. "The disproportionate burden of chronic medical conditions is compounded by lower access to healthcare among some racial and ethnic minority groups" and lower-income areas where medical care is of poor quality. *Id*. at 1-2.

Moreover, COVID-19 is highly correlated with low socioeconomic backgrounds and has disproportionately affected the above-mentioned racial and ethnic communities. A recent Pew Research Center article found that "61% of Hispanic Americans and 44% of Black Americans said in April [2020] that they or someone in their household had experienced a job or wage loss due to the coronavirus outbreak, compared with 38% of white adults." Mark Hugo Lopez, Lee Rainie, and Abby Budiman, Financial and health impacts of COVID-19 vary widely by race and ethnicity, Pew Research Center (May 5, 2020) available at: https://www.pewresearch.org/fact-tank/2020/05/05/financial-and-health-impacts-of-covid-19-vary-widely-by-race-and-ethnicity/ (last visited Oct.17, 2021). Furthermore, "nearly three-quarters of black (73%) and Hispanic (70%) adults said that they did not have emergency funds to cover three months of expenses; [while only] half of white adults (47%) said the same." *Id*.

In addition to race, age is another factor to consider here, when evaluating whether a fair cross-section of the community can be obtained. The NCSC found that senior citizens are also less likely to respond to jury summons. Cara Bayles, *Can You Get A Fair Jury Trial During The Pandemic*?, Law 360 (August 30, 2020) available at: https://www.law360.com/articles/1305161 (last visited Oct. 17, 2021). The NCSC concluded that 74% of individuals under the age of 50 indicated they would report for jury duty while only 53% of individuals over the age of 65 said they would report. *Id*.

The magnitude and breadth of social and economic change in the wake of the resurgent virus is vast. Predictions about the exact ways the virus will skew summons response rates are

therefore unknown. However, a cursory review of the data provided on October 15, 2021, suggests that the group of people who answered summonses does not resemble that produced by this Court's Jury selection plan, which was carefully calibrated to produce a fair cross-section of the community.[4]

During the COVID-19 pandemic, jury duty summons rates are likely to be significantly lower among Latino and Black communities and the elderly, thereby limiting the diversity within a jury venire. Furthermore, jurors from lower socioeconomic backgrounds are inevitably placed into positions of undue hardship and risk major financial burdens if required to sit on a jury for a few days or even weeks. When a finding is made and a juror is excused for undue hardship or extreme inconvenience, the jury venire once again dwindles down into a narrow group of individuals slated to determine a Defendant's fate.

## **CONCLUSION**

For the reasons above, Mr. Smith reasonably fears that his jury will not be representative during this unprecedented time. Mr. Smith must have the opportunity to complete a full demographic analysis of the jury system and potential venires, ensuring Mr. Smith's venire is comprised of a fair cross-section of the community. Due to the disproportionate percentages of racial and ethnic minorities and the pervasive fear of contracting COVID-19, Mr. Smith potentially faces a disproportionate impact on his jury venire, compromising his Sixth Amendment right to a fair cross-section for his upcoming trial.

Respectfully submitted,
_____/s/_____
Brandi Harden
Bar No. 470706
Counsel for Joseph Smith
Harden|Pinckney, PLLC

---

[4] Counsel received the Jury Selection Plan from the Jury Office on April 1, 2021.

400 7th Street Suite 604
Washington, DC 20004
hardenpinckney@gmail.com
(202) 390-0374

## CERTIFICATE OF SERVICE

I, Brandi Harden, hereby certify that on October 18, 2021, I caused a true and correct copy of the foregoing Opposition to be served via ECF on the parties of record.

_____/s/_____
Brandi Harden