# Declaration
# in the matter of
# United States v. Joseph Smith

**by**

**Bernard R. Siskin, Ph.D.**
**Director**

**BLDS, LLC**
**Philadelphia, PA**

**November 12, 2021**

**Declaration**
**in the matter of**
**United States v. Joseph Smith**

**Bernard R. Siskin, Ph.D.**

## I. INTRODUCTION

1) I am Bernard R. Siskin, Ph.D. I am a Director of BLDS, LLC, a specialty consulting firm. Prior to joining BLDS, I did similar work at the specialty consulting firms, LECG, LLC, the Center for Forensic Economic Studies, Inc., and National Economic Research Associates (NERA). Prior to that, I was a tenured faculty member and Chairman of the Department of Statistics at Temple University in Philadelphia. I received my Ph.D. in Statistics with a minor in Econometrics from the Wharton School of the University of Pennsylvania in 1970. I have authored four books, three book chapters on statistical methodology, and numerous papers, including articles on the role of statistics in the analysis of discrimination issues. Since receiving my Ph.D., I have specialized in the application of statistics to the analysis of employment and fair lending practices and determining and assessing statistical evidence in litigation. In this capacity, I have been retained by numerous governmental and private organizations including, but not limited to, the Third Circuit Task Force on Race and Gender, the Equal Employment Opportunity Commission (EEOC), the Civil Rights Division of the United States Justice Department, the Office of Federal Contract Compliance (OFCCP), the Federal Bureau of Investigation, and various states and municipalities as well as numerous private corporations. My resume is attached as Appendix A.

## II. ASSIGNMENT

2) I have been asked by Counsel for the United States to review the jury selection process used to select potential jurors in the United Stated District Court of the District of Columbia and to determine the extent to which there is a disparity due to the selection of potential jurors between (i) the representation of African Americans or Hispanics on the master juror list that existed during the two week period coinciding with Mr. Smith's jury pool and the resulting juror pool constituting the venire for Mr. Smith and (ii) the representation of African Americans and Hispanics in the community who were eligible to serve on a jury. If such a disparity existed, I was asked to determine the causes of the disparity and the extent to which these causes impacted the disparity. I was further asked to review and comment on the expert report of Dr. Richard Seltzer dated October 19, 2021.

## III. EXECUTIVE SUMMARY

3) It is undisputed that the percent African American in Mr. Smith's venire (or in the Qualified Jury Pool) is meaningfully less than that in the community. Based on the 2020 Census, I and defendant's expert Dr. Seltzer agree that the representation disparity is 10.7 for Mr Smith's venire and 14.4 for the Qualified Jury Pool.

4) However, Dr. Seltzer incorrectly concludes that the Jury Pool selected to be potential jurors underrepresented African Americans. This conclusion is wrong. Dr. Seltzer incorrectly studied only those in the Jury Pool who responded to the summons. There is no valid evidence that those summoned for the Jury Pool were not representative of the community and, in fact, the data would indicate that it almost assuredly was representative of the community.

5) Examination of the process determined that the Source List from which selections for the Master List and Jury Pool were made overrepresented African Americans compared to the

benchmark used by Dr Seltzer and me, i.e., the percent of D.C. residents of voting age who are African American.

6) Examination of the data shows that almost all (70.7) of the disparity between Mr. Smith's venire and the community was due to African Americans not responding proportionately to the summons, with almost all of the remaining disparity explained by African Americans who responded to the summons being more likely to be disqualified because of being a convicted felon.[1]

7) Examination of the data also shows that Hispanic representation in Mr. Smith's venire was almost identical to Hispanic representation in the community.

## IV. DATA RELIED UPON

8) The data I received and relied upon is listed in Appendix B of this declaration.

## V. FINDINGS

### A. Overview of Jury Selection Process

9) In order to select potential jurors, the first step is to create a list of potential jurors who could be selected for possible jury service. Statistically, this list from which potential jurors would be selected is referred to as the sampling frame. In theory, the sampling frame should represent the persons in the community who are eligible to serve as a juror, i.e., citizens at least 18 years of age who resided in the District of Columbia for at least the last year and who also meet additional qualifications and do not have any of the grounds for exemption or excuse from jury duty delineated in the Jury Selection Plan for the United States District Court for the District

[1] The determination of whether a prospective juror is a felon is based totally on the prospective juror's response to the questionnaire.

of Columbia, as amended through October 2012 and referred to herein as the Jury Plan. However, no list of those who meet the sampling frame criteria exists. Thus, one must create a sampling frame (list or lists) which reasonably represents the community. In order to determine how well the sampling frame mirrors the racial and ethnic composition of the community of interest, the demographics of the relevant community must be estimated. The data commonly used and accepted to determine the benchmarks against which the representation of the jury selection process is judged comes from either the Decennial Census or the American Community Survey ("ACS"). The Decennial Census allows one to control for the requirements that one be a resident of the District of Columbia and at least 18 years of age. Since this data is a census of the population, it has the advantage of being comprehensive and hence accurate[2], but since the Decennial Census is done only every 10 years, the information can become dated, and since the Census does not collect information about citizenship, it cannot account for differences in rates of citizenship by race or ethnicity. A widely used alternative to the Decennial Census is the American Community Survey, which is also conducted by the U.S. Census Bureau. The ACS takes a sample of the population each month and combines the 12 months of data to produce a 1-year ACS which is sufficient to estimate the demographics of a community as large as D.C.. Since the ACS is a sample rather than a census, it is not as accurate as the Decennial Census, but it has the advantage of being timelier, unless one is looking at a decennial year, and the ACS reports counts by citizenship.

10) Unfortunately, neither the Census nor the ACS data supplies a list of names that can be used as the sampling frame from which to select the master list of potential jurors. In this case,

[2] Assuming no errors in the collection of the data related to race or ethnicity. This problem is referred to as the undercount problem with the Census.

the Jury Selection plan specifies that the sampling frame will consist of all names formed by a merge of three lists. These three lists are (1) the D.C. Board of Elections' Registered Voter Master file, (2) the Department of Motor Vehicles' file of individuals 18 years and older who hold a driver's license, learner's permit or valid identification card issued by the D.C. Department of Motor Vehicles, and (3) the list of all individuals in the District of Columbia whose income tax forms are filed with the D.C. Department of Finance and Revenue. This merged list is referred to as the "Source List." The Source List (excluding those with an address not in D.C.) becomes the Master List. The Master Wheel at issue in this case was created on December 14, 2020.

11) The Jury plan describes the jury summonsing process as follows: "Pursuant of 28 U.S.C 1878 the court uses a one-step procedure to qualify and summon jurors. From time to time as need arises, the Clerk shall cause to be drawn from the master wheel by electronic data processing procedures the names and addresses of persons to whom questionnaires and summonses will sent for the purpose of examining their qualification for jury service" (The Jury Plan Part E).

12) As a result of this selection process, those who respond and are found qualified become the pool from which the venire for trials is randomly drawn. This size of the pool is based on anticipated need for a period of time, and supplemental selections are made as needed. The selections from the Source List are a scientific random sample, intended to ensure that " The selections of names from the source list and the master wheel must ensure that the mathematical odds of any single name being picked are substantially equal" (see The Jury Plan Part D).

B. Defining the Community Benchmarks

13) The racial and ethnic mix of the community in this case normally would be best estimated from the data collected and reported from the 2020 1-year ACS sample. While the U.S. Census Bureau, 2020 Decennial Census produced for Redistricting data per public law 94-171 is more current and accurate than the ACS for assessing the percent African American in the community, the trade-off of not controlling for citizenship seems more important with regard to determining the percent African American in the community. However, because of COVID, 2020 had the lowest response rate in the history of the survey, and the results of the 1-year ACS survey were markedly different from those of the Decennial Census. The COVID problems were overcome in the Decennial Census by extending collection time (something that could not be done in the ACS) and pouring additional resources into ensuring response. As a result, the 2020 ACS sample does not meet the Census Bureaus' Statistical Data Quality Standards and, hence, the Census Bureau will not release the 2020 1-year ACS.[3] Therefore, as did the defendant did, I rely on the Census data to estimate the community's demographics. Not limiting the benchmark to citizens likely understates somewhat the benchmark for African Americans since, according to the 2020 Current Population Survey, 93% of the total population are citizens, but 97% of the African American population are citizens, so the citizenship correction should increase the African American percent of the relevant population. However, the percent of Hispanics who are citizens is markedly lower than the percent in the total population, at only 64%, and the Census data should overstate the Hispanic eligible population.

[3] https://www.census.gov/newsroom/press-kits/2021/impact -pandemic-2020 -acs-1year.html

**TABLE 1**

**ESTIMATED PERCENT AFRICAN AMERICAN AND HISPANIC IN THE D.C. COMMUNITY**

| Basis for Estimate | Percent African American | Percent Hispanic |
|---|---|---|
| 2020 Decennial Census | 39.32% | 10.50% |

C. Comparing the Percent African American and Hispanic of Mr. Smith's venire and the Qualified Jury Pool from which Mr. Smith's Venire is Randomly Drawn to the Estimated Percent African American and Hispanic in the Community

14) The jury pool associated with Mr. Smith's venire was based on a random selection of those who were randomly chosen from the Source List. That selection from the Source List was a random sample such that every entry on the Source List had an equal probability of being selected. Hence, the racial and ethnic mix of those summonsed and sent a questionnaire should closely mirror the racial and ethnic mix of the source list. Information supplied by the Jury Administrator details that of the 1,838 summons sent, 1,141 summons were not responded to, while 697 were responded to. Those who responded were asked to identify their race and ethnicity and to fill out a questionnaire which would allow one to identify whether they were qualified. The 697 questionnaire responses received allow us to determine (i) the racial and ethnicity mix of those who responded and were deemed qualified and not excused, deferred, or exempted (those persons potentially available to be randomly selected for Mr. Smith's venire), and (ii) the racial and ethnicity mix of those who were found unqualified, excused, deferred, or exempted. However, we cannot determine from the 679 persons who responded to the summons the percent African American or Hispanic among the 1,838 potential jurors sent a summons,

since we do not have self-identified race and ethnicity information for those who did not respond. Moreover, as will be shown *infra*, the statistical evidence is that the racial and ethnicity mix of those not responding is very different from that of those who did respond.[4]

15) Table 2 presents the comparison between the racial and ethnicity mix of the community compared to the racial and ethnicity mix of the qualified jury pool and the racial and ethnicity mix of Mr. Smith's venire.

**TABLE 2**

**COMPARISON OF THE PERCENT AFRICAN AMERICAN AND HISPANIC OF THE QUALIFIED JURY POOL FOR MR. SMITH'S VENIRE & MR. SMITH'S ACTUAL AND THE PERCENT AFRICAN AMERICAN AND HISPANIC IN THE COMMUNITY**

| | Percent African American | Percent Hispanic |
|---|---|---|
| Mr. Smith's Venire | 28.57% | 10.48% |
| Community defined by Census | 39.32% | 10.50% |
| Difference between Mr. Smith's Venire and Census defined Community | -10.75% | -0.02% |

16) Table 2 shows that there is no meaningful disparity between the estimate of the percent Hispanic in the community and the percent Hispanic in Mr. Smith's venire. However, there is a meaningful difference in the percent African American in the community and the percent African American in Mr. Smith's actual venire.

[4] We know that the jury pool is randomly selected from the Source List. Hence, it should closely mirror the racial and ethnic mix of the Source List. When the racial and ethnic mix of the Source List is estimated *infra*, we find that the expected demographic mix of the random sample is quite different from the demographic mix of those who responded to the summons and self-identified their race and ethnicity.

D. Possible Reasons for The Disparity in the Percent African American and Hispanic in the community and among Mr. Smith's actual venire.

17) The first possible cause for the disparities is that the Source Lists do not accurately mirror the estimate of the racial and ethnic mix of the community. If this is a meaningful difference, the determination of Source Lists could possibly be altered to reduce the disparity. The second possible cause could be the racial and ethnic mix of the random sample drawn from the Source List not perfectly matching the racial and ethnic mix of the Source List due to random chance. Probability theory would suggest that this difference would be expected to have a trivial impact given the size of the sample. Moreover, this difference occurs by chance and is not remediable. In fact, random selection is used at various other stages, such as when selecting the Jury Pool and selecting Mr. Smith's venire from the Qualified Jury Pool. Whenever random selection is used, its possible effect will depend on the sample size. More importantly, its effect is random and not remediable.[5] The third possible cause would be that the racial mix of those who respond is meaningfully different from that of those who do respond. There is no obvious way to easily remedy this without selecting from those who did respond based on a racial and ethnic quota basis. The fourth and last possible impact would be that the racial and ethnic mix of those who are disqualified, excused, or deferred is different from that of those who are found qualified, not excused, and not deferred. Unless one is challenging the rules as invalid and suggesting they should be changed, any racial or ethnic effect due to the fourth cause would be valid and not remediable by altering the jury selection process.

[5] One could make sure the random sample matches the demographics of the community, but that would require sampling based on racial quotas.

E. <u>Overview of Assessment of the Extent of Any Disparity Between Benchmark Demography and the Demography of the Source List Used to Create the Master Jury Wheel</u>

**18)** The Source List's racial and ethnic representation may vary from that of the community because, although the Source List is intended to be representative of the population of citizens 18 years and older by race and ethnicity, it is necessarily derived from imperfect data. The voter registration list may miss eligible voters because the likelihood of voting may be different by race and ethnicity. However, the DMV list augmentation would hopefully fill in the gap and make the Source List more representative of the race and ethnicity of the population of prospective jurors, since many who do not register to vote may have a Drivers' License or photo ID. Similarly, the additional information from the list of those filing D.C. tax returns would further fill in the gap and expand the population of potential jurors to make the Source List more representative. Of course, the DMV and tax return lists do not require someone to be a citizen. However, the extent to which non-citizens are on the list will only increase the number of such persons being sent a questionnaire and, although this might affect the racial and ethnic mix of the summonsed pool, it would ultimately be remedied as non-citizens who respond would not be considered qualified.

**19)** Unfortunately, no racial and ethnicity information exists for the persons on the Source List. Therefore, I had to estimate the race and ethnicity composition of the Source List. The common and widely used method for estimating race is geocoding. Geocoding is based on estimating the proportion of persons who are of a given race based on the racial mix of where they live. In defining where they live, I used the residence address on the voter registration list. Conceptually, geocoding uses the racial/ethnic mix of the area where one resides to estimate the race of persons on the list from that area. That is, if 100 persons on Source List live in an area in

which 85% of the 18 and older population are African American, then we would estimate that 85 of these 100 are African American, and 15 are not. Assuming that the probability of being in the Source List if you live in that area is the same for everyone, this racial mix estimate will be very reliable, especially if we are selecting large numbers of persons. For example, if there are 343,984 selections from the area which is 85% African American, the probability is 95% that the actual percent of African Americans will be within .001 percentage points of 85%. The more demographically homogeneous the areas defined for the geocoding, the more accurate the estimate of race will be. To maximize accuracy of the geocoding, I defined the area as the census tract,[6] which is the smallest area for which information exists about the race of persons 18 and older. To produce my estimate, I relied upon the count by race provided by the 2020 decennial US census data for redistricting data for persons 18 and older in each census tract. To estimate the percent Hispanic, I used the Bayesian Improved Surname Geocoding (BISG) method, which enhances the accuracy of the geocoding by also using information about the ethnicity of a person's last name. This method has been shown to significantly improve the estimation for Hispanics.[7]

**20)** Table 3 shows that the percent African American in the Source List overestimates the percent African American compared to the estimate of the community. Conversely, the percent Hispanic in the Source List trivially underestimates the percent.

---

[6] Census tracts generally have a population size between 1,200 and 8,000 people, with an optimum size of 4,000 people. A census tract usually covers a contiguous area.

[7] For additional information on BISG, see Elliott, M.N., Morrison, P.A., et al. "Using the Census Bureau's Surname List to Improve Estimates of Race/Ethnicity and Associated Disparities" in Health Serv Outcomes Res Method 9:69-83 (2009).

**TABLE 3**

**COMPARISON OF PERCENT AFRICAN AMERICAN AND HISPANIC IN SOURCE LIST COMPARED TO PERCENT IN COMMUNITY**

| | Percent African American | Percent Hispanic |
|---|---|---|
| Source List | 42.62% | 9.40% |
| Community defined by Census | 39.32% | 10.50% |
| Difference between Source List and Census defined Community | 3.30% | -1.10% |

**Notes**

Source list is complete list excluding those without a D.C. address.

Race based on geocoding and ethnicity on Bayesian Surname Improved Geocoding.

21) The differences between the Source List and the community in racial and ethnic representation are critical because selections from the Source List and all other lists are random. Hence, the disparity between any jury pool or venire that is greater than the disparity between the Source List and the community can only be due to two causes: (i) differences by race and ethnicity of those who respond to the summons, and (ii) differences in whether one is found qualified and not excused or deferred among those who respond. As will be shown below, the impact of the racial/ethnic disparity between those who respond and those who do not respond is large and causes the bulk of the disparity between the community in Mr. Smith's jury pool and venire, while the differences by race/ethnicity in who is qualified and not excused or deferred are very small.

F. Impact of the Racial/Ethnic Disparity Among Respondents to the Jury Summons on the Disparity between the Jury Pool and Venire and the Percent African American and Hispanic in the Community.

22) As Table 4 shows, the majority of those sent a summons did not respond, and the majority of those who did respond are disproportionately not African American and Hispanic.

**TABLE 4**

**PERCENT AFRICAN AMERICAN AND HISPANIC WHO WERE SUMMONED FOR JURY POOL BY WHETHER RESPONDED OR NOT**

| | | Percent | |
|---|---|---|---|
| | Number | African American | Hispanic |
| Responded | 697 | 29.61% | 9.36% |
| Did not respond | 1,141 | 50.57% | 9.42% |
| Overall | 1,838 | 42.62% | 9.40% |

**Notes**

Responded based on race and ethnicity reported.

Overall based on race and ethnicity of source list from which randomly selected.

Did not respond based on percents responding and overall by race and ethnicity.

Percentages exclude unknowns.

Table 4 shows that there is a large drop in the representation of African Americans in the Qualified Jury Wheel because they disproportionately did not respond to the summons. Hispanics were also disproportionately underrepresented on the Qualified Jury Wheel because they did not respond to the summons, but to a much smaller degree.

23) Table 5 assesses whether a White or non-African American who responded was more or less likely than an African American to be found qualified, disqualified, excused or deferred. Table 5 also presents the same comparison for Hispanics and non-Hispanics.

**TABLE 5**

**COMPARISON OF RACE AND ETHNICITY OF THOSE WHO RESPONDED TO SUMMONS FOR JURY POOL BEING FOUND QUALIFIED, DEFERRED, DISQUALIFED AND EXCUSED**

| | Total Responses | | Qualified | | | Deferred | | Disqualified | | Excused | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Race | Number | Percent of all Race Responses | Number | Percent of All Qualified | Percent of Race Responses | Number | Percent of All Race Responses | Number | Percent of All Race Responses | Number | Percent of All Race Responses |
| Black/African American | 175 | 25.77% | 77 | 24.92% | 44.00% | 6 | 3.43% | 32 | 18.29% | 60 | 34.29% |
| White | 422 | 62.15% | 199 | 64.40% | 47.16% | 25 | 5.92% | 47 | 11.14% | 151 | 35.78% |
| Asian | 35 | 5.15% | 14 | 4.53% | 40.00% | 1 | 2.86% | 7 | 20.00% | 13 | 37.14% |
| Other Races | 26 | 3.83% | 11 | 3.56% | 42.31% | 3 | 11.54% | 8 | 30.77% | 4 | 15.38% |
| Multi Races | 21 | 3.09% | 8 | 2.59% | 38.10% | 2 | 9.52% | 2 | 9.52% | 9 | 42.86% |
| non-Black/African American | 483 | 71.13% | 224 | 72.49% | 46.38% | 29 | 6.00% | 62 | 12.84% | 168 | 34.78% |
| Hispanic | 64 | 9.40% | 27 | 8.77% | 42.19% | 4 | 6.25% | 21 | 32.81% | 12 | 18.75% |
| non-Hispanic | 617 | 90.60% | 281 | 91.23% | 45.54% | 33 | 5.35% | 78 | 12.64% | 225 | 36.47% |

**Notes**

The rates of responses for all races other than Black/African American are compared statistically to the Black/African American rate and the rate for non-Hispanics is compared to Hispanics.

Cells highlighted in red are cases where the rate for African Americans or Hispanics is statistically significantly worse. Cases not highlighted indicate the rate for African Americans or Hispanics is not statistically significantly worse.

24) Table 5 shows that there is little meaningful difference in the racial and ethnic mix of those who responded and those who were found not qualified, excused,[8] and deferred. The differenced in the rates between African Americans and Whites or non-African Americans was not statistically significant, except that African Americans were more likely than Whites to be disqualified. Hispanics were more likely than non-Hispanics to be disqualified.

25) The reason African Americans were statistically significantly more likely than Whites or non-African Americans to be disqualified was because African Americans were more likely to

[8] I understand there was a question about differences by race or ethnicity in the likelihood of excused for COVID 19. There was no statistically significant difference between Whites and non-African Americans and African Americans, and Hispanics and non-Hispanics in the likelihood of being excused overall, and that pattern holds true with regard to being excused specifically for COVID 19.

be a convicted felon. The reason Hispanics were statistically significantly more likely to be disqualified is because they were more likely to be non-citizens. The likelihood of being deferred and excused was not meaningfully different between Whites or non-African Americans and African Americans or among Hispanics and non-Hispanics.

26) The difference between the Qualified Jury Pool and Mr. Smith's venire is due totally to chance and is small (see Table 6).

**TABLE 6**

**COMPARISON OF THE PERCENT AFRICAN AMERICAN AND HISPANIC OF THE QUALIFIED JURY POOL FOR MR. SMITH'S VENIRE AND MR. SMITH'S ACTUAL VENIRE**

| | Percent African American | Percent Hispanic |
|---|---|---|
| Mr. Smith's Venire | 28.57% | 10.48% |
| Qualified Jury pool | 24.92% | 8.77% |
| Difference between Venire and Qualified Jury Pool | 3.65% | 1.71% |

G. Technical Issue in Drawing Random Sample from Source List.

27) The Source List is a combination of three lists. It is my understanding that the entries on the list that do not have a District of Columbia address were not part of the random selection, but all other entries were. That is, the random selection was based on all entries on the list such that each entry had an equal probability of being selected. While each entry had an equal probability of selection, each person on the Source List did not, because persons who appeared on more than one of the lists comprising the Source List may have been on the Source List multiple times. That is, a person on two lists would be twice as likely to be selected as a person on only one list.

The problem is not that a person would be selected multiple times, which is handled in the processing of responses, but that the multiple appearances may have an impact on the demographic mix of the Master List. In that case, the selections from the Source List would not be a proper random sample of persons on the list in that each entry on the Source List had an equal probability of selection, because each person on the Source List did not have an equal probability of selection. Thus, I conducted an analysis to determine the impact on the demographic mix of the Master Wheel of not removing the duplicates from the Source List before selecting a random sample.

28) Table 7 delineates the racial mix of the each of the components of the Source List.

**TABLE 7**

**GEOCODING RACE ESTIMATES FOR EACH SOURCE LIST AND BISG HISPANIC ESTIMATES FOR EACH SOURCE LIST LIMITED TO D.C. ADDRESSES**

| | | Percent | | |
|---|---|---|---|---|
| Source | Total | White | African American | Hispanic |
| Source = "V" | 401,237 | 42.20% | 44.69% | 9.75% |
| Source = "D" | 154,256 | 39.02% | 46.46% | 11.53% |
| Source = "O" | 359,891 | 47.28% | 38.67% | 10.54% |
| Complete Wheel | 915,384 | 43.66% | 42.62% | 10.36% |

29) The percent African American is similar on the voter list and the DMV list, but much lower on the taxpayer list. Augmenting the voter lists slightly increased the percent African American. Augmenting the voter lists also slightly increases the percent Hispanic. However, merging the lists creates duplicate records for the same person to the extent the same person is on multiple lists. The bulk (64%) of the unique names are on the voter list, with an additional 22%

of new names added from the DMV, and another 14% of new names added from the tax lists. Since a person can only be asked to serve once, I removed the duplicates from the list by matching names on a fuzzy name basis,[9] and included a birth date match if the date of birth was recorded. The demographic mixes of the Source List with and without the duplicates removed are presented in Table 8.

**TABLE 8**

**COMPARISON OF RACE AND ETHNICITY OF SOURCE LIST WITH D.C. ADDRESS WITH AND WITHOUT DUPLICATE PERSONS REMOVED**

| Source List | Juror Records | Unique Person | Percent White | Percent African American | Percent Hispanic |
|---|---|---|---|---|---|
| Duplicates Removed | 915,384 | 629,991 | 42.93% | 43.24% | 10.17% |
| As is | 915,384 | N/A | 43.66% | 42.62% | 9.40% |

30) The failure to remove the duplicates from the Source List before random selection slightly reduced the percent African American and slightly increased the percent Hispanic.

H. Summary of the |Causes of the Disparity Between the Percent African American and Hispanic in the Community and the Jury Pool and Mr. Smith's Venire

31) Table 9 summarizes the impact of the different factors causing the disparity in the percent African American and Hispanic in the community and the percent African American and Hispanic in Mr. Smith's venire.

[9] Names can be difficult to match due to spelling differences, inclusion/exclusion of middle names, and last name changes. I utilized a technique called trigram matching. Trigrams are a set of all possible three character substrings which exist in a string and a match is identified when at least 50% of the strings matched.

**TABLE 9**

**ANALYSIS OF ABSOLUTE DISPARITY BETWEEN MR. SMITH'S VENIRE AND COMMUNITY BASED ON CENSUS AND THE IMPACT OF THE CAUSES ON THE DISPARITY**

| | Percent | | Disparity Compared to Community* | | Difference in Disparity Due to Cause | | % of Disparity Between Venire and Community Due to Cause |
|---|---|---|---|---|---|---|---|
| Entity | African American | Hispanic | African American | Hispanic | African American | Hispanic | African American |
| Cause of Difference | | | | | | | |
| Mr. Smith's Venire | 28.57 | 10.48 | 10.75 | 0.02 | | | |
| Due to random selection variation | | | | | -3.65 | -1.71 | |
| Qualified Jury Pool | 24.92 | 8.77 | 14.4 | 1.73 | | | |
| Due to being excused or deferred | | | | | -0.40 | -1.38 | |
| Due to not being found qualified | | | | | 5.09 | 1.97 | 27.6% |
| Due to did not respond to summons | | | | | 13.01 | 0.04 | 70.7% |
| Jury Pool Summoned | 42.62 | 9.40 | -3.30 | 1.10 | | | |
| Due to random selection variance** | | | | | 0 | 0 | |
| Source list in DC | 42.62 | 9.40 | -3.30 | 1.10 | | | |
| Due to not removing duplicates before random selection | | | | | 0.31 | 0.77 | 1.7% |
| unique person on source list and in DC | 42.93 | 10.17 | -3.61 | 0.33 | | | |
| Due to demographics of persons on source list not matching community estimated demographics | | | | | -3.61 | 0.33 | |
| Community estimate based on Census | 39.32 | 10.50 | | | | | |

32) Table 8 shows that the overwhelming cause of the disparity was the difference in African American representation in Mr. Smith's venire (and the Qualitied Jury Pool), which was due to African Americans disproportionately not responding to the summons. This explained 70.7% of the disparity. African Americans being disqualified because they were convicted felons explain 27.9% of the disparity. Not removing duplicates, the Source List before random selection had a trivial adverse impact on African American representation.

## VI. REVIEW OF DR RICHARD SELTZER'S REPORT

33) Dr. Seltzer compares the percent African American to what he calls total jury pool, the Qualified Jury Pool, and Mr. Smith's venire to the community based on the Census.[10] Defendant concludes that "due to the disproportionate percentages of racial and ethnic minorities and the

[10] My community estimates based on the Census are the same as Dr. Seltzer's.

pervasive fear of contracting COVID 19 Mr. Smith potentially faces a disproportionate impact on his jury venire."

34) Dr. Seltzer' analysis does not include ethnic minorities, nor does it study the impact of COVID, or any reasons as to why the disparity occurs, or what in the process is causing the disparity.

35) I agree with his finding that there is a substantial disparity between the percent African American in the community and the Qualified Jury Pool and Mr. Smith's venire but, as I show, this is exclusively due to African Americans being less likely to respond to the summons and, to a much lesser extent, due to African Americans who did respond being disproportionately disqualified because they were convicted felons.

36) His conclusion that the percent African American in the total jury pool is meaningfully not representative of the community is wrong, since he does not have data on the total Jury Wheel. His data included only persons who responded to the summons. Moreover, since the summons were randomly selected from the Source List in which African Americans were overrepresented compared to the community, it is likely that those summonsed will similarly be overrepresented (or at least similarly represented) compared to the community. If one randomly selects 1,838 persons from the Source List, the probability that the sample would be at least 39.32% African American (the level of the community) is 0.999.

Bernard R Siskin

Bernard R. Siskin, Ph.D.
Dated: November 12, 2021

# APPENDIX A

# BLDS, LLC

**Bernard R. Siskin, Ph.D.**
**Director**

1608 Walnut Street
Suite 1108
Philadelphia, PA 19103 USA

Main: 215.717.2320
Fax: 215.717.2324
Email: statgroup@bldsllc.com

**SUMMARY**

Bernard Siskin received his B.S. degree in Mathematics from the University of Pittsburgh and a Ph.D. in Statistics from the University of Pennsylvania. For many years, he taught statistics at Temple University and served as Chairman of the Department of Statistics.

Dr. Siskin has specialized in the application of statistics in law, particularly in the area of analyzing data for statistical evidence of discrimination. He has testified for both plaintiffs and defendants in more than 200 cases, many of which were large employment class actions. In addition to discrimination studies, he has conducted statistical studies and has testified in commercial and environmental cases involving statistical issues.

Dr. Siskin has frequently been appointed by federal judges as a neutral expert to aid the court in statistical issues and he was the statistical consultant to the Third Circuit Court of Appeals Task Force on Equal Treatment in the Courts. I was also appointed by the Court as an Expert to measure the accuracy of the CCC vehicle valuation methodology and I suggested possible modifications to the methodology.

Dr. Siskin is the author of many articles and textbooks on statistics and quantitative techniques including *Elementary Business Statistics, Encyclopedia of Management* and *Quantitative Techniques for Business Decisions.* He has also written and lectured extensively on the use of statistics in litigation.

He has served as a statistical consultant to the U.S. Department of Justice, the Equal Employment Opportunity Commission, the U.S. Department of Labor, the Federal Bureau of Investigation, the Central Intelligence Agency, the Environmental Protection Agency, the National Aeronautics and Space Administration, Consumer Financial Protection Bureau (CFPB), OFCCP and Fannie Mae (the Federal National Mortgage Association) and Freddie Mac (the Federal Home Loan Mortgage Corporation), as well as numerous other federal, state and city agencies and Fortune Five Hundred corporations.

# BLDS, LLC

**EDUCATION**
University of Pennsylvania
Ph.D., Statistics (Minor, Econometrics), 1970

University of North Carolina
Graduate Study (Major, Economics; Minor, Statistics), 1966

University of Pittsburgh
B.S., Mathematics (Minor, Economics), 1965

**PRESENT POSITION**
BLDS, LLC, Director, 2011

**TEACHING EXPERIENCE**
Temple University, Adjunct Professor of Law School, 1992 to 2005
Temple University, Tenured Associate Professor of Statistics, 1973 to 1984
Temple University, Chairman-Department of Statistics, 1973 to 1978
Temple University, Assistant Professor of Statistics, 1970 to 1973
Temple University, Instructor of Statistics, 1968 to 1970

**OTHER POSITIONS HELD**
LECG, Director, 2003 to 2011
Center for Forensic Economic Studies, Senior Vice President, 1991 to 2003
National Economic Research Associates, Inc., Senior Vice President, 1989 to 1991
National Economic Research Associates, Inc., Vice President, 1986 to 1989
Center for Forensic Economic Studies, Ltd., President, 1984 to 1986
Center for Forensic Economic Studies, Ltd., Consultant, 1980 to 1984

**PUBLICATIONS**
Books

1. B. Siskin and N. Schmidt, "Proper Methods for Statistical Analysis of Promotions," *Adverse Impact Analysis: Understanding Data, Statistics, and Risk*, Psychology Press, 2017, S. Morris and E. Dunleavy, eds.
2. B. Siskin, "Employment Discrimination Litigation: Behavioral, Quantitative, and Legal Perspectives" John Wiley & Sons, Inc. 2005, Chapter 5 *Statistical Issues in Litigation* (with Joseph Trippi).
3. B. Siskin, "Use of Statistical Models to Provide Statistical Evidence of Discrimination in the Treatment of Mortgage Loan Applicants: A Study of One Lending Institution," *Mortgage Lending, Racial Discrimination and Federal Policy*, Urban Institute Press, 1996, J. Georing and R. Wienk, eds.
4. B. Siskin and J. Staller, *What Are The Chances?*, Crown Publishers, 1989.

# BLDS, LLC

**PUBLICATIONS (Continued)**

Books (Continued)

5. B. Siskin and R. Johnson, *Elementary Statistics: A First Course*, Duxbury Press, 1982.
6. B. Siskin and R. Johnson, *Elementary Business Statistics*, Duxbury Press, 1979
   2nd Edition, 1985
7. B. Siskin, *Encyclopedia of Management*, McGraw Hill, 1979. (Ed. Les Bechtel).
8. B. Siskin and R. Johnson, *Quantitative Techniques for Business Decisions*, Prentice Hall, 1976.

Articles

1. B. Siskin and D. Griffin, "Litigating Employment Discrimination & Sexual Harassment Claims," *Litigation Handbook Series*, 2002.
2. B. Siskin, H. Carter, V. Lee, G. Page, M. Parker, R.G. Ford, G. Swartzman, S. Kress, S. Singer and D.M. Fry, "The 1986 Apex Houston Oil Spill in Central California: Seabird Mortality and Population Impacts, Injury Assessments, Litigation Process, and Initial Restoration Efforts," *Marine Ornithology*, 2002.
3. B. Siskin, AUtilizing Statistics in Discrimination Cases,@ *Litigation Handbook Series*, 2001.
4. B. Siskin, B. Sullivan, J. Staller, and E. Hull, ADefending and Proving Damages in Employment Discrimination Cases,@ *Litigation Handbook Series*, 2000.
5. B. Siskin, "Litigating Employment Discrimination Cases," *Litigation Handbook Series*, 1998.
6. B. Siskin and D. Kahn, "Litigating Employment Discrimination Cases," *Litigation Handbook Series*, 1997.
7. B. Siskin, R. DuPont, D. Griffin, S. Shiraki, and E. Katze ARandom Workplace Drug Testing. Does It Primarily Identify Casual or Regular Drug Users?,@ *Employment Testing Law & Policy Reporter*, Vol. 4, Number One, 1995.
8. B. Siskin, R. DuPont, D. Griffin, S. Shiraki, and E. Katze "Random Drug Tests at Work: The Probability of Identifying Frequent and Infrequent Users of Illicit Drugs," *Journal of Addictive Diseases*, Vol. 14, Number 3, 1995.
9. B Siskin, J. Staller, B. Sullivan and L. Freifelder, "Litigating Employment Discrimination Cases," *Litigation Course Handbook Series*, 1995.
10. B. Siskin, "Comparing the Role of Statistics In Lending and Employment Cases," *Fair Lending Analysis: A Compendium of Essays on the Use of Statistics*, American Bankers Association, 1995.
11. B. Siskin, "Relationship Between Performance and Banding," *Human Performance*, Vol. 8, No. 3, July 1995.
12. B. Siskin, "Statistical Issues in Litigating Employment Discrimination Claims," *Federal Publications*, 1993.
13. B. Siskin, "Use of Statistical Models to Provide Statistical Evidence of Discrimination in the Treatment of Mortgage Loan Applicants: A Study of One Lending Institution," *Discrimination and Mortgage Lending Research and Enforcement Conference* Department of Housing and Urban Development, May 1993.

# BLDS, LLC

**SPEECHES (Partial List)**

1. Alabama Bar Association
2. American Bar Association
3. American Financial Services Association
4. American Statistical Association
5. Defense Research Institute
6. Federal Bar Association
6. Harvard University
7. Institute of Industrial Research
8. International Organization of Human Rights Association
9. Law Education Institute
10. Law Enforcement Assistance Administration
11. Michigan Bar Association
12. National Center on Aging
13. Ohio Bar Association
14. Penn State University
15. Pennsylvania Human Relations Commission
16. Practising Law Institute
17. Security Industry Association
18. Women's Law Caucus: National Conference

**STATISTICAL CONSULTANT (Partial List)**

1. Attorney General's Office of the Commonwealth of Pennsylvania, and states of California, Oregon, Massachusetts, Connecticut, Mississippi, Louisiana and New Jersey
2. Board of Higher Education for Massachusetts and Oregon
3. Central Intelligence Agency (CIA)
4. Environmental Protection Agency (EPA)
5. Equal Employment Opportunity Commission (EEOC)
6. Federal Bureau of Investigation (FBI)
7. Freddie Mac (Federal Home Loan Mortgage Corporation)
7. Fannie Mae (Federal National Mortgage Association)
8. Homeland Security
9. International Organization of Human Rights Associations
10. Municipal Court of Philadelphia
11. National Aeronautics and Space Administration (NASA)
12. Office of Federal Contract Compliance, Department of Labor (OFCCP)
13. Pennsylvania Human Relations Commission
14. Security Exchange Commission
15. Third Circuit Court of Appeals Task Force on Equal Treatment in the Courts
16. U.S. Department of Agriculture
17. U.S. Department of Commerce
18. U.S. Department of Labor
19. U. S. Justice Department
20. Numerous Fortune 500 and other private corporations

# APPENDIX B

**Data Relied Upon for my Report**

Master Source List

Disqualified Persons Pool 10121001 10-27-2021 (Excel file)

DOCDATA.cvs Persons instructed to report 10182021 (Excel file)

JMS Code (PDF file)

Jury Plan Selection (PDF file)

Panel (Excel file)

Pool of Excused Disqualified, deferred (Excel file)

Summoned Have Not Responded (Excel file)