# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Action No. 19-324 (BAH) |
| JOSEPH SMITH, | Chief Judge Beryl A. Howell |
| Defendant. | |

## MEMORANDUM OPINION

After a seven-day jury trial that began with jury selection on October 18, 2021, defendant was convicted on October 27, 2021, by a jury drawn from the citizens of the District of Columbia, on ten counts of production and possession of child pornography, enticement, and aggravated sexual abuse of a minor, in violation of federal and D.C. law, stemming from a series of incidents involving his step-daughter as she was just entering her teenage years.

Just hours before the start of his trial, defendant filed the pending motion to dismiss his indictment, with briefing completed over the course of the following months.  Defendant principally asserts that, because of the disproportionate impact of the COVID-19 pandemic on racial and ethnic minority communities, the jury selection plan used in this District is incapable of providing a jury pool drawn from sources reflecting a fair cross section of the community, as required by the Sixth Amendment and the Jury Selection and Service Act ("JSSA"), 28 U.S.C. § 1861 *et seq*.

Defendant successfully demonstrates that, at least during the pandemic, Black petit jury pool representation, in particular, falls short of full proportionality with the census-confirmed demographics of the community.  His motion brings to light that steps must be considered both to increase Black participation in juries in this District and to improve the Court's internal

1

processes in administering the jury pool—and such consideration is already underway.  At the same time, however, the factual support garnered for this motion does not provide sufficient reason to dismiss defendant's indictment or provide relief from his validly rendered conviction. For the reasons discussed in detail below, the pending motion must be denied.

## I.      BACKGROUND

The relevant background for disposition of defendant's pending motion is set out in three broad categories, starting with an overview, from start to finish, of this Court's Jury Selection Plan and the multiple steps involved in the process of seating a jury, followed by details of how this process was implemented in defendant's case and the relevant procedural history.

### A.      This Court's Jury Selection Plan

This Court maintains, and posts publicly on its website, a Jury Selection Plan outlining the procedures to be followed to assemble a venire of petit jurors for any jury trial at the request of a presiding Judge.  *See* Jury Selection Plan for the United States District Court for the District of Columbia for the Random Selection of Grand and Petit Jurors ("Plan") (as amended through October 2012).[1]  An overview of the central features of the Plan, as well as the terminology associated with the various phases of jury selection, is helpful in understanding the pending challenge to the venire from which a petit jury was selected for defendant's October 18, 2021 trial.

#### 1.      *Data Sources for Source List Used to Create Master Jury Wheel*

Jury selection for trials in federal court in the District of Columbia (the "District") begins with the periodic collection—at least once every four years—of three sources of data aimed at

---

[1]      The Plan (available at https://www.dcd.uscourts.gov/sites/dcd/files/JurySelectionPlan.pdf) also provides similar procedures for selection of grand jurors, but the instant motion raises no objection to the composition of, or selection process used to empanel, the grand jury that returned defendant's indictment on September 25, 2019.

identifying adult residents of the District: (1) a master list of registered voters provided by the D.C. Board of Elections; (2) a list of persons at least 18 years of age who "hold a driver's license, learner's permit, or valid identification card issued by the D.C. Department of Motor Vehicles" ("DMV"); and (3) a "list of all individuals of the District of Columbia whose income tax forms are filed with the D.C. Department of Finance and Revenue."  Plan ¶¶ B, D.  Any person appearing on one of these lists may also appear on either or both of the other two lists. Accordingly, the three lists are "merged" into the "Source List," Plan ¶ C, a process that employs the services of an outside vendor to deduplicate instances of individuals appearing in more than one of the underlying data sources.[2]

The Plan then calls for the "master jury wheel" to be constructed from the "Source List," again at least every four years, by electronically drawing a random subset of no less than 1,000 and no more than 700,000 entries from the Source List.  Plan ¶¶ D, D.1.  In recent years, the targeted size of the master jury wheel has been set to 600,000, below the 700,000-entry cap provided in the Plan.  Although not expressly provided in the Plan, after the master jury wheel is built, the set of 600,000 entries is periodically updated using a national change-of-address database operated by the U.S. Postal Service for the dual purposes of (a) obtaining the most up-to-date mailing address information available and (b) identifying persons whose names appeared

---

[2]     Given the different purposes of, and types and formatting of information furnished in, each of the three data sources, the deduplication process, when performed at scale, naturally results in some persons still appearing on the merged Source List more than once and, conversely, other persons being omitted from the merged Source List altogether despite appearing in one or more of the original data sources.  For example, an individual whose name appears differently across the data sources—because of, for example, a typographical error or name change—might not be fully deduplicated during the merge process and appear more than once but under different versions of the name.  Conversely, two persons sharing the same name and residing at the same address (as might happen, for example, when a child and parent share the same name and address) could find themselves erroneously deduplicated into a single record.  The implementation of a deduplication process requires design decisions in the criteria used to perform matches to balance the possibilities of over- and under-inclusion—decisions that may slightly affect the ultimate composition of the Source List but that are beyond the scope of the parties' arguments regarding the instant motion and, accordingly, need not be further addressed.

on the original data sources used to build the Source List and master jury wheel but since ceased to be residents of the District of Columbia and therefore must be disqualified from service.  *See* Def.'s Second Supp. Mot. Dismiss Indictment Pursuant Fifth & Sixth Amendments & Jury Selection & Service Act ("Def.'s Sur-Reply"), Ex. A, *United States v. Lutamila*, No. 20-cr-24 (JEB), Testimony of Jury Administrator Regina Larry, Jan. 5, 2022 ("Larry Test.") at 5:14–23, 12:7–13:6, ECF No. 180-4.  Additionally, a vendor database is used to identify deceased persons on the wheel and exclude them from being sent a summons.  *See id.* at 12:18–21.  These two master jury wheel maintenance activities are repeated at least annually.[3]

### 2.   *Random Selection from Master Jury Wheel for Two-Week Pool*

From the master jury wheel, the Jury Office periodically draws, at random, a group of names of potential jurors, sized to meet the anticipated needs of upcoming scheduled trials.  Plan ¶ E.  While the specific frequency is not dictated by the Plan, in practice the Jury Office draws, in advance, a set of potential jurors for a two-week window of trial start dates.  Each prospective juror whose name is randomly drawn from the master jury wheel is mailed a summons and a juror qualification questionnaire.  *Id.*  The purpose of the questionnaire is to furnish information to the Jury Office necessary to determine whether the respondent should be included in the list of prospective jurors who may potentially be called upon to appear on the day a trial is scheduled to begin.  Based on the questionnaire responses, this filtering of the respondents removes from further consideration individuals who are: (1) disqualified from jury service by statute; (2) exempted from service, also by statute; (3) in classes of persons the Plan excuses from

---

[3]     Certain current practices, such as the 600,000-entry "cap" in the master jury wheel and the periodic maintenance activities performed on the master jury wheel, are not formally documented in the Plan and have been ascertained through direct communications with relevant Clerk's Office personnel and the outside vendor, as well as through examination of the wheel itself.  Modifications to the text of the Plan are underway, intended to increase transparency about the process used to maintain and implement the Plan.

service and who elect to exercise such excuse; or (4) temporarily excused from service by request.  Each of these categories for removal is described more fully below.  While both the summons and questionnaire contain cautions about repercussions from failing to respond, no action is taken with respect to persons who fail to respond to the summons.

"Qualifications" to serve take the form of bright-line criteria spelled out in the Plan.  *Id.* ¶ H.  These criteria—including such requirements that a juror be a citizen of the United States, can read, write, and understand English, and has not been convicted of a felony (without subsequent restoration of rights)—are materially identical to the qualifications dictated by statute.  *Compare id.*, *with* 28 U.S.C. § 1865(b).  Next, certain groups are "exempt"—in other words, "barred"—from jury service, with similar effect as disqualification.  *See* 28 U.S.C. § 1863(b)(6); Plan ¶ H.1.  "Exempted" persons include active service members of the U.S. Armed Forces, members of police and fire departments, and certain government officers.  28 U.S.C. § 1863(b)(6); Plan ¶ H.1.

The Plan then sets forth "classes of persons [who] shall be excused from jury service when the individual requests to be excused," finding that such service would "entail undue hardship or extreme inconvenience to the members thereof."  Plan ¶ H.2.  This provision, too, is directed by statute, 28 U.S.C. § 1863(b)(5), though implementation is largely left to each court to make appropriate findings defining these groups in its plan.[4]  In this District, for example, the Plan excuses, upon request, persons over 70 years of age, and persons "who have served as grand or petit jurors" in this Court in the previous two years.  Plan ¶ H.2.

---

[4] The statute requires that "volunteer safety personnel," specifically those serving "without compensation, as firefighters or members of a rescue squad or ambulance crew," be excused from service upon request.  28 U.S.C. § 1863(b)(5)(B).  The Plan so provides.  Plan ¶ H.2.c.

Finally, the Plan, again consistent with statute, provides that "any person summoned for jury service may be *temporarily* excused upon a showing of undue hardship or extreme inconvenience."  Plan ¶ H.4 (emphasis added); *see also* 28 U.S.C. § 1866(c).  As implemented, the Court delegates authority to the Clerk's Office to evaluate whether the reason for excuse given by a particular summons respondent is a valid reason to excuse such person from service in a particular qualified two-week pool.  Any temporarily excused respondent may still be drawn anew from the master jury wheel at a later date.  Plan ¶ H.4.

The result of this process is a "qualified two-week pool" of prospective jurors who: (1) were randomly drawn from the master jury wheel and mailed a summons and questionnaire; (2) returned the questionnaire; (3) are neither disqualified nor exempt; (4) did not exercise an excuse available as of right; and (5) either did not request a temporary excuse from service or such request was denied.

### 3.     *One-Step vs. Two-Step Processes*

In developing the "qualified two-week pool," the Plan, as outlined above, employs a "one-step procedure."  Plan ¶ E; *see United States v. Hsia*, 125 F. Supp. 2d 6, 9 (D.D.C. 2000) ("As permitted under the Section 1878 of the [JSSA], this district and 22 others employ a one-step jury selection process.").  This means that the determination whether a prospective juror is eligible to serve (and not excused) is made *after* summonses are mailed, not before.  The alternative, a "two-step" process, separates the qualification and summons phases and reverses their sequence.  In the first step of a two-step process, a random subset of names from the master jury wheel is periodically drawn and mailed a qualification questionnaire, not in anticipation of any particular upcoming trial or trials.  *See* 28 U.S.C. § 1864(a).  Respondents' questionnaires are reviewed to determine eligibility for service, and the names of persons deemed qualified (and

neither exempt nor excused) are placed in a "qualified jury wheel."  28 U.S.C. § 1866(a).  In the second step, when the court anticipates needing jurors for an upcoming trial, summonses are issued and sent to the necessary number of these pre-qualified prospective jurors.

The JSSA is organized with a two-step process in mind, *see* 28 U.S.C. § 1864(a) (questionnaires and qualification); *id.* § 1866(a) (summonses).  Nevertheless, the JSSA also expressly authorizes the use of a "one-step" process like that set forth in the Plan, *id.* § 1878(a), and bars any challenge to a jury selection process predicated "solely on the basis that a jury was selected in accordance with a one-step summoning and qualification procedure," *id.* § 1878(b).

### 4.    *Selection of a Venire*

Under the Plan as implemented, prospective jurors in the "qualified two-week pool" are advised that for any given day in that window, they may be notified the prior evening to appear at the courthouse in the morning for jury selection.  When a presiding judge requests a venire of a particular size for a scheduled jury trial, the Jury Office generally calls in more prospective jurors than the requested number to account for the possibility of no-shows.  A venire of the size requested by the judge is drawn randomly from the group of persons who report on the morning of jury selection.  With that venire assembled and sent to the courtroom where jury selection will occur, the process of voir dire can begin.

### 5.    *Voir Dire*

While jury selection methods vary by presiding judge, in this case, the "struck method" of selecting the jury from the venire present was used.  *See generally* Order Regarding Trial Procedures, Attach. A, Jury Selection Process to Ensure Necessary Social Distancing During COVID-19 Pandemic, ECF No. 150.  The prospective jurors comprising the venire are listed in randomly selected order on the venire list circulated to the parties' counsel, and individual voir

7

dire is conducted *seriatim* in the random order listed to produce a qualified venire of 32, after excusing any panelists for cause on motion of either party. *Id.* ¶¶ 2, 4, 9. From this qualified venire, peremptory challenges are exercised, leaving a final jury of 12 regular jurors and 2 alternates. *Id.* ¶¶ 10, 11.

*   *   *

For the sake of clarity, the following is a summary of the critical phases in the jury selection process, along with relevant information from this case referenced parenthetically (and described in more detail in the next section), and the terminology used in this opinion to describe key elements in each phase. Every four years, data is obtained from voter registration records, the DMV, and taxpayer records. These three "*data sources*" are merged, with duplicates removed, into the "*Source List*." A random subset of 600,000 entries from the Source List is selected, yielding the "*master jury wheel*," on which certain list maintenance activities are periodically performed. On a rolling basis corresponding to two-week windows of potential trial start dates, the Jury Office sends out summonses and questionnaires to a group of around 1,800-2,000 randomly selected persons—the "*summons list*" (here, 1,837 entries)—from the master jury wheel. Out of those issued summons, some fraction of the questionnaires are completed and returned to the Jury Office, forming the group of "*respondents*" (here, 697 persons). The Jury Office processes disqualifications, exemptions, and excuse requests presented by respondents, with the group of remaining respondents called the "*qualified two-week pool*" (here, 309 persons).

The evening of the business day prior to the start of trial, a number of randomly selected persons in the qualified two-week pool are notified by a phone messaging system that they are directed to report the following morning for jury selection—the "*directed-to-report list*" (here,

105 persons).  Out of the persons who report as directed, a subset reflecting the number requested by the presiding judge to report to the courtroom for voir dire is randomly selected as the "*venire*" (here, 65).  Individual voir dire is conducted under the supervision of the presiding judge (here, on 57 persons) until 32 persons, who, after vetting, are not dismissed for cause upon motion by one or both of the parties, comprise the "*qualified venire*" (here, 32 persons).  After the parties exercise peremptory challenges against the qualified venire, the "*jury*" of 14 persons, of whom 2 are alternates, is approved by the parties and then sworn in.

### B.    Master Jury Wheel Used for Defendant's Jury

The petit jury selection process for defendant's trial fully complied with the Plan in all respects except for a now-resolved issue in the composition of the master jury wheel extant at the time of defendant's trial, which issue was caused by an error in the deduplication process by the outside vendor and was compounded by an internal Clerk's Office effort to rectify that error. *See* Def.'s Sur-Reply, Ex. B, Letter from Regina Larry, D.D.C. Clerk's Office Jury Administrator, to Judge Boasberg ("Larry Letter") (Jan. 25, 2022), ECF No. 180-5.[5]

When constructing the Source List in advance of the December 2020 regular deployment of a new master jury wheel, a programming error by the outside vendor caused only one name to be included in the Source List from the list of District of Columbia tax return filers—the third data source used to populate the list, after voter and DMV records.  Larry Letter.[6]  A master jury

---

[5]    The outside vendor used by this Court is on the list of four vendors recommended by the Administrative Office of the U.S. Courts as providing "jury wheel support services for the federal judiciary."  *Vendor Support Services for Jury Wheels*, ADMIN. OFF. U.S. COURTS (internal website) (last visited Feb. 11, 2022).

[6]    To be clear, this error does not mean that all D.C. taxpayers were omitted from the Source List.  Rather, the error had the effect that the third data source, the "list of all individuals of the District of Columbia whose income tax forms are filed with the D.C. Department of Finance and Revenue," Plan ¶ B, was, for all practical purposes, simply not used, but D.C. taxpayers whose names also appeared in one or both of the other two data sources were still included.  In other words, the Source List from which the master jury wheel was drawn was comprised of all D.C. residents who appeared on the voter list, the DMV list, or both—regardless of whether or not the resident also

wheel of 600,000 names randomly drawn from this smaller-than-intended Source List was put into service on December 14, 2020.  *Id.*[7]

The absence of names in the master jury wheel sourced from the taxpayer records was discovered on or about March 31, 2021.  *See* Larry Letter.  In an immediate effort to correct that deficit, a Clerk's Office information technology employee requested and obtained the taxpayer data file from the outside vendor and added all of its entries to the master jury wheel, without removing entries that duplicated persons already present in the wheel.  *Id.*  The resultant wheel, which remained in use until January 19, 2022, contained 961,221 entries, including many duplicates.

The master jury wheel from which defendant's venire was drawn was thus not built in strict adherence to the process prescribed by the Plan, *see* Plan ¶¶ B, C, and also exceeded the Plan's 700,000-entry cap, *see id.* ¶ D.1.  Once this issue was discovered, diagnosed, and corrected, a notice was filed publicly by a jury administrator in the Clerk's Office, in the docket of a separate pending criminal case in which the jury administrator had previously testified on January 5, 2022, for the purpose of correcting her testimony and the record in that case.  Larry Letter.  That notice provides a description of the issue as recited here.  *See id.*  Defendant is fully aware of this issue, and has referred to both the jury administrator's testimony and the notice correcting that testimony and included both documents as exhibits to his sur-reply.  Def.'s Sur-

---

appeared on the taxpayer list.  Residents appearing on *only* the taxpayer list and not the other two, however, were unintentionally omitted from the Source List.

[7]      In preparing for deployment, in December 2020, of a new master jury wheel, the outside vendor reported, in an email on November 5, 2020, to the Clerk's Office the following number of entries from each data source for the Source List from which the names in the master jury wheel were to be randomly drawn:  DMV (544,195 entries), Voter (511,271 entries), Tax (361,223 entries), with the merged Source List containing 616,590 entries, from which 600,000 names were randomly selected for the master jury wheel.  Of course, as later discovered, the Tax record entries were not in fact merged, though the number of entries the vendor reported for each data source appears to be correct.

Reply, Ex. A (Larry Test.); Def.'s Sur-Reply, Ex. B (Larry Letter).  At the same time, defendant

has articulated no specific objection or concern arising from this issue with the master jury

wheel, other than generally asserting these exhibits bolster his claimed violation of his fair cross

section right under the JSSA and Sixth Amendment.  *See* Def.'s Mot. Leave File Sur-Reply at 5–

6, ECF No. 180.

### C.    Procedural History and Defendant's Jury Data Requests

Defendant was indicted by a grand jury on September 25, 2019, on nineteen counts

alleging violations of federal law and D.C. Code relating to sexual abuse of a minor, enticement,

and production and possession of child pornography, all involving defendant's step-daughter,

age 12 to 13 at the time of the relevant incidents.  *See generally* Indictment, ECF No. 13.[8]  His

first trial date was set for June 8, 2020, Min. Entry (Nov. 15, 2019), but was later postponed and

rescheduled five times, due at first to the COVID-19 pandemic and later at defendant's request

for reasons unrelated to the pandemic.[9]  In the two years leading up to defendant's trial, the

---

[8]    Specifically, defendant was charged with one count of Production of Child Pornography, in violation of
18 U.S.C. § 2251(a), one count of Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(4)(B), one
count of Enticing a Minor, in violation of 18 U.S.C. § 2422(b), seven counts of First Degree Child Sexual Abuse
with Aggravating Circumstances, in violation of D.C. Code §§ 22-3008, 22-3020(a)(2), six counts of First Degree
Sexual Abuse with Aggravating Circumstances, in violation of D.C. Code §§ 22-3002(a)(1), 22-3020(a)(2), two
counts of Second Degree Child Sexual Abuse with Aggravating Circumstances, in violation of D.C. Code §§ 22-
3009, 22-3020(a)(2), and one count of Misdemeanor Sexual Abuse of a Child with Aggravating Circumstances, in
violation of D.C. Code §§ 22-3010.01, 22-3020(a)(2).  *See generally* Indictment.  Certain counts were later
dismissed shortly before trial, at the government's request, Gov't's Mot. Dismiss. Counts 5, 7, 8, 9, 10, 11, 17, 18, &
19 of Indictment, ECF No. 147, and the indictment was renumbered to reflect the ten remaining counts, which
collectively covered the same range of offense conduct, *see* Retyped Indictment, ECF No. 159.

[9]    *See* D.D.C. Standing Order 20-19 (Apr. 2, 2020) ¶¶ 2, 4 (delaying all criminal jury trials scheduled to begin
before June 11, 2020); Min. Order (April 9, 2020) (postponing trial to June 15, 2020); Parties' Joint Mot.
Continuance of June 15, 2020, Trial Date at 1, ECF No. 41 (citing "significant obstacles" posed by the COVID-19
pandemic "to preparing for and conducting [the] trial in mid-June"); Min. Order (May 14, 2020) (granting the joint
motion and resetting trial for October 26, 2020); D.D.C. Standing Order 20-68 (Aug. 10, 2020) ¶ 1 (delaying all
criminal jury trials scheduled to begin before November 9, 2020); Min. Order (Aug. 19, 2020) (postponing trial to
May 3, 2021); Min. Order (Mar. 26, 2021) (postponing trial to May 10, 2021, for medical reasons relating to
defendant); Min. Order (Apr. 9, 2021) (vacating May 10, 2021 trial date, at defendant's request, "in light of the
suspension of accreditation of the D.C. Department of Forensic Sciences (DFS) and the additional discovery that
may have to be produced and reviewed as a result"); Scheduling Order (May 3, 2021) (rescheduling trial for October
18, 2021).

Court resolved nine government motions and ten defense motions, after holding several motions

hearings and the pretrial conference.  *See* Min. Entry (June 9, 2020) (motion hearing); Min.

Entry (Mar. 24, 2021) (status and motion hearing); Min. Entry (Mar. 26, 2021) (motion hearing);

Min. Entry (May 10, 2021) (motion hearing); Min. Entry (Oct. 1, 2021) (pretrial conference).[10]

Following this extensive motion practice as well as substantial delay occasioned by the

suspension of jury trials during portions of the COVID-19 pandemic, jury selection in

defendant's trial began on the morning of October 18, 2021.  At the outset, before the voir dire

process began, the Court and the parties discussed, as detailed in Part I.C.3, *infra*, defendant's

motion, filed only hours before, to dismiss the indictment for alleged constitutional and statutory

violations in the venire composition.  A thorough voir dire process then ensued and continued

into the following day, ultimately yielding a jury composed of three Black jurors, eight White

jurors, and one juror self-identifying as multi-race (unspecified), along with two alternate jurors,

one Black and another self-identifying as multi-race (both Black and White).[11]  The parties

---

[10]     The Court resolved (1) nine government motions *in limine* ("MIL"), *see* Gov't's MIL Admit A.S.'s Prior
Statements, ECF No. 24; Gov't's MIL Preclude Def. from Referencing Potential Punishment or Other Adverse
Consequences of Conviction, ECF No. 25; Gov't's MIL Admit Evid. Pursuant to Fed. R. Evid. 404(b), ECF No. 31;
Gov't's MIL to Bar Evid. Regarding Sexual History of Victim & Exclude Evid. Offered to Prove Victim's Sexual
Predisposition, ECF No. 32; Gov't's MIL Admit Country-of-Origin Product Markings, ECF No. 93; Gov't's Notice
& MIL Allow Authentication & Admis. Certain Business Records, ECF No. 104; Gov't's MIL Preclude References
Certain DFS Matters & 2021 Digital Forensics, ECF No. 133; Gov't's Suppl. Notice & MIL Allow Authentication
& Admis. Certain Business Records, ECF No. 134; Gov't's MIL Preclude References DEU QCARs, ECF No. 151;
(2) seven defense motions, three of which were to suppress or exclude evidence, *see* Def.'s Mot. Exclude Test.
Gov't's Proposed Expert Witness, ECF No. 36; Def.'s Mot. Conduct *Taint* Hr'g, ECF No. 57; Def.'s Suppl. Mot.
Exclude Expert Test. Dr. Stephanie Wolf & Req. *Daubert* Hr'g, ECF No. 63; Def.'s *Ex Parte* Mot. Issuance
Subpoena for Records Pursuant to Fed. R. Cr. P. 17, ECF No. 74 (sealed); Def.'s Mot. Suppress Tangible Evid. &
Electronic Data, ECF No. 114; Def.'s Resp. Ct.'s Min. Order of June 21, 2021 & Mot. Req. Evidentiary Hr'g, ECF
No. 121; Def.'s Mot. Exclude Witnesses Including FBI Agent Pursuant to Fed. R. Evid. 615, ECF No. 152; and (3)
three defense motions for pretrial release on bond with conditions, *see* Def.'s Emergency Mot. Recons. Pretrial
Detention Based on Immediate Threat Posed by COVID-19 Pandemic, ECF No. 18; Def.'s Mot. Recons. Ct.'s
Detention Order, ECF No. 94; Def.'s Mot. Recons. Detention Order, ECF No. 111.

[11]     Out of 57 venire panelists appearing before the Court for individual voir dire, a total of 24 panelists were
excused for cause.  In all but one instance, defendant made the motion to excuse each juror, and defendant did not
oppose the one motion to excuse made by the government.  Out of the 23 panelists excused at defendant's motion,
nine were Black.  *See* Rough Trial Tr. at 79:13–16, 93:10–19, 104:23–105:16, 113:7–14, 132:20–133:1, 135:9–11,
150:3–151:11, 161:6–21, 163:25–164:7, 166:23–167:6, 177:7–179:7, 206:21–207:1, 224:2–4, 232:20–233:11,
235:12–16, 242:14–243:9, Oct. 18, 2021; Rough Trial Tr. at 22:8–23:14, 26:5–9, 35:4–7, 36:23–37:2, 52:18–22,

expressly approved this jury.  Rough Trial Tr. at 73:12-19, Oct. 19, 2021 (The Court: "Counsel, are you still checking or . . . is this jury accepted"?  Government counsel: "Yes, Your Honor." Defense counsel: "Yes, pending any outstanding motion.").  Jurors heard testimony spanning five days and ten witnesses, including the alleged victim (now an adult) and defendant himself.

Defendant's counsel ably discharged her duties and provided zealous representation including a well-presented theory of the case and robust cross-examination of government witnesses.  Indeed, defense counsel prevailed both pretrial and at trial to exclude evidence of defendant's prior convictions, allowing defendant to be portrayed in the most favorable light possible.  *See* Def.'s Opp'n Gov't's Mot. Regarding Rule 609 Admissibility, ECF No. 40 (arguing inadmissibility of convictions at issue under FED. R. EVID. 609); Gov't's Withdrawal of Mot. in Limine Regarding Rule 609 Admissibility of Two Fraud Convictions at 1, ECF No. 59 (conceding government would "not likely be able to gather sufficient additional details about the defendant's two misdemeanor fraud convictions" and withdrawing "its motion *in limine* regarding the use of this evidence for impeachment purposes"); Rough Trial Tr. at 77:6–87:23, Oct. 26, 2021; *id.* at 85:9–10 (Government counsel: "Well either way we didn't give the notice that was required so we can't bring it in.").  Defense counsel also successfully opposed the government's motion to preclude references by the defense to certain records maintained by the

---

Oct. 19, 2021.  Furthermore, the government opposed defendant's motion to excuse two of these Black panelists, *see* Rough Trial Tr. at 177:23–178:1, 242:16–20, Oct. 18, 2021, and one White panelist, *see id.* at 232:22–233:1.  The one panelist whom the government moved to excuse, without opposition from defendant, was White.  *See id.* at 137:25–138:5.  Finally, one White panelist was deemed exempt from service and thus disqualified because he was an appointed employee of an elected official.  *Id.* at 46:23–48:14; *see* 28 U.S.C. § 1863(b)(6)(C) (requiring that a plan exempt "public officers"); *id.* § 1869(i) (defining "public officer" as including a person "directly appointed by a person elected to public office").  All told, out of the 24 panelists subject to motions to excuse for cause, nine Black panelists—60% of the Black panelists examined—were excused on defendant's motion, as compared to 10 White panelists—only 28.6% of the White panelists examined.

D.C. Department of Forensic Science's Digital Evidence Unit. *See* Min. Order (Oct. 15, 2021) (denying government's motion *in limine*).

The government's combination of victim testimony, digital forensic evidence including explicit child pornography images taken at defendant's direction, relevant business records, and other circumstantial evidence proved insurmountable for defendant. On October 27, 2021, the jury returned a verdict of guilty on all ten counts as well as "yes" answers to all questions posed concerning aggravating circumstances. Verdict Form, ECF No. 169. Defendant, detained since 2019, awaits sentencing, currently scheduled for February 25, 2022.

Set against this backdrop of overall activity in defendant's case, defense counsel also developed and pursued grounds for the pending challenge to the jury selection process, as described next.

1. ***Defendant's Pretrial Data Requests***

Defendant, through counsel, first contacted the Jury Office on March 31, 2021 (at which time defendant's trial was slated to begin on May 10, 2021), posing an extensive list of over thirty questions and data requests about the implementation of the Plan, any changes related to the COVID-19 pandemic, demographics of the master jury wheel, raw data from the master jury wheel, and information on the qualification status of prospective jurors specific to defendant's upcoming trial. *See generally* Letter from Brandi Harden, Defense Counsel, to Regina Larry, D.D.C. Clerk's Office Jury Administrator (Mar. 31, 2021). The Jury Office responded on April 1, 2021, with answers to counsel's questions as well as a series of large data files collectively comprising the master jury wheel then in effect.

As relevant here, the master jury wheel data files identified, for each entry, the data source from which it was drawn (voter, DMV, or tax records), residence location within the

District (including nine-digit zip code), sex, race (coded numerically), and date of birth

("DOB").  The latter three columns—sex, race, and DOB—were only partially populated.  Race

data, in particular, is generally not available until a prospective juror returns a questionnaire in

response to a summons.  In addition, entries sourced from voter and DMV records generally

included sex and DOB whereas those from tax data generally did not.  In total, the fields for sex

and DOB were populated for approximately 62% of entries, while the numerical race column

was populated only minimally, for under 0.5% of entries.

The May 10, 2021 trial date was subsequently vacated at defendant's request for reasons

unrelated to the jury selection process, *see* Min. Entry (Apr. 9, 2021), and rescheduled for

October 18, 2021, *see* Scheduling Order (May 3, 2021).  On October 5, 2021, defendant's

counsel renewed her request to the Jury Office for jury data owing to the rescheduled trial date.

Email from Brandi Harden, Defense Counsel, to Regina Larry, D.D.C. Clerk's Office Jury

Administrator (Oct. 5, 2021).  The master jury wheel was at that time unchanged from the

April 1, 2021 disclosure to defense counsel, but the summons list of persons summoned to

respond to the jury questionnaire as well as those deemed qualified for the two-week pool

necessarily needed to be re-generated as any previous data no longer applied to the October trial

date.

On October 7, 2021, the Jury Office furnished counsel with two electronic files, each

formatted as a "comma-separated values" file readable by various software programs including

Microsoft Excel, relating to the qualified two-week pool in effect at the time defendant's trial

was slated to begin on October 18, 2021.  Email from Regina Larry, D.D.C. Clerk's Office Jury

Administrator, to Brandi Harden, Defense Counsel (Oct. 7, 2021, 10:33 AM); Email from

Regina Larry, D.D.C. Clerk's Office Jury Administrator, to Brandi Harden, Defense Counsel

(Oct. 7, 2021, 11:46 AM).  These files collectively showed that summonses were sent to 1,837 prospective jurors on the summons list.  One file contained entries for 1,140 persons to whom summonses were sent but from whom questionnaires in response were not received.  While nine-digit zip code data, as in the master jury wheel files, was provided for all entries, gender data was populated for about 68.5% of entries while the numeric race code was populated for only about 1% of entries.  The other file contained entries for 697 persons on the summons list to whom summonses were sent and from whom completed questionnaires were received by the Jury Office—an overall response rate of about 38% to the 1,837 summonses issued.  This file contained fully populated gender and race code fields for over 99% of respondents and also identified the "status" of each respondent.[12]  Out of the 697 responses, 104 (about 15%) were disqualified and 284 (41%) were excused or "deferred" to possible future selection.  The remaining 309 prospective jurors (44% of respondents, or 17% of persons on the summons list) constituted the "qualified two-week pool" from which defendant's venire could be drawn.[13]

On October 15, 2021—the Friday immediately preceding the Monday on which jury selection in defendant's trial began—the Jury Office furnished to counsel an additional data file with records corresponding to the 105 prospective jurors who were randomly selected from the 309-person "qualified two-week pool" and directed to report on the morning of trial.  Email from Regina Larry, D.D.C. Clerk's Office Jury Administrator, to Brandi Harden, Defense Counsel (Oct. 15, 2021, 7:38 AM).  This third file, the "directed-to-report list," contained the same

---

[12]    The Jury Office did not at this point provide, and defendant did not request, definitions for the numeric race codes in conjunction with these two files.

[13]    Defendant's motion erroneously describes these files as "Master Wheels" and, more importantly, incorrectly asserts that "[e]ach list . . . did not include race."  Def.'s Mot. at 4.  In fact, both files *did* include a numeric race code column which was fully populated for nearly all questionnaire respondents.  Defendant later corrected this representation.  Def.'s Suppl. to Mot. Dismiss Indictment Pursuant Fifth & Sixth Amendments & Jury Selection & Service Act ("Def.'s Suppl.") at 2–3, ECF No. 163.

columns as did the second file discussed above, and by this stage the gender and numeric race columns were populated for all 105 persons listed.  Also on October 15, 2021, counsel requested and received from the Jury Office the definitions of the numerical race codes (applicable to all of the data files), reflecting that the race code "1" stands for Black and "3" stands for White.  Def.'s Suppl. to Mot. Dismiss Indictment Pursuant Fifth & Sixth Amendments & Jury Selection & Service Act ("Def.'s Suppl.") at 3, ECF No. 163; *see also* Email from Brandi Harden, Defense Counsel, to Regina Larry, D.D.C. Clerk's Office Jury Administrator (Oct. 15, 2021, 12:07 PM); Email from Regina Larry, D.D.C. Clerk's Office Jury Administrator, to Brandi Harden, Defense Counsel (Oct. 15, 2021, 12:20 PM).

## 2. *Defendant's Pending Motion to Dismiss*

In the early morning hours of October 18, 2021—the day jury selection was scheduled to begin in defendant's trial—defendant filed the pending motion to dismiss the indictment, invoking the Sixth Amendment and the JSSA.  Def.'s Mot. Dismiss Indictment Pursuant Fifth & Sixth Amendments & Jury Selection & Service Act ("Def.'s Mot.") at 1, ECF No. 161. Defendant invoked the Sixth Amendment guarantee to trial "by an impartial jury drawn from sources reflecting a fair cross section of the community," *id.* at 2–3 (quoting *Berghuis v. Smith*, 559 U.S. 314, 319 (2010)), as reaffirmed by the JSSA, *id.* at 3 (citing 28 U.S.C. § 1861).  He further invoked the JSSA as a basis to bring this challenge, noting the Act's objective that "potential jurors will be selected at random from a representative cross section of the community and that all qualified citizens will have the opportunity to be considered for jury service."  *Id.* at 3 (quoting *United States v. Miller*, 116 F.3d 641, 656 (2d Cir. 1997)).

Citing a "brief review" of data provided at defense counsel's request by the Jury Office regarding the demographic composition of defendant's venire, defendant observed that the

"venire is *approximately* 29% Black or African-American, 65% White and 6% other," which demographic breakdown is "disproportionate with" Census data showing the population of the District of Columbia to be 41.4% Black and 39.6% White.  *Id.* at 4–5 (emphasis in original). [14] Defendant conceded that the Court's Jury Selection Plan "was carefully calibrated to produce a fair cross-section of the community," *id.* at 7, and did not allege any deviations from the Plan. Nevertheless, defendant conjectured that the racial composition of the venire for his trial could have been skewed by disproportionate impacts of the COVID-19 pandemic on minority communities and the ensuing adverse effects on jury summons response rates among such groups, *see id.* at 5–7.

Noting the short window (essentially, a weekend) between what he believed to be his initial receipt of relevant demographic data and the start of his trial, defendant acknowledged that his motion was not accompanied by a "sworn statement of facts which, if true, would constitute a substantial failure to comply with" the JSSA, 28 U.S.C. § 1867(d), as the Act requires when bringing a statutory challenge.  Def.'s Mot. at 4 n.2.  He therefore "request[ed] that the Court allow [him] the opportunity to supplement this Motion with the required affidavit."  *Id.*

### 3.    *Pretrial Colloquy*

On the morning of October 18, 2021, shortly before jury selection was set to begin, the parties and Court discussed defendant's motion as a preliminary matter.  Trial Tr. at 15:16–29:6, Oct. 18, 2021.  In this colloquy, the Court sought to confirm precisely what relief defendant was requesting.  In response to the Court's statement, "I understood . . . that you were preserving

---

[14]     Defendant noted that "[t]he JSSA gives [him] an 'unqualified right' to jury selection records," Def.'s Mot. at 4, and has not alleged any impairment of his exercise of that right.

your right to do this without delaying the trial," defendant's counsel confirmed: "Yes.  So as to avoid any future problems that something wasn't properly preserved."  *Id.* at 28:24–29:4.[15]

The Court also queried defense counsel about the absence of a sworn statement in support of the motion, as required by the JSSA.  *See* Trial Tr. at 16:9–17:13, Oct. 18, 2021.  In response, defense counsel acknowledged that, absent a sworn statement, the motion was not perfected and therefore not ripe for the Court to consider, at least insofar as it raised a statutory challenge to defendant's jury pool.  *Id.*  Ultimately, defense counsel confirmed that the motion was intended to be "a timely motion asking for additional time to file [the] sworn statement so that it can be ripe" and to preserve any appeal rights.  *Id.* at 16:22–17:5.  The Court granted defendant 48 hours to perfect the instant motion with a sworn statement, without ruling on whether the JSSA allowed, under the circumstances, consideration of the statutory claims raised in the motion as though the motion had been timely perfected in strict compliance with the statute's procedural requirements.  *See id.* at 27:10–28:23.

On October 20, 2021—within the 48-hour period afforded by the Court—defendant supplemented his motion reiterating his original argument, *see generally* Def.'s Suppl., including a three-page declaration from Dr. Richard Seltzer, a Professor of Political Science at Howard University, Def.'s Suppl., Ex. A, Decl. of Dr. Richard Seltzer ("Seltzer Decl."), ECF No. 163-1. Defendant asserted that Dr. Seltzer's analysis "establishe[d] a Sixth Amendment violation," Def.'s Suppl. at 3, principally because the proportion of Black prospective jurors shown on the

---

[15]    Defendant's counsel noted that while the motion sought to dismiss the indictment against defendant, she had not discussed with defendant the alternate remedy of seeking a continuance of the trial to address jury composition concerns.  Trial Tr. at 15:23–16:8.  Counsel noted that she did not think defendant "want[ed] to be between deciding whether or not he has a constitutionally protected jury and whether he has the right to go forward with respect to his speedy trial."  *Id.* at 16:3–6.  Much later, in a motion seeking leave to file a sur-reply, Defendant attempted to recharacterize his original motion, claiming that his "written request to stay the proceedings" on October 18, 2021 was "denied."  Def.'s Mot. Leave File Sur-Reply at 4.  The record plainly belies defendant's new portrayal of pretrial events.

lists from the Jury Office fell short of the Black share of the adult population of the District of Columbia by over ten percentage points, Seltzer Decl. ¶¶ 7–8.

The government countered that, under case law concerning both constitutional and statutory challenges to jury pool composition, defendant's challenge fails because defendant did not establish Black underrepresentation in the master jury wheel and, even if he had, he did not show that any underrepresentation was caused by "systematic exclusion" of Black citizens from the jury selection process. *See generally* Gov't's Opp'n Def.'s Mot. Dismiss Indictment ("Gov't's Opp'n"), ECF No. 172.[16]  In support, the government provided a 19-page declaration from statistician Dr. Bernard Siskin, Director of the "specialty consulting firm" BLDS, LLC. Gov't's Opp'n, Ex., Decl. of Bernard R. Siskin, Ph.D. ("Siskin Decl.") ¶ 1, ECF No. 172-1. While Dr. Siskin did not dispute that Blacks were underrepresented in the pools specific to defendant's trial, he concluded that this phenomenon was almost entirely attributable to racial differences in response rates to the summons and, to a lesser degree, a higher share of disqualifications of Black jurors on account of having a felony conviction. *Id.* ¶¶ 31–32.

### 4. *Defendant's Post-Trial Jury Data Requests and Supplemental Briefing*

On November 21, 2021— several weeks after defendant's conviction on October 27, 2021, and after the government's opposition was filed but before defendant's reply was due— defense counsel contacted the Jury Office seeking additional data on the master jury wheels, qualified two-week pools, venires, and empaneled juries for *all* trials held in this District for the almost three-year period from 2019 to 2021.  Email from Brandi Harden, Defense Counsel, to Regina Larry, D.D.C. Clerk's Office Jury Administrator (Nov. 21, 2021).  On the following day,

---

[16]    The government requested and was granted, with defendant's consent, a five-day extension to file its opposition.  Min. Order (Nov. 8, 2021).

the Jury Office furnished data files, analogous to those discussed above for defendant's trial, for the qualified two-week pools, venires, and juries for all 2021 trials. Email from Regina Larry, D.D.C. Clerk's Office Jury Administrator, to Brandi Harden, Defense Counsel (Nov. 22, 2021). No additional master jury wheel information was provided since the trials referenced all took place from May 2021 to November 2021, so the same master jury wheel already disclosed to counsel was in effect throughout. The Jury Office advised defense counsel that records from previous years were available for inspection in paper form.

While not taking issue with this defense request for additional data, the Court directed defendant "to limit his arguments and data sources in his reply in support of" his motion to dismiss "to the scope of defendant's Motion, defendant's Supplement, and the government's Opposition," or, in the alternative, to show cause "why defendant should be allowed to expand his Motion to address new data sources." Min. Order (Nov. 23, 2021). In an unopposed, and granted, request for a two-week extension to file his reply, defendant responded to the Court's minute order, explaining that his request for additional records was directly responsive to certain of the government's opposition arguments. Def.'s Consent Mot. Extend Deadline File Reply ("Def.'s Mot. Extension") ¶¶ 9, 14, ECF No. 173.

Defendant's reply noted that the Jury Office had provided him with electronic records regarding the jury pools for trials held in 2021 (including his own) and had offered access to some hard copy records from 2019 and 2020, Def.'s Reply Gov't's Opp'n Def.'s Mot. Dismiss Indictment ("Def.'s Reply") at 1, ECF No. 174, and further indicated that Dr. Seltzer had analyzed the additional 2021 data for the purpose of showing that Black underrepresentation in jury pool was not unique to defendant's venire, *id.* at 2. In support, defendant attached a declaration prepared by Dr. Seltzer for a case involving a different defendant and pending before

another Judge on this Court.  Def.'s Reply, Ex. A, Declaration of Dr. Richard Seltzer ("Seltzer Second Decl.") ¶ 6, ECF No. 174-2 ("The Jury Office provided *Mr. Lutamila's* attorney with two sets of spreadsheets." (emphasis added)).

Defendant's reply included several additional requests, largely buried in a footnote.  First, in a footnote, defendant "request[ed] a 120 day stay of this Court's ruling until" testimony was heard in *United States v. Lutamila*, No. 20-cr-24 (JEB), of Jury Office staff concerning the jury selection process.  Def.'s Reply at 1 n.1.  Second, in the same footnote, defendant indicated that he intended to "seek leave to supplement" the record in this case, at a then-unspecified time, to "incorporate" the Jury Office testimony anticipated in that other case.  *Id.* at 2 n.1.  Third, defendant suggested that the Court should hold a *Daubert* hearing to test the reliability of a methodology used by the government's expert, Dr. Siskin.  *Id.* at 4–5.

Upon review of defendant's reply, the Court requested that the government address these three newly-raised issues.  *See* Min. Order (Dec. 14, 2021).  The government responded to the Court's request, filing its *de facto* sur-reply on December 21, 2021, opposing defendant's suggestions on all three points.  *See generally* Gov't's Resp. Ct.'s Dec. 13 Min. Order & Def.'s Reply Gov't's Opp'n Mot. Dismiss Indictment/Vacate Convictions ("Gov't's Sur-Reply"), ECF No. 175.  Defendant requested and received leave to file a sur-reply on January 28, 2022, fulfilling defendant's previously-stated intent to "supplement" the record to incorporate outside testimony.  *See* Def.'s Mot. Leave File Sur-Reply; Def.'s Sur-Reply, ECF No. 180-2; Def.'s Reply at 2 n.1 (anticipating such filing).  Defendant enclosed two exhibits with his sur-reply: (1) a transcript of the testimony of Regina Larry, a jury administrator in the Clerk's Office, in a hearing held on January 5, 2022 in the *Lutamila* case, *see* Def.'s Sur-Reply, Ex. A (Larry Test.); and (2) a letter filed by the same jury administrator in the *Lutamila* docket on January 25, 2022,

correcting and supplementing certain matters from her testimony, *see* Def.'s Sur-Reply, Ex. B

(Larry Letter). The government filed its response on February 1, 2022. *See* Gov't's Opp'n

Def.'s Second Suppl. Mot. Dismiss Indictment/Vacate Convictions, ECF No. 181.

The instant motion is now ripe for resolution.

## II.    LEGAL STANDARD

A criminal defendant "may raise by pretrial motion any defense, objection, or request that

the court can determine without a trial on the merits." FED. R. CRIM. P. 12(b)(1). Such pretrial

motion may challenge "a defect in the indictment or information" if "the basis for the motion is

then reasonably available and the motion can be determined without a trial on the merits." FED.

R. CRIM. P. 12(b)(3)(B). Although a court's supervisory powers provide the authority to dismiss

an indictment, because doing so "'directly encroaches upon the fundamental role of the grand

jury,' dismissal is granted only in unusual circumstances." *United States v. Ballestas*, 795 F.3d

138, 148 (D.C. Cir. 2015) (quoting *Whitehouse v. U.S. Dist. Court*, 53 F.3d 1349, 1360 (1st Cir.

1995)).

## III.   DISCUSSION

Defendant challenges the jury selection process, as applied to his case, by bringing

largely overlapping claims under the Sixth Amendment and the JSSA and, for each, seeking

dismissal of the indictment against him. As an initial matter, defendant's JSSA claim is time-

barred, while his constitutional claim may proceed. Furthermore, defendant's election to seek

dismissal of his indictment as the remedy is mismatched with his challenge directed to the petit

jury that returned his conviction. Even giving defendant all the benefit of the doubt on these

threshold issues, however, defendant's challenge still fails on the merits. Defendant's fair cross

section challenge, relevant to both the JSSA and constitutional claims, fails to show either a

substantial Black underrepresentation in the jury selection process rising to the level of a constitutional violation or that any Black underrepresentation is the product of systematic exclusion.  Finally, to the extent defendant raises other miscellaneous issues under the JSSA that do not necessarily implicate the fair cross section protections, these concerns are not actionable under persuasive case law authority.

A.     **Timeliness of Defendant's Jury Selection Challenge**

The title of defendant's motion announces challenges to the jury selection process based on the JSSA as well as on constitutional grounds under the Fifth and Sixth Amendments. Defendant's JSSA challenge is barred as untimely, but his parallel constitutional challenge must be reviewed on the merits.

1.     *Jury Selection and Service Act Statutory Challenge*

The JSSA sets forth two threshold requirements for a criminal defendant bringing a challenge concerning jury selection procedures.  First, as a timing matter, a JSSA challenge must be brought "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier."  28 U.S.C. § 1867(a).  Second, as a matter of form, a motion initiating a JSSA challenge must "contain[] a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title."  *Id.* § 1867(d); *see United States v. Williamson*, 903 F.3d 124, 133 (D.C. Cir. 2018) (noting that a "sworn statement" must be provided when "submitting a motion to challenge the composition of a jury under section 1867(d)").  These requirements are problematic for defendant, given that a conforming motion is "the *exclusive means* by which a person accused of a Federal crime . . . may challenge any jury

on the ground that such jury was not selected in conformity with the provisions of this title."  28

U.S.C. § 1867(e) (emphasis added).[17]

The JSSA's timing requirements are demanding.  The seven-day rule, in particular, starts

a very short, strict clock upon the occurrence of a specific event: "defendant discovered" a

problem "or could have discovered [it], by the exercise of diligence."  28 U.S.C. § 1867(a).[18]

Furthermore, that window is the same in duration regardless whether the trial is next week or is

six months away.  The window is indifferent to whether the "discover[y]" of a problem happens

to occur over a holiday or when counsel is in the middle of another trial—and any "discovery"

after the "the voir dire examination begins" is too late since the JSSA language, "whichever is

earlier," essentially sets the beginning of voir dire as the latest possible cut-off for bringing a

JSSA challenge.  Finally, the JSSA demands that counsel quickly assemble detailed, sworn

"facts," perhaps requiring the services of an expert versed in the necessary data analysis, again

on short notice.  This is a lot of fast-paced data collection, review, analysis and reporting to ask

of defense counsel, but for better or worse, this is what the plain text of the JSSA commands.

The alternative deadline, "before the voir dire examination begins," seems less

ambiguous as a trigger but may still pose challenges for defense counsel.  As a matter of judicial

economy, it makes good sense to require objections to the process used to assemble the venire

---

[17]     The government has not objected, either at trial or in opposition to the pending motion, to the timeliness of defendant's pretrial JSSA motion, to allowing defendant a brief extension of time to furnish the requisite sworn statement, or to the statutorily untimely nature of that statement once filed.  Nevertheless, given the JSSA's "exclusive means" language, examination of this issue *sua sponte* is necessary given the statutory constraint on judicial authority to grant relief.

[18]     The triggering event for the seven-day window could, in principle, be entirely external to a defendant's own case.  For example, to the extent that a JSSA fair cross section challenge could be broadly applicable to multiple defendants with cases pending in the same district at the same general time period, does the filing of such a challenge in one case mean that other defendants (through counsel) "could have discovered, by the exercise of diligence" the same issue for their own case, triggering the seven-day clock for all of them?  Fortunately, whether the text of the JSSA covers this scenario need not be explored further, since the facts in this case fix a fairly clear point in time when the seven-day window begins.

(as opposed to the eventual jury itself) to be lodged before an ostensibly faulty venire is used to empanel a jury and the parties put through the expense and effort of a trial.[19]  In a court that employs a statutorily permissible "one-step" summons and qualification process like that set out in the Court's Plan, *see* Part I.A.3, *supra*, identification of the pool of jurors deemed "qualified" (*i.e.*, the "qualified two-week pool") takes place up to several weeks before voir dire in a particular trial, with the actual venire unknown until the day of jury selection.[20]  As a result, in practice, the window between demographic data availability about the qualified two-week pool and voir dire is rather short.  In this respect, the JSSA's timing setup is a better match for a "two-step" process, whereby a "qualified wheel" is identified and questionnaires returned well in advance of any particular trial.

Yet, in a one-step process the JSSA timing still works fairly.  The fair cross section guarantee, as both a constitutional and statutory matter, rests primarily on the source lists and master jury wheel, and those records are generally available long before a scheduled trial date (unless a new wheel is deployed close in time to the scheduled trial date).  *See United States v. North*, 910 F.2d 843, 909 (D.C. Cir. 1990) (per curiam) (alteration in original) ("The act . . . does not require that at any stage beyond the initial source list the selection process shall produce groups that accurately mirror community makeup.") (quoting H.R. Rep. No. 90-1076, at 5

---

[19]     Allowing an *ex post* challenge to pre-voir dire processes could also create a perverse incentive for a defendant to withhold raising an objection until such time as an unfavorable verdict appears likely or has been rendered.  *Cf. United States v. Williams*, 819 F.3d 1026, 1029 (7th Cir. 2016) (endorsing the "sensible" rule that "the dismissal of the venire or the swearing of the jury is the presumptive deadline for making" challenges to racially motivated peremptory strikes under *Batson v. Kentucky*, 476 U.S. 79 (1986)).  To be clear, no such insinuation is made about the instant motion.  Here, defendant's motion was made (albeit incompletely under JSSA strictures) prior to voir dire identifying the general contours of the demographic concerns defendant argues.  *See* Def.'s Mot. at 4–5 (observing, based on a "brief review of" data provided by the Jury Office, that Black citizens were underrepresented in defendant's jury venire relative to census data).

[20]     Recall that the venire is randomly drawn from the qualified two-week pool and, again, randomly drawn from those persons on the directed-to-report list who show-up at the courthouse on the day of jury selection.

(1968)), *withdrawn and replaced in other part*, 920 F.2d 940 (D.C. Cir. 1990) (per curiam);

*McCall v. Shields Assocs., Inc.,* 617 F. Supp. 244, 247–48 (D.D.C. 1985) ("[T]he statute does not

contemplate challenges . . . so long as 'the initial source list [in] the selection process' produces a

fair representation of the make-up of the community." (quoting H.R. Rep. No. 90-1076, at 5)).

Further, so long as the winnowing process for the qualified two-week pool and venire both (a) is

random when making selections; and (b) disqualifies, excludes, and excuses persons using

objective criteria, the requirements of the Act are satisfied and records relating to those

downstream pools are less critical in the preparation of a JSSA challenge. *See Hsia*, 125 F.

Supp. 2d at 10 ("The [JSSA] requires only that the source list or master wheel . . . consists of a

fair cross-section of the community. The Act does not entitle a defendant to have any particular

group represented on her trial jury, her grand jury, or even on the venire from which the jurors

from either are chosen." (citation omitted)); *see also United States v. Percival*, 756 F.2d 600, 615

(7th Cir. 1985) ("It is the master jury wheel . . . which must represent a fair cross section of the

community. So long as the master jury wheel is adequate and the prescribed procedure is

thereafter followed, there can be no complaint that the panel ultimately produced by random

selection is somehow unrepresentative in result." (citation omitted)).[21]

---

[21]     Notwithstanding the primacy of the upstream sources, most significantly the master jury wheel, the Circuit has criticized, as not "best practice," what it called the "administrative habit" of not making "the list of the D.C. residents called and to be present for voir dire" available prior to the day of trial. *United States v. Bagcho*, 923 F.3d 1131, 1137 (D.C. Cir. 2019). Beyond the fact that the directed-to-report list was made available to defendant in advance, and the obvious practical limitation that the venire itself is not knowable until persons actually report to the courthouse as directed, the Circuit's broader criticism is misplaced. "A petitioner raising this claim is challenging the pool from which the jury is drawn, and not necessarily the venire panel directly before him." *Ambrose v. Booker*, 684 F.3d 638, 645 (6th Cir. 2012). A fair cross section challenge thus does not turn on the lists specific to a particular defendant's venire. The lists that *do* matter in determining if a jury is drawn from "sources reflecting a cross section of the community" are the original Source List and the master jury wheel. Even insofar as a challenge relies on later lists in the process (perhaps because the challenge concerns excuse practices or because of difficulty ascertaining race from the master jury wheel), such challenge must be based on a series of observations from *other* trials over time.

Regardless of any time pressures generated by the timetable and sworn statement prerequisites for a JSSA challenge, courts have consistently enforced those constraints strictly. *See, e.g.*, *United States v. Webster*, 639 F.2d 174, 180 (4th Cir. 1981) ("Any objection to the composition of the jury was waived, however, because defendants first sought to raise it at a time subsequent both to the beginning of the voir dire examination and to a point seven days after they could have discovered the grounds for the challenge by the exercise of due diligence."); *United States v. Young*, 570 F.2d 152, 153 (6th Cir. 1978) (per curiam) ("The failure of appellant to make a timely motion in the district court in the manner prescribed by the statute forecloses this question.  The requirements of the statute are strictly enforced."); *United States v. Beavers*, 756 F.3d 1044, 1059 (7th Cir. 2014) (deeming statutory challenge waived where defendant failed to file a motion before voir dire began and failed to provide a "sworn statement of facts"); *United States v. Paradies*, 98 F.3d 1266, 1277 (11th Cir. 1996) ("The timeliness requirement 'is to be strictly construed, and failure to comply precisely with its terms forecloses a challenge under the Act.'" (citation omitted)).  As the Fifth Circuit explained, "This is the Act's tradeoff: 'In the Act, Congress set out a uniform, relatively strict scheme for jury selection.  Congress included a new remedy for substantial violations of the Act, regardless of whether the litigant challenging the jury had been prejudiced by the jury selection.  As a price for this remedy, Congress was entitled to exact strict compliance with formal procedural rules.'"  *United States v. Rosbottom*, 763 F.3d 408, 415 (5th Cir. 2014) (quoting *United States v. Bearden*, 659 F.2d 590, 595 (5th Cir. Unit B Oct. 1981)).[22]

---

[22]    In 1997, the D.C. Circuit mused that circumstances might exist where the JSSA deadline could be relaxed if "the Jury Selection Act and the jury selection procedures utilized by the district court effectively foreclosed the filing of [defendants'] motion at an earlier time."  *United States v. DeFries*, 129 F.3d 1293, 1300 (D.C. Cir. 1997) (per curiam).  In *DeFries*, like here, defendants filed a perfected motion two days after voir dire began.  *Id.* at 1299–1300.  The D.C. Circuit focused on the fact that counsel "did not see a list of the jurors who would be in their venire until the members of the jury venire were brought into the courtroom" on the first morning of voir dire, and "[e]ven if they could have seen the list of venire jurors in the jury office prior to that date, the list would not have included

The unambiguous statutory text supports this consistent out-of-circuit authority, even if this authority is not binding.  As a result, defendant's motion is foreclosed as a JSSA challenge because, notwithstanding any legitimate practical reasons for the timing of his filings, he failed to file a perfected motion within either of the two tight timeframes specified by the JSSA.  First, defendant concedes he did not file a motion perfected by the requisite "sworn statement" of facts "before the voir dire examination begins."  Def.'s Mot. at 4 n.2.  Although defendant was permitted to supplement his briefing two days after voir dire began, the Court withheld judgment on whether such noncompliance with the JSSA requirements could be excused.  Trial Tr. at 27:10–28:23, Oct. 18, 2021.  Based on a plain text reading and the consensus of authority discussed *supra*, the Court finds that the JSSA does not authorize extensions of the statutory deadlines.

Second, based on the facts of defense counsel's correspondence with the Jury Office before trial, his seven-day window for filing a JSSA challenge closed as early as October 14, 2021—four days before he filed the instant motion.  Defendant received the master jury wheel on April 1, 2021, and then, on the morning of Thursday, October 7, 2021, received a data file that, as relevant here, enumerated demographic information for the 697 persons on the summons list

---

information on the ethnicity or gender of the jurors."  *Id.* at 1300.  By contrast, defendant in the instant case not only had initially received the master jury wheel in April 2021, over six months prior to trial, but also had access prior to trial to two iterations of the list from which the venire would be drawn on October 18, 2021.  On October 7, the Jury Office furnished a list (without names) of the 309 qualified jurors forming the two-week list, *including race and gender data*.  Email from Regina Larry, D.D.C. Clerk's Office Jury Administrator, to Brandi Harden, Defense Counsel (Oct. 7, 2021, 10:33 AM).  On October 15, defendant received the directed-to-report list of the narrowed group of 105 persons who would be told to appear for jury selection on October 18.  Email from Regina Larry, D.D.C. Clerk's Office Jury Administrator, to Brandi Harden, Defense Counsel (Oct. 15, 2021, 7:38 AM).  While the final venire of 65 persons was not known, or knowable, before the morning voir dire began—since that selection hinged on which persons actually appeared as directed—defendant, unlike the *DeFries* defendants, nonetheless had the advance opportunity to review the racial composition of the master jury wheel and two progressively narrower pools from which the venire would be randomly drawn.  Timely filing was thus, even if challenging, not "effectively foreclosed."  In any event, the Circuit did not decide the question of JSSA timing exceptions because the challenge also failed on the merits.  *See DeFries*, 129 F.3d at 1300; *see also United States v. Bryant*, 523 F.3d 349, 354 (D.C. Cir. 2008) (similar).

who responded by completing questionnaires in the relevant round of summonses, and further denoted from within that group the 309 prospective jurors deemed qualified to serve and not otherwise excused in the two-week pool. Email from Regina Larry, D.D.C. Clerk's Office Jury Administrator, to Brandi Harden, Defense Counsel (Oct. 7, 2021, 10:33 AM). This spreadsheet included a column for "race_code," in which a numeric value between 1 and 9 was present for all but two entries. *Id.* The inclusion of the race code information sufficiently informed defendant that he was in possession of race data for the qualified two-week pool from which the venire would be drawn and the jury ultimately selected. This race data was the critical linchpin for his planned motion.

To be sure, numeric values like "1" and "3" are not as plain as an outright statement of race. When contemplating a JSSA challenge based on race, the "mapping" between numbers and race descriptions is clearly essential, so defendant could reasonably have known as early as October 7, 2021 to ask for a translation of the numeric values for the "race_code" column—in essence, a "Rosetta Stone" for decoding those numbers. Defendant states that he ultimately received the mapping information when "requested by Mr. Smith on October 15, 2021," Def.'s Suppl. at 3, indicating that the Jury Office was able to, and did, provide the translation of the numeric race codes promptly—within 15 minutes—when asked.[23] Even without the benefit of the race code translation information from the Jury Office, this data file contained sufficient information to allow a user of the data readily to deduce the values most important for defendant's challenge: namely that "1" represented Black and "3" White.[24] Either way, the

---

[23]      *See* Email from Brandi Harden, Defense Counsel, to Regina Larry, D.D.C. Clerk's Office Jury Administrator (Oct. 15, 2021, 12:07 PM) (requesting "the race portion of the doc[ument]"); Email from Regina Larry, D.D.C. Clerk's Office Jury Administrator, to Brandi Harden, Defense Counsel (Oct. 15, 2021, 12:20 PM) (furnishing the race code definitions).

[24]      Even without the benefit of the official definitions of the race codes, the fact that "1" stands for Black and "3" stands for White was obvious and certainly not difficult to infer. Out of the 697 questionnaire respondents,

Court finds that the exercise of the requisite reasonable diligence called for under the JSSA would have made possible for defendant to be aware of the demographic information central to his challenge on October 7, 2021.  Even allowing a few days' buffer, his JSSA challenge window closed before his motion was filed on October 18, 2021.

All told, the JSSA claim asserted by defendant is time-barred by the rigid and strictly enforced requirements the statute imposes for the contents of a perfected JSSA challenge and when such challenge may be filed.  Nevertheless, the merits of defendant's challenge must still be assessed, as he raises a constitutional claim not subject to the JSSA's statutory constraints.

### 2.    *Constitutional Claim*

Defendant argues that the Sixth Amendment guarantees him a right to "an impartial jury drawn from sources reflecting a fair cross section of the community."  Def.'s Mot. at 2-3 (quoting *Berghuis*, 559 U.S. at 319).  "In order to establish a prima facie violation of the Sixth Amendment's fair cross-section requirement, a criminal defendant must show '(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to

---

codes "1" and "3" are the most common by far, encompassing the vast majority (over 85%) of respondents.  Quick perusal of the entries for selected zip codes in the District confirms large congregations of codes "1" and "3" that readily reveal these two definitions.  For example, in zip code 20019—the easternmost zip code in D.C., situated to the east of the Anacostia River and D.C. Highway 295—out of the 38 respondents, 32 (about 84%) reported race code "1."  Meanwhile, in zip code 20007—roughly the Georgetown neighborhood, deep in the Northwest quadrant—out of 30 respondents, 28 (about 93%) reported race code "3."  In general, although population dynamics are shifting, demographic information in the District is well known and documented that the Southeast and Northeast quadrants have had a much higher proportion of Black residents than has the Northwest quadrant. *See, e.g.*, Matt Johnson, *Maps Show Racial Divides in Greater Washington*, GREATER GREATER WASH. (Sept. 21, 2010), https://ggwash.org/view/6497/maps-show-racial-divides-in-greater-washington (showing these concentrations clearly on a map).  Through these samples or various others, the definitions of codes "1" and "3" are easily deduced.

system[at]ic exclusion of the group in the jury-selection process.'" *Id.* at 3 (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979)).[25]

Just as a consensus of authority bars JSSA challenges that fail to adhere to the statute's formalities, a similar consensus leaves little doubt that accompanying constitutional challenges are *not* so limited. *See, e.g.*, *United States v. Young*, 822 F.2d 1234, 1239 (2d Cir. 1987) ("Although it bars them from statutory relief, defendants' failure to comply with the provisions of the Jury Selection Act does not preclude them from raising a constitutional challenge to the makeup of the venire, based on the [S]ixth [A]mendment."); *United States v. Nelson*, 718 F.2d 315, 319 (9th Cir. 1983) ("[F]ailure to establish a statutory claim does not end our inquiry. The legislative history of section 1867 explains that 'the Act will not preclude any person . . . from asserting rights created by other statutes or from enforcing constitutional rights.'" (second alteration in original) (quoting H.R. Rep. No. 90-1076, at 16)). Indeed, the JSSA text itself asserts that the JSSA challenge procedure is the "exclusive means" only to challenge a "jury on the ground that such jury was not selected in conformity with *the provisions of this title*." 28 U.S.C. § 1867(e) (emphasis added). The Sixth Amendment is of course not a "provision of this title."[26]

---

[25] The motion's title also alludes to a Fifth Amendment challenge, *see* Def.'s Mot. at 1, but this supposed Fifth Amendment challenge may be quickly dispatched as entirely undeveloped. Indeed, the word "Fifth" appears nowhere other than the title in defendant's motion nor his subsequent supplement. *See generally* Def.'s Mot.; Def.'s Suppl. Thus, this purported ground for the pending jury challenge need not be discussed further.

[26] Although not directly dispositive here, the JSSA further states: "Nothing in this section shall preclude any person . . . from pursuing any other remedy" provided by "any law prohibiting discrimination on account of race, color, religion, sex, national origin or economic status in the selection of persons for service on grand or petit juries." 28 U.S.C. § 1867(e). Defendant does not bring a "discrimination" claim per se, but this language indicates that the JSSA does not purport to occupy exclusively the field of judicial remedies for issues related to jury composition.

* * *

To summarize, defendant's JSSA statutory claim fails on timeliness grounds, but the bulk of the substance of his challenge survives for review on the merits on the Sixth Amendment grounds he also asserts.  Although the legal analysis of a fair cross section claim is the same whether the claim is brought under the Sixth Amendment or the JSSA, defendant's failure to meet the onerous timing demands of the JSSA would ordinarily foreclose his attempt to argue additional technical statutory violations not coextensive with his Sixth Amendment fair cross section claim.  Nevertheless, given the importance of the validity of the jury selection process for all jury trials in this District and the D.C. Circuit's suggestion, presented as *dicta* in *United States v. DeFries*, 129 F.3d 1293, 1300 (D.C. Cir. 1997) (per curiam), that courts may elect to overlook procedural noncompliance with the JSSA's strict formalities in some circumstances, for completeness this opinion will continue to test the merits of defendant's challenge against both the JSSA and Sixth Amendment standards.  The result is the same either way:  Defendant has not established grounds for relief from his indictment or conviction.

## B.  Defendant's Requested Remedy

Defendant has asked only that the Court "dismiss the indictment against him."  Def.'s Mot. at 1; Def.'s Suppl. at 1.  Although defendant observed correctly in his original motion that "[t]he JSSA permits [him] to dismiss the indictment *or stay the proceedings against him* if he can demonstrate substantial failure to comply with the Juror Selection Plan," Def.'s Mot. at 1 (emphasis added); *see also* 28 U.S.C. § 1867(a), (d), he did not in fact ask the Court to do the latter, confirming as much in a colloquy with the Court on the first day of trial shortly before voir dire began, Trial. Tr. at 15:23–17:13, Oct. 18, 2021.[27]

---

[27]      In reply, defendant incorrectly states that he "moved the Court to dismiss the indictment against him or in the alternative stay the proceedings citing a fair cross-section violation."  Def.'s Reply at 1.  Even there, however,

The JSSA, in defining the "exclusive means" for addressing violations thereof, 28 U.S.C. § 1867(e), lists dismissal of the indictment or stay of trial as the only remedies available to an aggrieved defendant, *see id.* § 1867(a), but contemplates dismissal of an indictment *only* for "a substantial failure to comply with the provisions of this title in selecting the *grand jury*," *id.* § 1867(d).[28]  The logic behind that distinction is straightforward: grand juries return indictments and petit juries return verdicts.  An improperly constituted grand jury thus calls into question the validity of the indictments it returns, whereas an improperly constituted petit jury calls into question the verdicts it returns.  Defendant offers no examples of federal courts dismissing indictments based on alleged (or actual) problems with petit jury selection, and the limited case law entertaining that idea is decidedly unfavorable to this remedy for a petit jury selection challenge.  *See United States v. Rodriguez*, 588 F.2d 1003, 1009–10 (5th Cir. 1979) ("[Section 1867(d)] makes it clear that [dismissal of indictment] is available only to those challenging their grand juries.  A court faced with a proper attack on the selection of the petit jury has the power only to stay proceedings.  Thus, appellant's motion, which requested only a dismissal of the indictment, was insufficient to invoke the only statutorily available relief.").

Here, defendant alleges nothing whatsoever about the grand jury sworn in on May 7, 2019, that returned his nineteen-count indictment on September 25, 2019.  *See* Indictment at 1,

---

his reply concluded with only the request that "his convictions be vacated and the Indictment against him dismissed."  *Id.* at 6.

[28]     While the statute does not explicitly bar dismissal of an indictment as a remedy for issues concerning the petit jury, the intended meaning is unmistakable given that the statute includes such dismissal as a remedy for grand jury issues and conspicuously omits it in *the very next sentence* when discussing petit juries.  28 U.S.C. § 1867(d) ("If the court determines that there has been a substantial failure to comply with the provisions of this title in selecting the grand jury, the court shall stay the proceedings pending the selection of a grand jury in conformity with this title or dismiss the indictment, whichever is appropriate. If the court determines that there has been a substantial failure to comply with the provisions of this title in selecting the petit jury, the court shall stay the proceedings pending the selection of a petit jury in conformity with this title.").  Furthermore, the statute affords courts some discretion in the choice of remedy for a grand jury selection issue by allowing the court to select "whichever [remedy] is appropriate" between stay and dismissal, whereas no such discretion is offered for petit jury issues.

ECF No. 13.[29]  He raises no issue with the Plan, nor with the Jury Office's compliance with the

Plan in the process leading up to the grand jury's empanelment.  Likewise, he does not challenge

the demographic composition of the actual grand jury that indicted him.  Simply put, defendant

offers nothing to impugn the validity of his indictment.

Instead, defendant's argument concerning his *petit* jury largely invokes the COVID-19

pandemic.  *See, e.g.*, Def.'s Mot. at 2 (noting a "drastic change in circumstances" as a result of

pandemic); *id.* at 5 (describing polling suggesting that Black respondents were less likely to heed

a court's jury summons during the pandemic), *id.* at 5–6 (discussing different pandemic-related

case rates and frequency of comorbidities across racial groups), *id.* at 6 (observing that minority

communities were disproportionately affected by pandemic-related economic hardship); *id.* at 7

(speculating that there could be reduced "diversity within a jury venire" during the pandemic);

*id.* (implying that excuses from service granted for "undue hardship or extreme inconvenience"

could be sought more often by persons "from lower socioeconomic backgrounds").  Indeed,

defendant's entire conclusion to his motion rides entirely on the pandemic as the basis for

believing his venire was not drawn from sources reflecting a fair cross section of the community.

*Id.*  Needless to say, the COVID-19 pandemic cannot have had any untoward impact on

defendant's indictment or the grand jury that delivered it since the dates of both the grand jury's

---

29        As noted in note 8, *supra*, the indictment was "retyped" shortly before trial, *see* Retyped Indictment, ECF
No. 159, after the government moved to dismiss nine of the original counts, *see* Gov't's Mot. Dismiss Counts 5, 7,
8, 9, 10, 11, 17, 18, & 19 of Indictment, ECF No. 147.  The "retyping" entailed only the renumbering of the
remaining counts to be consecutive due to the government's concern that presenting nonconsecutive count numbers
to a jury on a verdict form, signaling that counts had been dropped, could be prejudicial to the government as well as
confusing.  *See id.* at 1.  A grand jury was not involved, nor did one need to be, for dismissal of some, and
renumbering of the remaining, counts.  *See United States v. Chun-Yin*, 48 F.3d 562 (D.C. Cir. 1995) (per curiam)
(unpublished table decision) ("[W]hen a grand jury indictment has been retyped for submission to the petit jury so
that dismissed counts are not considered by the petit jury, there is no Fifth Amendment violation.").

empanelment and the indictment it returned squarely precede the novel coronavirus's emergence in March 2020 as a concern.[30]

Given the absence of even a conjecture of a problem with the grand jury that indicted defendant, his only requested remedy—dismissal of that indictment—is entirely unmoored from the problem he alleges: the purported infeasibility, during the pandemic, of drawing a petit jury venire from a fair cross section of the community as the JSSA and Constitution demand. This alone is sufficient reason to deny the instant motion. As discussed next, however, even if defendant had sought an appropriate remedy and done so in a timely fashion, defendant's challenge would still fail on the merits because neither a violation of the fair community cross section requirement nor a substantial failure to comply with the Jury Selection Plan has occurred.[31]

## C.    Defendant's Fair Cross Section Challenges

Defendant's central argument in support of some form of relief is that at least during the ongoing COVID-19 pandemic, this Court's Jury Selection Plan *in practice* does not and cannot adequately vindicate his Sixth Amendment right "to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." Def.'s Mot. at 2–3 (quoting *Berghuis*, 559 U.S. at 319). To understand defendant's argument, first clarifying what is *not* at issue helps focus the discussion.

---

[30]      *See Basics of COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (updated Nov. 4, 2021), https://www.cdc.gov/coronavirus/2019-ncov/your-health/about-covid-19/basics-covid-19.html (noting that COVID-19 "was discovered in December 2019"); Donald G. McNeil Jr., *Coronavirus Has Become a Pandemic, W.H.O. Says*, N.Y. TIMES (Mar. 11, 2020); Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 18, 2020) ("Now, therefore, I, Donald J. Trump, President of the United States, . . . do hereby find and proclaim that the COVID-19 outbreak in the United States constitutes a national emergency, beginning March 1, 2020.").

[31]      For the same reason, defendant was not prejudiced by any infirmities in counsel's filing timeline or articulation of the specific request for relief.

First, defendant does not expressly take issue with the design of the Plan.  To the contrary, as previously noted, defendant credits the Plan as having been "carefully calibrated to produce a fair cross-section of the community."  Def.'s Mot. at 7.  Relatedly, defendant does not identify any specific design changes to the Plan that he believes are needed for the Plan to be able to fulfill its function of drawing jurors from a fair community cross section.[32]

Second, defendant does not argue that the Plan fails to deliver jury pools comprised of a fair cross section of the community *outside* the context of the COVID-19 pandemic.[33]  While defendant proffers evidence that venires in this District have exhibited underrepresentation of Black citizens over an "extended period," Def.'s Reply at 5, the period referenced is a seven-month window in 2021, wholly contained within the time span of the pandemic, *see* Seltzer Second Decl. ¶¶ 6, 9.

Third, this motion is not about the composition of the actual jury empaneled to hear defendant's case and render a verdict.  While defendant offers the conclusory assertion that he "has established that the composition of *his* jury violated the Sixth Amendment," Def.'s Reply at 2 (emphasis in original), nowhere in his briefing does he even *state* the composition of his jury or in what respects he found the jury unacceptable.  Indeed, at trial, defendant viewed and expressly approved the particular jury that emerged from voir dire and was sworn to hear this case.  *See* Part I.C, *supra*.  Although defense counsel expressed a brief caveat to that approval "pending any

---

[32]     Defendant curiously notes in his reply that the JSSA "mandates that the procedures for selecting jurors 'shall ensure that each county . . . within the . . . division is substantially proportionally represented in the master wheel for that judicial district, division or combination of divisions."  Def.'s Reply at 3 (alterations in original) (quoting 28 U.S.C. § 1863(b)(3)).  That is true.  Defendant does not, however, argue that the Plan fails to do so—nor could he.  The District of Columbia has not been subdivided into counties since the formation of a unified District government in 1871.  *See* Organic Act of 1871, ch. 62, §§ 40–41, 16 Stat. 419, 428–29.  As such, this District has no need to take any measures to ensure pro rata representation of counties or any other political subdivisions in the master jury wheel.

[33]     Indeed, defendant raises no issue with the process used to empanel the grand jury that returned his indictment in 2019, prior to the onset of the pandemic.

outstanding motion," Rough Trial Tr. at 73:12-19, Oct. 19, 2021—presumably a reference to the pending request for dismissal of the indictment—nothing about the seated jury prompted, let alone compelled, a request to delay the trial for selection of another jury from an alternative venire or master jury wheel.  Accordingly, any objection to the specific jury panel seated for trial is waived.  *See McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 550 n.2 (1984).

As to what it does argue, the instant motion fails on the merits for several reasons.  First, defendant fails to make the prima facie showing necessary to prevail on a Sixth Amendment fair cross section challenge under the test set forth in *Duren v. Missouri*, 439 U.S. 357 (1979). Second, even if his JSSA challenge were deemed timely (or any untimeliness excused) notwithstanding the analysis in Part III.A.1, *supra*, defendant fails to show a "substantial failure" to comply with the JSSA or the Plan.  Any fair cross section challenge under the JSSA also relies on the *Duren* test and fails on the same basis as under the Sixth Amendment.

### 1.    *Fair Cross Section and the* Duren *Test*

The parties agree that the *Duren* test provides the correct analytical framework for a court evaluating a fair cross section challenge.  *See* Def.'s Mot. at 3; Gov't's Opp'n at 3.  Under *Duren*, "[i]n order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."  439 U.S at 364.  While *Duren* concerned an alleged Sixth Amendment violation, *id.*, the same test is used to evaluate a fair cross section claim brought through the JSSA.  *See United States v. Bryant*, 523 F.3d 349, 361–62 (D.C. Cir. 2008) ("The JSSA codifies this [Sixth

Amendment fair cross section] right, stating that federal litigants entitled to a jury trial have 'the

right to grand and petit juries selected at random from a fair cross section of the community in

the district or division wherein the court convenes.'" (quoting 28 U.S.C. § 1861)).  A defendant

need not demonstrate that actual prejudice resulted from the fair cross section violation at issue.

*See United States v. Vecchiarello*, 536 F.2d 420, 423 (D.C. Cir. 1976); *see also Holland v.*

*Illinois*, 493 U.S. 474, 477 (1990) ("[T]he Sixth Amendment entitles every defendant to object to

a venire that is not designed to represent a fair cross section of the community, whether or not

the systematically excluded groups are groups to which he himself belongs.").

The first prong of the *Duren* test, the "'distinctive' group" requirement, is easily met

here, though not without some ambiguity as to precisely which group (or groups) defendant

intended.  Defendant's initial motion does not expressly identify the "distinctive group" he

claims is underrepresented in the jury pool for purposes of the *Duren* analysis, but his discussion

of racial representation repeatedly mentions Black and Hispanic residents in tandem.  *See*

*generally* Def.'s Mot.  The government agrees that these are two "distinctive groups."  Gov't's

Opp'n at 4.  Defendant also suggests that "age is another factor to consider here," citing a survey

concluding that the elderly may be less likely to report for service in response to a summons.

Def.'s Mot. at 6.  The government rejects the premise that a "distinctive group" can be defined

by age.  Gov't's Opp'n at 4 n.5 (citing cases).

Out of these three possible groups—Blacks, Hispanics, and older residents—defendant

does not furnish *any* empirical analysis concerning the latter two.  *See generally* Seltzer Decl.;

Def.'s Reply; Seltzer Second Decl.[34]  Therefore, for the purposes of the instant motion, Blacks

---

[34]    The jury questionnaire furnished by the Administrative Office of the U.S. Courts and used by this Court
does not include "Hispanic" as an option for the question asking respondents to self-identify their race (or races, if
more than one).  Instead, identification as "Hispanic or Latino" is a separate yes/no question.  The data files
provided by the Jury Office for the summons list, enumerating the summonses sent, responses received, and

are the only "distinctive group" for which defendant could plausibly satisfy the *Duren* requirement.[35]

## 2.    *Underrepresentation*

The second *Duren* prong focuses on whether "the representation of [Blacks] in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community."  439 U.S. at 364.  On the Friday before the Monday on which defendant's trial began, 105 persons on the directed-to-report list were instructed to report to the courthouse on Monday morning.  The parties agree that the representation of Blacks in that group lagged the Census-estimated share of Blacks in the adult population of the District by at least 10.7 percentage points.  Seltzer Decl. ¶ 7; Siskin Decl. ¶ 3.[36]  They also agree that the analogous disparity was 14.4 percentage points for the qualified two-week pool of 309 persons.  Seltzer Decl. ¶ 7; Siskin Decl. ¶ 3.

Let there be no mistake as to the significance of this central observation, independent of whether the *Duren* standard is met.  The Court takes very seriously this apparent current deficit in the demographic representativeness of the jury pool produced in the later stages of the

---

qualification status for each respondent, correspond to these jury questionnaire questions and provide no "race code" for "Hispanic," but contain a separate yes/no column for the "Hispanic" attribute, making this information readily available for persons who responded to summonses by completing the questionnaire.  The files furnished to defendant containing the contents of the master jury wheel lack this "Hispanic" column, though that omission has little practical significance given how sparsely the "race code" column is also populated in the master wheel. Nevertheless, defendant's empirical argument is only developed with respect to Black, and not Hispanic, jurors.

[35]    The fact that defendant is himself Black is irrelevant.  *Holland*, 493 U.S. at 477.

[36]    Both experts incorrectly refer to this directed-to-report group as defendant's "venire," when more accurately this group of persons, who are directed to report on the morning of trial, is drawn from the qualified two-week pool.  The venire is not known until the morning of trial and is randomly selected from the persons on the directed-to-report list who actually report at the courthouse as directed.  The venire in this case consisted of 65 prospective jurors.  Based on the Court's own analysis, Black representation fell by four percentage points, from 28.6% on the directed-to-report list of 105 persons, as both experts report, to 24.6% in the venire of 65 randomly selected persons from those who reported.  This fairly closely matches the Black representation seen among all 697 respondents to the summons for the relevant two-week period (25.1%) and the subset thereof of 309 persons in the qualified two-week pool of those deemed qualified and not excused (24.9%).

summons response process.  Addressing any deficit in Black participation and representation at every stage of the jury selection process in this District is a salutary objective—*regardless of the cause* of the deficit.  This Court will and should not be satisfied until all reasonably practicable measures are being taken to address this deficit and, to that end, areas of improvement are already under consideration.  To the extent the challenges brought by this defendant and others have helped hasten improvements in this Court's jury selection process, counsel's collective diligence is welcomed and a service to the Court, the bar, and litigants writ large.  The existence of room for improvement, however, does not a Sixth Amendment or JSSA violation make.

The Supreme Court has not prescribed a specific quantitative test to determine if, for *Duren* purposes, a particular group is underrepresented to an extent that the representativeness of the pool ceases to be "fair and reasonable."  *See Berghuis*, 559 U.S. at 329–30 ("[W]e . . . have no cause to take sides today on the method or methods by which underrepresentation is appropriately measured.").  The D.C. Circuit has not opined on the matter.  A body of case law in sister circuits, however, has coalesced principally around two flawed but straightforward numerical tests: the "absolute disparity" test and the "comparative disparity" test.  *See United States v. Hernandez-Estrada*, 749 F.3d 1154, 1160–65 (9th Cir. 2014) (en banc) (surveying methods and case law).  Other imperfect methods exist but are not pursued by the parties here.

Under the "absolute disparity" test, a court identifies the degree of underrepresentation by subtracting the distinctive group's representation in the qualified jury wheel from its representation in the population of the community.  *Hernandez-Estrada*, 749 F.3d at 1160–61.  This test, while "easy to administer," has been criticized as producing misleading results, especially by understating the significance of a disparity for a group that comprises a small

minority of the population.  *See id.* at 1162.[37]  The "comparative disparity" test, intended to

mitigate this defect, divides the absolute disparity percentage by the percentage representation of

the subject group in the community.  *Id.* at 1162–63.  This method is susceptible to the opposite

criticism, of possibly overstating the significance of disparities for groups comprising a very

small share of the population.  *See id.* at 1163.

In assessing whether a particular jury selection scheme results in a fair cross section

violation based solely on a quantitative metric of disparity, points of reference as to what types

of values are viewed as acceptable (or not) would provide useful guideposts.  Yet, any bright-line

threshold may be necessarily arbitrary and, in any event, judicial consensus is lacking on any

such guideposts.  For absolute disparity, the government cites scholarship indicating that courts

employing the absolute disparity method have often "ruled that absolute disparities less than

10% are insufficient as a matter of law to demonstrate a violation of the fair cross section

requirement."  Gov't's Opp'n at 5 (quoting Paula Hannaford-Agor, *Systematic Negligence in*

*Jury Operations: Why the Definition of Systematic Exclusion in Fair Cross Section Claims Must*

*Be Expanded*, 59 DRAKE L. REV. 761, 767–68 (2011)).  The Third Circuit sets the bar a touch

higher, at 11.5%.  *See Howell v. Superintendent Rockview SCI*, 939 F.3d 260, 271 (3d Cir. 2019)

(Porter, J., concurring).  Standards are even less clear for comparative disparity, but various

---

[37]     The Ninth Circuit in *Hernandez-Estrada* illustrates this concern through simple hypotheticals demonstrating that the same difference in percentage points can have starkly different meaning depending on a group's representation in the community.  *See* 749 F.3d at 1162.  "[I]f we assume a group makes up 90% of the population, but 80% of the jury pool, there would be a 10% absolute disparity.  Under those circumstances, it is doubtful that any court would consider the group underrepresented.  However, if a population group constituted 10% of the population, but had no representation in a jury pool, that result might give rise to fair cross section concerns. Yet, the absolute disparity—10%—would be identical under both scenarios."  *Id.*  Likewise, if a group comprises 15% of the population but only 5% of the jury pool, this same "10%" disparity signifies that the group's members are only one-third as likely to be called for jury service as they should be.

cases have rejected challenges presenting values as high as 50% or more. *See United States v. Savage*, 970 F.3d 217, 258 (3d Cir. 2020) (citing cases), *cert. denied*, 142 S. Ct. 481 (2021).

As indefinite as these benchmarks are, they at least provide context when evaluating the disparities identified by defendant here. As an initial matter, the parties' experts both agree, and the Court accepts, that the Black share of the adult population of the District, as found by the 2020 Census, is about 39.3%. *See* Seltzer Decl. ¶ 4; Gov't's Opp'n at 6; Siskin Decl. ¶ 13.[38] Likewise, the experts agree that the qualified two-week pool for defendant's trial had 24.9% Black representation. Seltzer Decl. ¶ 6; Siskin Decl. ¶ 23 tbl.5. Subtracting these two values (39.3% - 24.9%), yields an absolute disparity of 14.4 percentage points.[39] As noted above, comparative disparity is computed by dividing the absolute disparity percentage by the percentage representation of the subject group in the community. Here, dividing the absolute disparity percentage (14.4) by the Black percentage of the adult population in the community

---

[38] This 39.3% value matches information available through the Census Bureau's "Data Explorer" reflecting redistricting data produced by the 2020 Census. *See P3: Race for the Population 18 Years and Over*, U.S. CENSUS BUREAU, https://bit.ly/3AM4a5s (last viewed Feb. 10, 2022) (showing, for the District of Columbia, a total adult population of 575,161 out of which 226,137 identify as "Black or African American Alone"—approximately 39.3%). This value somewhat oversimplifies the question of the proportion of Black D.C. residents because some respondents identify as multiple (up to as many as five) races, none of whom are included in the 39.3% estimate. The comparison to data provided by the Jury Office remains valid, however, because on the juror questionnaire respondents may self-identify as more than one race and, if so, they are coded as "Multi-Race." As such, respondents of mixed race are also excluded from the Black tabulation in the jury data, making this an apples-to-apples comparison.

Defendant's original motion, filed before he had secured an expert declaration, states a 41.4% value for the Black population of the District. Def.'s Mot. at 4–5; Gov't's Opp'n at 6 n.7. That value is consistent with 2020 Census data *without* filtering to include only persons age 18 and up. *See P1: Race*, U.S. CENSUS BUREAU, https://bit.ly/3KYA2IX (last viewed Feb. 10, 2022). Defendant's expert declaration later adopts the 39.3% value, Seltzer Decl. ¶ 4, as does the text of defendant's reply, Def.'s Reply at 4. Accordingly, defendant's originally cited 41.4% statistic is disregarded.

[39] This Memorandum Opinion refers to a value derived from a subtraction between two percentage values (*e.g.*, absolute disparity), as "percentage points" for clarity to distinguish such values from a difference derived from division (*e.g.*, comparative disparity), when the symbol "%" is used. So, for example, to "increase by 50 percentage points" means going from 20% to 70%, but to "increase by 50%" would mean going from 20% to 30% because "increasing by 50%" means "multiplying by 150%, or by 1.5." These dramatically different results underscore the importance of clear language to describe calculations.

(39.3%) yields the value 0.366, or 36.6%—the comparative disparity.  Defendant posits that this difference—in terms of absolute disparity or comparative disparity—demonstrates a Sixth Amendment violation.  *See* Def.'s Suppl. at 3; Def.'s Reply at 4; Seltzer Decl. ¶¶ 7–8.  As the government correctly argues, however, even if one or both of those values exceeds the relevant threshold, the story does not end here.

Fair cross section violations are not identified by examining a single jury, a single venire, or a single draw of persons to be summoned from a master jury wheel.  *See* Gov't's Opp'n at 5 ("Courts have held that, generally, underrepresentation must occur over a period of time to satisfy the second prong.").  The second *Duren* prong queries representation "in *venires* from which *juries* are selected."  439 U.S. at 364 (emphasis added).  As the Supreme Court has said, "in holding that petit juries must be drawn from a source fairly representative of the community [the Court] impose[d] no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population."  *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975).  By logical extension, the representativeness of a single venire (or the precursor pools from which the venire is drawn, *e.g.*, the qualified two-week pool or the directed-to-report list) does not, itself, dictate whether or not the second *Duren* prong is met.  *See* *Berghuis*, 559 U.S. at 319 (describing the Sixth Amendment right to a jury "drawn from *sources* reflecting a fair cross section of the community" (emphasis added)).

In response to the government's argument that underrepresentation cannot be established without observing patterns over time, defendant does exactly that by attaching a second declaration by Dr. Seltzer (albeit one prepared for another case).[40]  This time, Dr. Seltzer does

---

[40]     A procedural skirmish between the parties on this subject must be laid to rest.  Before defendant filed his reply, the Court, upon learning that defendant had requested additional data from the Jury Office, cautioned defendant either "to limit his arguments and data sources in his reply . . . to the scope of defendant's Motion, defendant's Supplement, and the government's Opposition" or, alternately, to show cause "why defendant should be

not focus on this defendant's qualified two-week pool, but rather considers data provided by the Jury Office for six qualified two-week pools sampled between May and November of 2021, both individually and in aggregated form.  Seltzer Second Decl. ¶¶ 6, 8, 9.[41]  Inexplicably, Dr. Seltzer appears to have omitted from this analysis *the very two-week pool at issue in this motion*, that from which this defendant's venire was drawn—a pool consisting of 309 persons, of whom 24.9% were Black, derived from a set of 1,837 summonses originally sent on August 25, 2021.[42] In any event, Dr. Seltzer found that out of the 1,748 jurors deemed qualified and not excused from those six other 2021 pools, 29.2% were Black, *id.* ¶ 8 tbl.3, a higher overall proportion and therefore somewhat *more* representative—that is, a deviation of 10.1 percentage points from Census data as opposed to 14.4 percentage points, which is the corresponding number for

---

allowed to expand his Motion to address new data sources."  Min. Order (Nov. 23, 2021).  Defendant responded to the Court's order by noting, *inter alia*, that his data request "is *directly responsive* to the government's claims" that a disparity must be shown to be persistent over time.  Def.'s Mot. Extension ¶ 14 (emphasis in original); *see also* Gov't's Opp'n at 5–6.  Defendant's use of the additional data is indeed responsive to the government's argument and defendant's advance explanation for why he should be permitted to introduce analyses of that additional data adequately satisfies the directive in the November 23, 2021 show cause order.  Nevertheless, the government later raised vigorous objection to defendant's reply brief.  After defendant's reply, the Court asked the government to opine on new, narrow issues implicated by the reply.  *See* Min. Order (Dec. 14, 2021).  The government not only responded to those queries but also recharacterized the reply brief as a "disguise[d]" attempt to file "a wholesale new motion" in contravention of the December 14, 2021 minute order.  Gov't's Sur-Reply at 5–6.  To be clear, under the circumstances, defendant's introduction of data for an "extended period" of jury pools in his reply brief legitimately responds to the government's reasonable rejoinder about the type of proof necessary to show underrepresentation.  Even under the JSSA, where the opening motion must include a "sworn statement of facts," 28 U.S.C. § 1867(d), the government has not presented any authority for the proposition that the initial declaration must establish the entirety of the factual record ultimately used in arguing the motion, including data anticipating any and all opposition arguments the government might bring.

[41]      Dr. Seltzer's use of the terms "total" and "responded" to identify groups of summoned jurors, *see* Seltzer Second Decl. ¶ 8, is confusingly imprecise, though derived from the abbreviated "status" field in the data files provided by the Jury Office to describe persons sent a summons and questionnaire.  The five "status" values used are "deferred," "disqualified," "excused," "responded," and "summoned," *id.* ¶ 7, with each person assigned only one "status" label.  While "summoned" is one of the choices, *all* individuals on these lists were "summoned," and thus "summoned" status means the person does not fall into any other status group, meaning the person is "summoned and has not responded."  Likewise, while "responded" is a status option, jurors who are excused from serving, for example, also clearly "responded" to the summons and questionnaire and thus the "responded" status indicates the person "responded and is deemed able to serve (*i.e.*, neither disqualified, deferred, nor excused)" and is in the qualified two-week pool.

[42]      Dr. Seltzer had the relevant data for defendant's qualified two-week pool, having derived these same statistics in his first declaration.  *See* Seltzer Decl. ¶ 6 tbl.2.

defendant's jury pool.[43]  Indeed, *all six* of the other 2021 pools studied exceeded the 24.9%

Black representation in defendant's qualified two-week pool.  *See id.* ¶ 9 tbl.4 (showing a range

of 25.4% to 34.3%).  For reference, had Dr. Seltzer's analysis included defendant's qualified

two-week pool, thus aggregating seven jury pools instead of six, the resulting Black percentage

would have been only slightly different: 28.6%, or 10.7 percentage points below the Census

benchmark.[44]

Defendant's "six month" analysis both strengthens and weakens his argument that Blacks

are underrepresented in the qualified two-week pools from which venires are drawn.  On the one

hand, he shows that a nontrivial degree of underrepresentation persisted over this period and was

not a "fluke" unique to his jury pool.  On the other hand, because defendant's qualified two-week

pool had somewhat lower Black representation than the six-pool (or seven-pool) aggregate, the

data over a broader period of time show a smaller deviation from the population, with the 10.7

percentage point deficit sitting perilously close to, or even below, levels that some other courts

applying the absolute disparity test have rejected as insufficient to show underrepresentation for

*Duren* purposes.  *See, e.g.*, *United States v. Quiroz*, 137 F. App'x 667, 670 (5th Cir. 2005)

(11.22%); *United States v. Grisham*, 63 F.3d 1074, 1078–79 (11th Cir. 1995) (10%); *Savage*,

970 F.3d at 257 (8.45%).  Meanwhile, these data show a comparative disparity of 27.2% (10.7

---

[43]     Defendant's reply brief undersells this disparity further still, stating that Dr. Seltzer's newer analysis "has
shown that black people made up 31% of a qualified panel," which results in "an 8.3 [percentage point] absolute
disparity and a comparative disparity of 21.1%."  Def.'s Reply at 4.  The only place a 31% Black share appears in
Dr. Seltzer's tables is in describing the *single* jury pool identified as "Nov 30 2021."  Seltzer Second Decl. ¶ 9 tbl 4.
Regardless of the source of this value, the Court will grant defendant the benefit of the more favorable figures and
credit Dr. Seltzer's aggregated 29.2% Black share over defendant's reply brief's reference to "31%," which is, at
best, a misplaced statistic or otherwise of unknown origin.

[44]     Dr. Seltzer's aggregation of six pools (not including defendant's) includes 511 Black prospective jurors out
of a total of 1,748.  If defendant's pool is added, the result is 588 Black prospective jurors (the original 511 from the
first six pools, plus 77 from defendant's pool) and 2,057 prospective jurors overall (the original 1,748 from the first
six pools, plus 309 from defendant's pool).  The percentage of Black representation in this aggregation of *seven*
pools is, therefore, 588 divided by 2,057, or 28.6%.

divided by 39.3), a value below those generally found to be significant.  *See, e.g.*, *Savage*, 970

F.3d at 258 (citing cases deeming insufficient comparative disparity values ranging from 38.17%

to as high as 58.39%).

Finally, instead of directly arguing that these levels of underrepresentation are inadequate

to support a fair cross section violation, the government argues that analyses drawing from

summoned jury pools miss the mark because the relevant inquiry is really whether Blacks are

appropriately represented in the *master jury wheel* from which all subsequent lists are drawn and,

in Dr. Siskin's assessment, if anything the master jury wheel modestly *overrepresents* Blacks.

*See* Gov't's Opp'n at 6; Siskin Decl. ¶ 5.  Indisputably, the composition of the master jury wheel

is highly relevant to the underrepresentation inquiry.  If the demographics of the master jury

wheel were grossly misaligned with the demographics of the adult population of the District,

such misalignment would offend *Duren*.  *See Duren*, 439 U.S. at 363–64 (indicating that "jury

wheels" must be "reasonably representative" (quoting *Taylor*, 419 U.S. at 538)).  It is not true,

however, that even a perfectly representative master jury wheel ends the inquiry as to whether

underrepresentation exists for *Duren* purposes.  Indeed, in *Duren* itself the Court identified not

only severe deficits in female representation in the master jury wheel but also the later

discriminatory treatment of persons not responding to summons.  *See id.* at 361–63.

Analogously here, anything that introduces disproportionate representation, including problems

that manifest after the master jury wheel is built, must be considered.  For that reason,

defendant's arguments about the equitable composition of the master jury wheel are best

addressed in the systematic exclusion analysis next.

All told, though defendant has certainly shown a degree of Black underrepresentation in

jury pools, this showing is not sufficient to satisfy *Duren*'s second prong.  The Court finds that

on the record in this case the defendant has not made a sufficient showing because, even if

crediting defendant as having shown a greater absolute disparity than his analysis stated (10.7

percentage points versus 10.1), the disparity demonstrated sits in a range that courts have

generally deemed insufficient for a Sixth Amendment violation under the *Duren* test.

Ultimately, however, this prong is not dispositive because defendant's fair cross section claim

clearly fails at the third *Duren* prong requiring a showing of systematic exclusion.

### 3.     *Systematic Exclusion*

The final showing defendant must make is that "the underrepresentation of [Blacks],

generally and on his venire, was due to their systematic exclusion in the jury-selection process."

*Duren*, 439 U.S. at 366.  For exclusion to be systematic, the cause of underrepresentation must

be "inherent in the particular jury-selection process utilized."  *Id.*  Importantly, "[a] showing that

a jury venire underrepresents an identifiable group is, without more, an insufficient showing of

systematic exclusion under the third prong of the *Duren* test.  If underrepresentation by itself

were sufficient to support a holding of unconstitutionality, the second and third prong of *Duren*

would effectively collapse into one inquiry."  *Randolph v. California*, 380 F.3d 1133, 1141 (9th

Cir. 2004).

Defendant identifies, with varying levels of exposition, only three potential causes for

Black underrepresentation: (1) disproportionately low Black response rates to jury summonses

driven by the COVID-19 pandemic, *see* Def.'s Mot at 5–7, that was exhibited in a "consistent

and predictable" manner, Def.'s Sur-Reply at 7; (2) "discretion exercised by the jury office to

excuse jurors and to enforce compliance with summonses," Def.'s Reply at 6; and (3) defects in

the master jury wheel used at the time defendant's jury pool was developed, *see* Def.'s Mot.

Leave File Sur-Reply at 5–6.  Each of these arguments is addressed following review of applicable legal principles for systematic exclusion.

### a)        Applicable Legal Principles for Systematic Exclusion

Case law examples suggest three general routes by which a showing of systematic exclusion may be made.  First, if "an exclusionary process is 'readily apparent'" or a practice is not facially neutral with respect to a distinctive group, systematic exclusion may be present.  *See Savage*, 970 F.3d at 259 (noting that "overtly barring a racial group from jury service" and "giv[ing] a racial group additional opportunities to opt out that were not provided to others" would be examples of systematic exclusion); *Duren*, 439 U.S. at 366–67 (condemning an automatic opt-out afforded to women who either explicitly request to be excused or fail to return the questionnaire).  Defendant has not identified any facially discriminatory feature of the Plan either as written or as implemented in practice, because no such feature exists.

Second, systematic exclusion can in some cases be shown by the existence of an implementation error or design choice that, while facially neutral, has a readily articulable defect with severe implications for the representativeness of jury pools.  Two examples, both involving inadvertent geographic exclusions, are instructive.  In *United States v. Osorio*, 801 F. Supp. 966 (D. Conn. 1992), defendant prevailed in a Sixth Amendment challenge, *id.* at 980, where the cities of Hartford and New Britain, Connecticut—which together account for about two-thirds of the Black and Hispanic populations of the division—were omitted entirely from the qualified jury wheel, *id.* at 972, for peculiar reasons.  The Clerk's office simply never input the names from the voter rolls provided by New Britain's Registrar of Voters, while the Hartford absence was initially unexplained.  *Id.* at 972–93.  After *Osorio*, further study uncovered "a computer programming error had caused the letter 'd' in 'Hartford' to communicate to the computer that all potential jurors from Hartford were deceased and thus unavailable for jury service."  *United*

*States v. Jackman*, 46 F.3d 1240, 1242–43 (2d Cir. 1995).  Although the qualified wheel was abandoned and started anew at this point, *see id.* at 1243, when the Jury Clerk directed qualified jurors to report for service, her process for doing so relied on another intermediate list, the "Jury Clerk's Pool," which list had not been refreshed after the retirement of the defective qualified wheel, *see id.* at 1243–44.  The Second Circuit held that defendant had shown systematic exclusion in *Jackman* as well due to the continued use of obsolete data, in effect perpetuating the method rejected in *Osorio*.  *See id.* at 1248.

In another episode, in July 2002, media reported that the Kent County, Ohio, jury selection system had for over a year been afflicted by a "glitch."  *Ambrose v. Booker*, 684 F.3d 638, 640–41 (6th Cir. 2012).  For reasons unknown, when driver's license and state identification data was loaded into the County's database, a numeric "parameter" affecting the juror selection process was set incorrectly.  *Id.* at 641.  "The net effect of this incorrect parameter is that the Jury Management System performed a random selection against the first 118,169 jurors on the file," a file which actually had 453,981 entries.  *Id.*  Unfortunately, at the time of import the file was sorted in order of zip code.  *Id.*  As a result, the per capita rate of jurors pulled from lower numbered zip codes exceeded by many times the rate from higher numbered zip codes.  *See id.*  Worse, the lower-numbered zip codes in Kent County were outside of the Grand Rapids area.  *Id.* at 642.  The effect on Black representation in the jury pulls resulted in "an absolute disparity of 6.03% and a comparative disparity of 73.1%."  *Id.*  On habeas review, the federal courts deemed this scenario "systematic exclusion."  *Id.* at 640.

Third, systematic exclusion might be demonstrable even in the absence of a "readily identifiable" cause if the data show that a particular juror selection practice produces underrepresentation over an extended period of time.  *See Savage*, 970 F.3d at 260.  The duration

of the required showing, however, must occur over many years, especially when the actual cause

of the underrepresentation is unclear.  *See id.*; *see also Ramseur v. Beyer*, 983 F.2d 1215, 1233

(3d Cir. 1992) (listing examples of studies running for 7, 11, and 25 years, respectively, as

having satisfied the "significant period of time" requirement to demonstrate an equal protection

violation in the context of jury selection).  Further, a long-standing "extreme underrepresentation

may be enough to establish a *per se* systematic exclusion."  *Bates v. United States*, 473 F. App'x

446, 450 (6th Cir. 2012).

      At the same time, systematic exclusion claims have been rejected where the

underrepresentation is attributable to "external forces."  *United States v. Rioux*, 97 F.3d 648, 658

(2d Cir. 1996).  Such "external forces" can include the "inability to serve juror questionnaires

because they were returned as undeliverable," *id.*; the failure of eligible persons to register to

vote, *United States v. Cecil*, 836 F.2d 1431, 1448 (4th Cir. 1988) ("The authorities cited, from

practically every Circuit . . . , categorically establish that there is no violation of the jury cross-

section requirement where there is merely underrepresentation of a cognizable class by reason of

failure to register, when that right is fully open."); Hurricane Katrina, *United States v. Haynes*,

No. 05-cr-308, 2006 WL 1236059, at \*3 (E.D. La. May 3, 2006); the relative inability of rural

jurors to report for service as directed during "inclement weather," *United States v. Little Bear*,

583 F.2d 411, 414 (8th Cir. 1978); and, most notably here, nonresponses to jury questionnaires,

*Bates*, 473 F. App'x at 451 ("Non-responses, however, are not a problem 'inherent' to the jury

selection procedures, but are the result of individual choice. . . . In fact, every court to address the

issue has held that non-responses do not constitute a 'systematic exclusion.'" (citing cases)).  The

Supreme Court has even recognized that "[c]ircumstances or chance may well dictate that *no*

*persons* in a certain class will serve on a particular jury or during some particular period."

*Hernandez v. Texas*, 347 U.S. 475, 482 (1954) (emphasis added).

Set against this general legal background regarding systematic exclusion, each of defendant's arguments is considered next.

### b)      Summons Response Rates

Out of the 1,837 jury summonses sent out for the time period covering defendant's trial, 697 recipients returned the questionnaire—a response rate of 37.9%.  The parties seemingly agree that response rates recently have been especially low among Black citizens, *see* Def.'s Mot. at 6–7; Gov't's Opp'n at 8–11; Siskin Decl. ¶ 22, but differ sharply both in their reasons for this phenomenon and in the implications thereof.

Defendant hypothesizes that during and because of the ongoing pandemic, Black summons recipients are somewhat less likely to report for jury duty than are White recipients. Def.'s Mot. at 5.  In support, defendant cites a June 2020 survey of 1,000 voters, conducted by the National Center for State Courts, reporting that while 69% of White respondents surveyed said they would report for jury duty if summoned, only 58% of Black respondents said the same. *Id.*; *see also* Cara Bayles, *Can You Get a Fair Jury Trial During the Pandemic?*, Law360 (Aug. 30, 2020), https://www.law360.com/articles/1305161.[45]  Defendant further observes that "COVID-19 disproportionately affects racial and ethnic minorities," Def.'s Mot. at 5, and offers some high level studies supporting this observation.  For example, "[t]he recent Centers for Disease Control and Prevention (CDC) study reported that '21.8% of COVID-19 cases in the

---

[45]      This survey—querying whether respondents would *report* for jury duty if summoned—is a mismatch to the one-step Plan in this District, where the immediate action asked of a summons recipient is to fill out and return a questionnaire, not physically to report for duty.  Under this Court's one-step Plan, reticence to *appear* could manifest later in the process, perhaps after a particular juror is notified that they are to report the following morning. The practical difference may be minimal, however, since either form of hesitation could have the same ultimate result of affecting the demographics of the venire presented to the parties on the morning of trial.

United States were African Americans," even though Blacks comprise only 13% of the U.S. population.  Def.'s Mot. at 5 (quoting Don Bambino Geno Tai et al., *The Disproportionate Impact of COVID-19 on Racial and Ethnic Minorities in the United States*, 72 CLIN. INFECTIOUS DISEASES 705, 705 (June 20, 2020)).[46]  Further, Blacks suffer higher rates than the general population of comorbid pre-existing conditions, increasing susceptibility not only to infection but also to severe adverse outcomes including death.  *See id.* at 5–6.  On top of all this, defendant also observes that "COVID-19 is highly correlated with low socioeconomic backgrounds" and that studies done in 2020 show that Blacks experienced somewhat higher rates of coronavirus-related job loss than did Whites while at the same time Blacks were also substantially less likely to have three months of emergency savings on hand.  *See id.* at 6.  The government neither disputes nor addresses any of these contentions.

Defendant's pending motion does not present the appropriate occasion—nor does this Court or the parties, even with experts, have the appropriate expertise—for a deep dive into the many complex dynamics of how the pandemic has differentially affected various population segments, but defendant's broad observations are credited as reasonable and generally consistent with phenomena widely reported over the course of the nearly two years that the pandemic has dramatically affected life in this country.  The specific statistics defendant cites are considerably less useful as they date from the summer of 2020, a time when our collective understanding of the pandemic was far more rudimentary, vaccines had not yet been deployed, and treatment regimens for the infected were still relatively nascent.  Regardless, none of these contentions or

---

[46]     Although unclear precisely what "recent CDC study" is referenced and debatable whether such "study" is reasonably characterized as "recent," the cited article states that CDC reported these case frequencies "[a]s of June 2020."  Tai et al., *supra*, at 705.

data derives from the actual results of jury selection processes, and even less clear is whether the causal relationship defendant suggests was actually manifest, in this District, in October 2021.

Ironically, the best empirical support for the part of defendant's thesis that Black response rates to summonses are disproportionately low, particularly during the pandemic, comes from the government's expert. Dr. Siskin offers analysis—entirely empirical and without making any conjectures as to *why* response rates vary—that convincingly suggests, but does not definitively prove, not only that Black response rates to the summonses sent leading up to defendant's trial were comparatively low but also that this differential response rate is the principal cause of Black underrepresentation in qualified two-week pools.[47] The exercise of comparing the demographics of all persons on the summons list to the subset of respondents who return the questionnaire, however, hits an immediate roadblock: the data in the master jury wheel, from which the names of persons to be sent summons are drawn, contains race information for only a *de minimis* fraction of entries. For all practical purposes, the master jury wheel lacks race data. *See* Siskin Decl. ¶ 19 ("Unfortunately, no racial and ethnicity information exists for the persons on the Source List."). The only available indicator of race for individual prospective jurors comes from responses to the questionnaire accompanying the summons, which responses are of course only received *from those who respond*.

To draw conclusions about response rates given this data gap, some kind of estimation methodology is required to attempt to infer the race distribution of persons on the summons list using information that *is* known about them. Defendant's expert makes no effort to discern this information. Dr. Siskin, by contrast, offers a "geocoding" method designed to use the address

---

[47] Dr. Siskin also offers uncontroverted analysis that most of the remaining disparity is driven by higher rates of disqualification due to felony conviction among Black prospective jurors. *See* Siskin Decl. ¶ 32.

reported for each name on the master jury wheel to make estimates of the demographic composition of that wheel. Siskin Decl. ¶ 19. Each address falls in a specific "census tract," which is a "small, relatively permanent statistical subdivision[] of a county," with an average of about 4,000 residents and a range from 1,200 to 8,000. Geo. Prods. Branch, *Census Tracts*, U.S. CENSUS BUREAU at 3, https://www2.census.gov/geo/pdfs/education/CensusTracts.pdf (last visited Feb. 11, 2022). The 2020 Census provides data at the tract level, including the racial breakdown of adults in each tract. Siskin Decl. ¶ 19. For each census tract, Dr. Siskin tabulates the number of persons on the master wheel who live in that tract, and then estimates the racial composition of this small set of individuals using the existing Census data that provides that racial breakdown for the tract as a whole. *See id.* At the end, adding together all of the tract-level estimated racial breakdowns produces an estimated racial breakdown for the master wheel. As relevant here, Dr. Siskin estimates Black representation on the master jury wheel to be 42.62%. *Id.* ¶ 20 tbl.3.

The geocoding-derived estimate that the master jury wheel is 42.62% Black provides a reference point against which to compare the group of persons who *did* respond to the questionnaire. The latter group, in defendant's case, contained 679 persons of known race, of whom 175, or only 25.77%, self-identified as Black.[48] Assuming that the randomly selected group of 1,837 persons to whom summonses were sent is demographically similar to the master wheel at large, *see* Siskin Decl. ¶ 14 n.4, the summoned group, too, was likely about 42.62% Black.[49] The fact that the Black share of the respondents is so much lower—by nearly 17

---

[48]     Dr. Siskin's table identifies this percentage as "29.61%," Siskin Decl. ¶ 22 tbl.4, which appears to be in error. The set of respondents consists of 697 persons, and race data is missing for 18, leaving 679 persons of known race. Dividing the Black count of 175 by 679 yields 25.77%, a figure which appears in a later table in Dr. Siskin's declaration. *See id.* ¶ 23 tbl.5. No computation has been identified that would yield the "29.61%" figure.

[49]     Dr. Siskin indicates that summonses were sent to 1,838 persons, while the original data files from the Jury Office place this count at 1,837. This discrepancy could arise from the method used to combine the two separate

percentage points—than that of the summoned group can only mean that Blacks responded to the summons by sending in their questionnaires at lower rates than did others.[50]  Regardless of whether this disparity is caused, or exacerbated, by the pandemic, every individual's choice of whether or not to respond to the summons is a prototypical "external force" that generally cannot sustain a claim of systematic exclusion.[51]

Defendant assails Dr. Siskin's geocoding analysis as "speculative" and with unproven reliability.  Def.'s Reply at 5.  Instead of offering any specific criticism of the geocoding method, including in the supplemental expert declaration accompanying his reply, however, defendant demands "to test Dr. Siskin's theory at an evidentiary *Daubert* hearing."  *Id.*; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  This request is denied.  Defendant overstates the complexity of the geocoding method and its supposedly "speculative" character.  Geocoding, as described and implemented by Dr. Seltzer, may take some expertise and programming skill to

---

data files for responding and non-responding recipients, respectively, wherein it is possible for a "header row" to be counted as though it were an actual data entry.  Regardless of the cause, however, this *de minimis* discrepancy has no material effect.

[50]    To be clear, the "Black share of the respondents" and the "response rate among Black summons recipients" are two quantities that are closely related—indeed, they will rise and fall together—but are not the same.  The former—the 25.77% value noted above—is the known percentage of all questionnaire respondents who are Black, and does not rely on any estimation methodology.  This 25.77% is lower than the estimated Black share of questionnaire recipients, 42.62%, leading to the conclusion that the Black response rate is lower than that of the full group of recipients.  The Black response rate *itself*, on the other hand, is defined differently as the percentage of Black summons recipients who respond, and cannot be known exactly because an estimate is required to determine how many summonses were sent to Black recipients.  Dr. Siskin's analysis estimates, statistically, that 782.93 summonses were sent to Black recipients (42.62% of the 1,837 total summonses) and, since 175 Black respondents are known to have responded out of the estimated 782.93 summonses sent to Black recipients, dividing these two values yields a Black response rate of about 22.4%.  The similarity between these two percentages (25.77% and 22.4%), however, is purely coincidental.  As expected, however, this 22.4% estimated Black response rate is lower than that of all recipients—around 37.9% (697 out of 1,837).

[51]    The "external" nature of a non-response is solidified by the Jury Office's efforts to maintain up-to-date address information for persons on the master jury wheel.  This is accomplished in three ways, as discussed in Part I.A.1, *supra*.  First, the master wheel is rebuilt in its entirety using updated data source files from the three sources (voters, DMV, and tax filers) at least every four years.  Second, names and addresses in the master wheel are periodically (at least annually) checked against a National Change of Address database and the wheel updated if a change is detected.  Third, if outgoing mail is returned by the Post Office bearing a forwarding address, Jury Office Staff update the database accordingly and re-send the summons and questionnaire to the new address.  Larry Test. at 25:15–26:16.

execute, but conceptually is a fairly straightforward and logical way to use known information to infer an estimate of missing information.  Further, like Dr. Seltzer's analyses, the geocoding analysis, too, appears to rely only "on raw data provided by the jury office and information compiled from the U.S. Census," Def.'s Reply at 5, not any mysterious or proprietary data sources.[52]

This is not to say that geocoding produces precisely accurate numbers of the demographic make-up of the master jury wheel.  By necessity, the method involves certain assumptions, limiting the accuracy of the results the more "reality" deviates from these assumptions.  As Dr. Siskin notes, for census tracts that are "demographically homogeneous"— or, more bluntly stated, tracts that are highly racially segregated, as portions of the District remain—geocoding produces highly accurate results.  *See* Siskin Decl. ¶ 19.  For tracts that are more racially mixed, the geocoding method may be somewhat less precise, *see id.*, but still useful as an estimation tool.  In a sense, the geocoding method is simply a way of deriving additional information about one data set from another data set and is, as a *method*—the crux of a *Daubert* inquiry—as reliable as the variable features of the input data and the underlying assumptions.  In this case, defendant has raised absolutely no question as to the reliability of the input data of the addresses in the master jury wheel nor to the census tract and related census demographic data, let alone any specific challenge to the method used to match the two data sources, leaving a puzzle as to what questions, if any, would be addressed about the geocoding

---

[52]     As Dr. Siskin notes, the geocoding analysis relies on Census-provided population data broken down by census tract and race.  Siskin Decl. ¶ 19.  Each entry on the master jury wheel includes an address, so the only additional information required is which census tract corresponds to each address on the list.  Fortunately, the Census Bureau delivers here as well with a simple tool that allows anyone to input a street address and receive a response with assorted information including the identifying number of the census tract in which that address sits. *See Welcome to Geocoder*, U.S. CENSUS BUREAU, https://geocoding.geo.census.gov/geocoder/geographies/ address?form (last visited Feb. 11, 2022).  This tool also provides a mechanism for "batch address processing" to obviate any need to query manually large numbers of addresses.  *See id.*

method at any *Daubert* hearing.  Defendant has had, and forgone, ample opportunity to argue with specificity why he believes the geocoding method is infirm.[53]

Moreover, as the government notes, there is little need for the "gate-keeping function" of a *Daubert* hearing in this circumstance, where no jury is involved.  Gov't's Sur-Reply at 7–8; *see also United States v. McDaniel*, 925 F.3d 381, 385 (8th Cir. 2019) ("The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony.  There is less need for this gatekeeping function in bench trials." (citations and quotation marks omitted)).  Nothing is to be gained from the academic exercise of conducting a *Daubert* hearing about the geocoding method and ruling on whether geocoding results may be considered, among other evidence, when deciding a matter *about* (and decidedly not *before*) a jury.  Furthermore, several district courts have recently found Dr. Siskin's geocoding approach to have some utility on this very topic for purposes of evaluating a master jury wheel.  *See United States v. Celestine*, No. 20-cr-286, 2021 WL 4133755, at *4 (E.D.N.Y. Sept. 10, 2021); *United States v. Lucas*, No. 21-cr-382, 2021 WL 4925715, at *3 (S.D.N.Y. Oct. 21, 2021); *United States v. Corbett*, No. 20-cr-213, 2021 WL 5588816, at *5 (E.D.N.Y. Nov. 30, 2021); *see also United States v. Powell*, No. 2006-FEL-23645, 2008 D.C. Super. LEXIS 2, at *16–19 (D.C. Super. Ct. June 17, 2008) (Boasberg, J.) (endorsing Dr. Siskin's geocoding methodology in a Sixth Amendment challenge heard in D.C. Superior Court).[54]

---

[53]    The government uses Dr. Siskin's analysis to suggest that the master wheel "actually *over-represented* the percentage of Black residents as compared to the community," Gov't's Opp'n at 8 (emphasis in original); Siskin Decl. ¶ 36, based on the estimation that Black representation in the master wheel is 42.62%, as compared to the 39.32% census data of the percentage of Blacks among adult District residents, Siskin Decl. ¶ 20 tbl.3, a small difference of 3.3 percentage points.  This conclusion may be a bridge too far.  Given the understood imprecision and embedded assumptions involved with the geocoding method, the actual Black share of the master jury wheel could differ from 42.62% by several percentage points in either direction.  These two values are too close to assert confidently that the master wheel overrepresents Blacks.  That said, nothing in the government's argument requires that Black representation in the master jury wheel exceeds that in the population in this regard.

[54]    One court has expressed disagreement, noting that "it is not possible to 'test the accuracy of geocoding for the entire master wheel because [the parties] do not have confirmatory demographics for the entire wheel.'"  *United*

Finally, defendant offers no alternative approach to assess *his own hypothesis* that the pandemic depresses Black response rates.  Without some kind of empirical method of estimating the composition of the master jury wheel, there is no effective way to determine whether Black response rates are lower than for the population at large, let alone whether that response rate is depressed, as defendant speculates, by the pandemic.  Given that defendant bears the burden of showing "systematic exclusion" as part of his prima facie case establishing a fair cross section violation, *Berghuis*, 559 U.S. at 327, condemning the only analytical option offered to test his hypothesis works against him, not in his favor.  As already noted, Dr. Siskin's geocoding results actually tend to *support* defendant's theory that a response rate issue is at play.  The fatal flaw in this argument for defendant is that poor response rates are an "external force" militating against finding "systematic exclusion"—a problem compounded by the *additional* "external force" of a pandemic causing further disruptions.

In the end, defendant fails to establish "systematic exclusion" based on pandemic-related pressures affecting Black response rate to summonses.  The parties agree that a deficit in Black response rate exists, and the government offers reasonable analysis consistent with that result.  No postulated reasons for the response rate issue, however, are "inherent" in the selection process.

### c)  Discretion in Granting Excuses and Enforcing Compliance

Defendant argues in passing that "discretion exercised by the jury office to excuse jurors and to enforce compliance with summonses has even further exacerbated" disparities caused by the pandemic.  Def.'s Reply at 6.  This argument is meritless and readily dispatched.

---

*States v. Lawrence*, No. 21-cr-127, 2021 WL 3500838, at *6 (S.D.N.Y. Aug. 9, 2021) (alteration in original) (citation omitted).  This critique makes little sense, since if those "confirmatory demographics" were available "for the entire wheel," no estimation methodology would be at all necessary.

Defendant is correct that a certain degree of discretionary decision-making is, as a practical necessity, delegated to the Jury Office component of the Clerk's Office. *See* Larry Test. at 31:10–32:9; Plan ¶ J. The data, however, belie defendant's contention that the granting or denial of discretionary excuses has meaningfully affected the racial composition of the qualified jury pool. *See* Siskin Decl. ¶ 23 tbl.5. Specifically, out of the summons respondents relevant to defendant's trial, 37.7% of Black respondents were excused or deferred for reasons other than statutory disqualification, compared to 41.7% of White respondents. *See id.* Put another way, if anything, the discretionary excuse and deferral process marginally *increased* the share of Black representation in the qualified two-week pool.[55]

As for enforcement, defendant is also correct that under current practice, if a summons is neither returned completed nor returned as undeliverable, no further action is taken. Larry Test. at 42:13–16. There is room for a robust policy debate as to what action, if any, should ideally be taken in these circumstances, especially given that the majority of summonses mailed do not yield a completed questionnaire in return. Perhaps a second summons should be sent. Perhaps better notice of adverse repercussions from failure to respond or some degree of enforcement against non-respondents is appropriate. For present purposes, however, defendant identifies no law suggesting that any of these steps are requirements for achieving compliance with the fair cross section requirement. Indeed, case law suggests just the opposite. *See United States v. Orange*, 447 F.3d 792, 800 (10th Cir. 2006) (noting that "the clerk's office takes no further follow-up action" upon a non-response, and this does not "constitute systematic exclusion"); *United States v. Santos*, 588 F.2d 1300, 1303 (9th Cir. 1979) (holding that lack of "follow-up"

---

[55]     Defendant appears to hypothesize that COVID-19-related discretionary grants of excuses have further depressed Black representation in the jury pool, *see* Def.'s Reply at 1 n.1, 6, but here, too, the data do not bear this out. Out of the set of respondents relevant to defendant's trial, only 2.3% of Black respondents received excuses recorded by the Jury Office as being related to COVID-19, compared to 4.5% of White respondents.

does not violate JSSA as 28 U.S.C. § 1864(a) "clearly provides for discretionary follow-up");
*Hsia*, 125 F. Supp. 2d at 9 (rejecting a challenge based on non-enforcement, emphasizing the permissive language in the statute indicating that a non-respondent "may" be summoned to appear); 28 U.S.C. § 1864(a) ("Any person who fails to return a completed juror qualification form as instructed *may* be summoned by the clerk or jury commission forthwith to appear before the clerk or jury commission to fill out a juror qualification form." (emphasis added)).[56]

### d)   Master Jury Wheel Construction Issue

Defendant's sur-reply and motion for leave to file the same suggest that a fair cross section violation exists because of facts disclosed in a recent letter from a Clerk's Office jury administrator filed in *Lutamila*, No. 20-cr-24 (JEB), *see* Def.'s Mot. Leave File Sur-Reply at 4–6; Def.'s Sur-Reply at 3, and summarized in Part I.B, *supra*.  In short, the master wheel in effect at the time relevant to defendant's jury selection was oversized and bore many duplicate entries because of the combination of (1) a programming error by an outside vendor at the time the master wheel was first deployed on December 14, 2020, causing taxpayer records to be omitted from the wheel; and (2) a well-meaning but ill-fated attempt in March 2021 by Clerk's Office information technology support staff to mitigate the first error by importing the entirety of the taxpayer records atop the then-existing wheel, without deduplication.  *See generally* Larry Letter. The issue was resolved and a completely new wheel deployed on January 19, 2022, under close scrutiny by the Clerk's Office to ensure full compliance with the Court's Jury Selection Plan.

---

[56]   *Hsia* drew a nuanced distinction between mandatory ("shall") statutory language applicable to courts employing a two-step jury selection process and permissive ("may") language invoked by a one-step process.  *See Hsia*, 125 F. Supp. 2d at 8–9 (comparing 28 U.S.C. § 1866(g) (2000) ("shall") and *id.* § 1864(a) (2000) "may"). Eight years after Judge Friedman decided *Hsia*, Congress simplified matters by amending § 1866(g) to use the permissive "may" term as well, putting to rest any question whether a court is required to summon non-respondents, and obviating the need for detailed analysis about which conditions trigger which enforcement provision of the JSSA.  *See* Judicial Administration and Technical Amendments Act of 2008, Pub. L. No. 110-406, § 4, 122 Stat. 4291, 4292 (amending 28 U.S.C. § 1866(g)).

Unquestionably, this episode is regrettable.  Strict adherence to the parameters and process set forth in the Jury Selection Plan is important, as the Plan is carefully calibrated to ensure that jury pools are drawn randomly from a fair cross section of the community.  Further, the Court strives to provide, and litigants reasonably expect, transparency in the operations of the jury selection system as a way of promoting confidence that the Plan is being executed as promised at all times.  As soon as these issues came to the Court's attention in early January 2022, swift action was taken to investigate and diagnose the origins, to validate and deploy a corrected wheel, and to inform litigants by correcting the record in *Lutamila*.

The conclusion cannot be gainsaid, however, that the now-resolved defects in the master jury wheel did not compromise the fair cross section objective of the Plan in any material way. Fortuitously, the government has already furnished analysis that now happens to be the exact analysis needed to demonstrate that the effect of duplicate entries on the demographics of the master jury wheel—and therefore on everything downstream of it—was *de minimis*.  This analysis, while produced without knowledge of *why* so many duplicates existed on the wheel, is agnostic as to the reason for the defect.  Specifically, Dr. Siskin identified in November 2021, as part of his expert analysis, that a significant volume of duplicate entries appeared on the master jury wheel and leveraged his geocoding analysis to quantify the impact.  *See* Siskin Decl. ¶¶ 27– 30.  He did so by performing his own effort at deduplicating the list and then estimating the racial demographics of the list before and after that deduplication.  Siskin Decl. ¶ 29 tbl.8.[57] Although the taxpayer list had somewhat lower Black representation than did the voter and DMV lists, even with its inclusion without deduplication, the overall deduplication failure resulted in a

---

[57]     Dr. Siskin's deduplication method appears to have been sound, given that the number of unique records he found after deduplication is roughly consistent with what the Court would have expected based on related counts generated in the process of developing the current master jury wheel deployed on January 19, 2022.

diminution of overall Black representation of 0.62 percentage points—far below the absolute disparity thresholds discussed in Part III.C.2, *supra*.

*   *   *

Ultimately, defendant has failed to establish a fair cross section violation under either the Sixth Amendment or JSSA, even when liberally accepting all of his various filings regardless of any possible timeliness concerns or improper selection of remedies.

### D.      JSSA "Substantial Failure" Arguments

For a jury selection issue to be actionable under the JSSA, a "substantial failure to comply with [its] provisions" when selecting the jury must be shown.  28 U.S.C. § 1867(a), (d).  While the text of the statute does not elaborate further on what constitutes a "substantial failure," case law in other circuits provides some interpretive guidance.  According to the Eleventh Circuit, "[a] JSSA violation is 'substantial' if it 'frustrates one of the three principles underlying the Act: (1) random selection of juror names; (2) from a fair cross-section of the community; and (3) use of objective criteria for determination of disqualifications, excuses, exemptions, and exclusions.'"  *United States v. Davis*, 854 F.3d 1276, 1296 (11th Cir. 2017) (quoting *United States v. Carmichael*, 560 F.3d 1270, 1277 (11th Cir. 2009)); *see also United States v. Carter*, 483 F. App'x 70, 74 (6th Cir. 2012) (similar, without expressly mentioning the fair cross section requirement).  Further, mere "[t]echnical violations of the [JSSA] are 'insubstantial where they do not frustrate the Act's goals.'"  *Hernandez-Estrada*, 749 F.3d at 1167 (quoting *United States v. Nelson*, 718 F.3d 315, 318 (9th Cir. 1983)).

This authority makes apparent that cognizable JSSA violations are somewhat more expansive than under the Sixth Amendment.  That broader scope is what lies on the other side of the "tradeoff" for Congress's election to require "strict compliance with formal procedural rules" as a prerequisite for invoking the JSSA.  *See Rosbottom*, 763 F.3d at 415.  Accordingly,

assuming *arguendo* that the procedural defects for a JSSA challenge in this motion are excusable, defendant's claims must be examined not only against the Sixth Amendment but also against the JSSA standard.  To the extent defendant alleges fair cross section violations, the analysis in Part III.C, *supra*, applies equally to statutory and constitutional claims, for JSSA fair cross section claims are evaluated using the *Duren* test.  *See Bryant*, 523 F.3d at 361–62.

Recall that defendant's three identifiable objections involve: (1) disproportionately low Black response rates to summonses driven by the COVID-19 pandemic, *see* Def.'s Mot at 5–7; (2) "discretion exercised by the jury office to excuse jurors and to enforce compliance with summonses," Def.'s Reply at 6; and (3) defects in the master wheel used at the time defendant's jury pool was developed, *see* Def.'s Mot. Leave File Sur-Reply at 5–6.  These objections are examined in turn through the JSSA lens, and all of them are unavailing.

### 1.      *Underrepresentation*

First, defendant's argument that Black citizens are underrepresented in jury pools and venires *because of the pandemic* can only be described as a fair cross section argument.  This results-oriented objection rests on no hypotheses concerning the Act's other two objectives— deviations from random selection procedures or non-objective criteria for disqualifying or excusing jurors.  Accordingly, the Sixth Amendment analysis of the jury pool composition finding no fair cross section violation is likewise dispositive of the JSSA claim, which fails.

### 2.      *Jury Office Discretion and Summons Enforcement*

Defendant's concern "that discretion exercised by the jury office to excuse jurors and to enforce compliance with summonses has even further exacerbated these disparities," Def.'s Reply at 6, maps directly to one of the JSSA principles other than the fair cross section requirement: the "use of objective criteria for determination of disqualifications, excuses,

exemptions, and exclusions," *Davis*, 854 F.3d at 1296. Defendant raised this concern, without elaboration, first in his reply, and explained his enforcement argument for the first time in his sur-reply, Def.'s Sur-Reply at 8–9. While the late and minimal development of this argument may present waiver issues, the importance of this issue favors its examination nonetheless.

With respect to "objective criteria" for excluding individuals from the qualified two-week pool, the precise nature of defendant's objection is unclear since the criteria at issue are expressly spelled out in the Plan and largely mirror provisions of the JSSA itself. *See* Part I.A.2, *supra*. Out of the Plan provisions, the only criterion arguably described as discretionary is the determination of whether a questionnaire respondent seeking to be temporarily excused has made a sufficient "showing of undue hardship or extreme inconvenience." Plan ¶ H.4. Defendant makes no objection to such a showing being evaluated by an Article III judge or a magistrate judge and thus his concern, apparently, is limited to the exercise of this decision-making authority by the Jury Office (under the supervision of the Clerk of the Court). *See* Def.'s Reply at 6. The Plan contemplates the delegation of such authority to the Jury Office, as a practical necessity. *See* Plan ¶ J.

While considerable fact-specificity is involved in the task of determining whether a particular respondent requesting excuse from service would experience "undue hardship or extreme inconvenience" if required to appear on the originally requested timetable, *see* Larry Test. at 31:17–32:23 (acknowledging that "each request is different" when asked if "there [are] criteria that [Jury Office staff] use to make that decision"), defendant neither alleges nor provides any examples of arbitrary or overly "subjective" decision-making by the Jury Office in processing such excuse requests. His objection seems, based on the limited articulation in his briefing, to imply that for a criterion to be considered sufficiently "objective" to pass JSSA

muster, a deterministic, bright-line rule must be spelled out for Jury Office staff to reach an unambiguous disposition for every fact pattern.  This is not the applicable standard.

To the contrary, case law suggests a concern about discretionary jury selection criteria that is more tightly coupled to the accompanying fair cross section requirement.  "The types of subjective criteria that are prohibited are, for example, 'good character, approved integrity, sound judgment and fair education.  The problem recognized with their use [is] that 'in at least some instances, even though the jury selection officials were well intentioned, these additional qualification requirements have produced discriminatory results, especially in relation to the poor and other minorities.'"  *Carmichael*, 560 F.3d at 1278 (quoting *Bearden*, 659 F.2d at 608) (alteration in original).  Defendant suggests nothing of the sort taking place in the Jury Office.  Even with a degree of discretion vested in the Jury Office, the actual set of excuses granted through that avenue served to marginally *increase* Black representation in the qualified two-week pool relative to the group of summons respondents, indicating that the JSSA's goal of fair representation is not frustrated by this practice.  *See* Part III.C.3.c, *supra*.

Furthermore, the exercise of creating an omnibus rule set to extinguish any measure of discretionary judgment would quickly devolve into an exercise in futility that would impossibly encumber the decision-making process.  The JSSA itself recognizes a measure of discretion, defining "undue hardship or extreme inconvenience" as "great distance, either in miles or traveltime [sic], from the place of holding court, grave illness in the family or any other emergency which outweighs in immediacy and urgency the obligation to serve as a juror when summoned, or *any other factor* which the court determines to constitute an undue hardship or to create an extreme inconvenience to the juror."  28 U.S.C. § 1869(j) (emphasis added).  While

that definition borders on farcically circular, that very circularity underscores the point that absolute determinism is a practical impossibility.

With respect to summons enforcement, defendant is correct that at present, "any individual who chooses to ignore the summons and questionnaire," Def.'s Sur-Reply at 8, does so with little risk of consequences, despite available penalties for such noncompliance.[58] Perhaps that should change, particularly in light of the disappointingly low response rates observed overall, or perhaps greater public notice of the possible consequences of noncompliance with a jury summons is warranted. Even so, the front page of the summons carries a "WARNING" that reproduces in full the statutory penalties available under 28 U.S.C. § 1866(g), including a fine of up to $1,000, up to three days' imprisonment, and/or mandated community service. Anyone who chooses to disregard the summons does so despite that admonition and despite the Court's prerogative to implement enforcement measures at any time—a situation quite different in kind from the "volunteer jury system" defendant critiques. In any event, defendant provides no evidence for, or even alleges, that the minimal likelihood of facing enforcement action for ignoring a federal jury summons in this District is common knowledge—a critical assumption behind the notion that a lack of enforcement yields a volunteer system. More importantly, the completely uniform nature of this non-enforcement practice nullifies any risk that this practice could be used selectively to discriminatory ends.

Finally, defendant tellingly cites no case law suggesting that even an overt across-the-board non-enforcement policy constitutes a "substantial failure" to comply with the JSSA, particularly given the conspicuous absence of any mandatory enforcement requirement in the

---

[58]   *See* 28 U.S.C. § 1866(g) ("Any person summoned for jury service who fails to appear as directed may be ordered by the district court to appear forthwith and show cause for failure to comply with the summons. Any person who fails to show good cause for noncompliance with a summons may be fined not more than $1,000, imprisoned not more than three days, ordered to perform community service, or any combination thereof.").

current text of the JSSA, which instead provides only that a clerk of court "may" summon a

questionnaire non-respondent to appear to complete the form, 28 U.S.C. § 1864(a), just as a

district court "may" order a person failing to appear for jury service to appear before it, *id.*

§ 1866(g).[59]  Defendant's attempt to invoke *Duren* as an example, *see* Def.'s Sur-Reply at 8–9, is

wholly unpersuasive.  In *Duren*, the Supreme Court rejected, as violating the Sixth Amendment,

Missouri's "automatic exemption from jury service for any women requesting not to serve"

compounded by the practice of "presum[ing] [women] to have claimed exemption when they did

not respond to the summons."  439 U.S. at 359, 361, 367.  According to defendant, "[i]t is to be

remembered that in *Duren*, the Court had regard not only to the exclusion of those women who

activated the exemption supplied by Missouri at that time, but also to those who simply ignored

the summons for jury service, where Missouri chose not to follow up these summonses."  Def.'s

Sur-Reply at 8–9.  True, but it is also "to be remembered" that the reason the Court found this

practice so objectionable was not because Missouri failed to enforce summonses but because

Missouri did so *for women* specifically.  As a result, the gross underrepresentation of women in

the wheel and venires "was quite obviously due to the *system* by which juries were selected."

*Duren*, 439 U.S. at 367 (emphasis in original).  Here, insofar as non-enforcement may have

anything to do with Black underrepresentation, it is due not to "the *system*" but rather to the

independent behavior of individual citizens.  Furthermore, *Duren* was a Sixth Amendment case,

---

[59]     The word "may" in § 1866(g) is no accident.  When the word "shall" was replaced by "may" in 2008, a
proponent of the bill noted on the House floor that the modification "clarifies a court may bring individuals into
court when they do not respond to a jury summons, thus *eliminating non-meritorious challenges* to an impaneled
jury."  154 Cong. Rec. 22,824 (2008) (statement of Rep. Lamar Smith) (emphasis added).  This permissive language
contrasts with the directive in 28 U.S.C. § 1864(b) that a district court "shall" order to appear before the court a
person who disregards not only the questionnaire but also a clerk's subsequent summons to appear to complete the
questionnaire pursuant to § 1864(a).  This seemingly mandatory directive does not apply, however, where, as here,
the Clerk's Office does not issue § 1864(a) summonses.  In any event, defendant makes no attempt to identify what
degree of enforcement at the questionnaire stage *would* be sufficient to satisfy any purported JSSA requirement and
certainly makes no suggestion that sending Deputy U.S. Marshals into the community to follow-up with non-
respondents on the summons list is the answer.

not a JSSA challenge.  To invoke *Duren* is to make a fair cross section argument, which has

already been entertained and rejected in detail in Part III.C, *supra*.

### 3.    *Master Jury Wheel Construction Issue*

Finally, defendant argues that the errors in the construction of the master jury wheel used

for the petit jury at his trial, as discussed in Parts I.B and III.C.3.d, *supra*, constitute newly

discovered "substantial failures of the jury office to comply with the JSSA" because they

"clearly destroyed the random nature or objectivity of the selection process."  Def.'s Mot. Leave

File Sur-Reply at 5–6.[60]

Again, the Court makes no excuses for the issues affecting the master jury wheel in 2021.

This should not have happened, period.  As close examination has already shown, however, the

substantive effect on the composition of the master jury wheel (and, by implication, every

random selection downstream of that) was *de minimis*.  This issue did, however, as defendant

notes, cause a large number of persons to have "twice the chance of being selected by random

process, as compared to persons listed only once."  Def.'s Mot. Leave File Sur-Reply at 4.  This

challenge appears to implicate the "random selection" objective of the JSSA.  Defendant's claim

that the wheel composition issue "clearly destroyed the random nature or objectivity of the

selection process," *id.* at 5–6, however, overstates matters greatly.

---

[60]    Defendant's principal substantive articulation of this argument is found in his motion for leave to file a sur-reply rather than in the sur-reply itself.  In the same motion, defendant asserts that "[h]ad he been made aware" of this issue "before his trial began," he would have "moved for a continuance," Def.'s Mot. Leave File Sur-Reply at 5, a curious claim given that (a) at no previous point had he indicated a desire to further delay his trial, and (b) he incorrectly asserts *in the same filing* that he had earlier made a pretrial "written request for a stay of the proceedings," *id.* at 3.  In any event, it is unclear why *this* issue, with its demonstrably *de minimis* significance, would have tipped the scales, given that the instant motion to dismiss, filed before trial, preliminarily identified a far greater demographic disparity among the directed-to-report list, Def.'s Mot. at 4–5, yet defendant at that time clearly indicated he did not seek a continuance.

"[T]he essence of randomness is the absence of any arbitrary attempt to exclude a class of persons from the jury." *Nelson*, 718 F.2d at 319 (alteration in original) (quoting *McClendon v. United States*, 587 F.2d 384, 387 (8th Cir. 1978)).  Not only did no such deliberate "attempt" occur here, but also no cognizable "class of persons" was "exclude[d]" in the partially noncompliant master jury wheel construction in effect at the time summonses were sent in anticipation of defendant's trial.  Indeed, in the period relevant to defendant—from about March 31, 2021 to January 19, 2022—nobody was "exclude[d]" at all.  To the contrary, in that period an unplanned and certainly unintended side benefit of the wheel construction at issue was that a significant number of persons ended up having a chance at being selected who, under a "correctly" constructed wheel, would have had no chance of being selected at all, for two reasons related to the practice of imposing a 600,000-entry cap.  First, the omission of taxpayer records from the original random selection of 600,000 entries left room for a *greater* number of voter and DMV records to be included in the first instance.[61]  Second, when the taxpayer records were later appended, they were not constrained by the 600,000-entry cap.  As such, no person was omitted from the wheel on account of the errors made in its construction.

---

[61]    In fact, the omission of taxpayer records at this stage likely caused the master jury wheel, even when capped at 600,000 entries, to include over 4,500 *more* residents of the District than it would have without the error. Critically, because of the 600,000-entry cap, for every single taxpayer name excluded from the wheel, a name sourced from the deduplicated voter and DMV list was *included* because of the "space" freed up by the taxpayer record exclusion.  On top of that, the overall number of eligible persons in the wheel (and thus, the effective "size" of the wheel) likely *increased* somewhat because of the replacement of missing taxpayer records with names from the deduplicated voter and DMV list.  This counterintuitive result arises because of the following three characteristics of the wheel and the construction process: first, the current method for generating the Source List and master jury wheel retains ineligible non-resident individuals (*i.e.*, those with non-D.C. residence addresses) until they are identified and deactivated, a process that takes place *after* the 600,000-entry cap is imposed; second, based on empirical examination of the corrected wheel now in service, persons appearing in the wheel by way of the taxpayer list are more than *twice* as likely to have non-D.C. addresses than are persons included in the wheel via the voter or DMV records; and third, the number of non-resident persons in the wheel via the taxpayer list alone is substantial, exceeding 9,000.  Because entries sourced from the voter or DMV lists are only half as likely to correspond to non-resident persons, supplanting the taxpayer-list-sourced entries with more from the voter or DMV lists likely reduced the total number of non-residents consuming space in the wheel by around 4,500.

That said, the chance of any particular *entry* in this master jury wheel being selected was somewhat diluted by the excessive size of the wheel—961,221 entries.  Insofar as some persons appeared twice in the wheel on account of the addition of the tax records without deduplication, that fact increased the relative chances of selection for the duplicated persons and decreased— but not to zero—the relative chances of selection for others.  The group whose chances of selection were reduced, however, is defined by convoluted contours: persons who (a) appeared on the deduplicated list combining voter and DMV records; (b) were randomly selected for inclusion in the wheel when the initial sample of 600,000 names was taken; and (c) did not appear on the list of taxpayer records.  A group so oddly defined is not a legally cognizable group.  Furthermore, while identical likelihood of selection for all names would of course be preferable, "Congress did not intend for 'random selection' under the Act to be defined as 'statistical randomness.'"  *Bearden*, 659 F.2d at 602.  "It is sufficient for the purpose of this legislation if the plan adopts some system of selection that affords no room for impermissible discrimination against individuals or groups."  *United States v. Gregory*, 730 F.2d 692, 699 (11th Cir. 1984) (quoting S. Rep. No. 90-891, at 16 n.9 (1967)).[62]  That criterion is met.[63]

---

[62]    Limited case law exists on deduplication failures, including a trio of 2021 cases from the Eastern District of New York, where the court held that insufficient deduplication in merging voter and DMV lists, even where the result was a pool that exceeded the eligible population, did not violate the JSSA because the errors did not introduce fair cross section violations.  *See Celestine*, 2021 WL 4133755, at *11; *Corbett*, 2021 WL 5588816, at *10; *United States v. Todd*, No. 20-cr-256, 2021 WL 5712153, at *10 (E.D.N.Y. Dec. 1, 2021).

[63]    The implications of the master jury wheel construction issue are somewhat different for the period of December 14, 2020 to about March 31, 2021, when the master jury wheel failed to incorporate all but one entry from the file of tax records.  During that time, persons whose names appeared only in the tax records and not in the voter or DMV records were excluded from the wheel, but this, too, did not actually diminish fair cross section coverage of the master jury wheel.  Data from the replacement wheel deployed on January 19, 2022 suggests that out of the 361,221 names in the taxpayer records, only a fairly small fraction—about 45,000 names, or around 13%—are likely to have appeared in the taxpayer records but in neither of the voter nor DMV data files.  Because of the 600,000-entry cap, only around 37,000 of those names would likely have been included in the master jury wheel.  Out of that group, around 9,000 of those entries would have been, despite their inclusion in the wheel, disqualified from being summoned because their addresses indicated residence outside of the District.  Another 300 or so would have been found to be deceased or moved without leaving a forwarding address.  All told, this yields a set of under 28,000 potentially eligible persons—less than 5% of the wheel—potentially excluded from service during this three-and-a-half month period.  Moreover, the actual effect of this "exclusion" is even less significant

Finally, defendant argues that the master wheel construction issue is not an excusable "technical error" because it was "caused by the actions or inactions of employees within the jury office."  Def.'s Mot. Leave File Sur-Reply at 4.  Drawing some distinction between "technical" or other types of errors makes little analytical sense in this context.  Failure to catch a machine-generated "technical error" reflects a shortcoming in quality assurance and thus ultimately amounts to a "human" error for which the Clerk's Office and this Court bear—and accept—responsibility.  This may be the point defendant is trying to make but is the wrong focus here. Diagnosing the reason that construction of the master jury wheel did not comply with certain terms of the Court's Jury Selection Plan, though important to identify and critical to fix, is a wholly separate inquiry from whether a substantial failure to comply with the JSSA occurred. For the reasons already explained above, no such failure has been shown here.

Any JSSA challenge based on noncompliance with the Plan's strict terms regarding merged data sources and the 700,000-entry limit in construction of the master jury wheel fails.

*   *   *

The discussion above exhaustively explains why, even granting defendant the benefit of proceeding to the merits, despite his JSSA timing default and failure to seek an appropriate remedy, the facts and law do not entitle him to the relief requested of dismissal of the indictment (or from his conviction) based on alleged infirmities in construction of the master jury wheel or other aspects of the jury selection process.

---

than this 5% figure suggests: as explained in note 61, *supra*, during this three-and-a-half month period, because non-residents of the District in the wheel still count against the 600,000-entry cap, when the roughly 37,000 entries that would have appeared via the taxpayer list were supplanted by 37,000 entries drawn from the voter or DMV lists, the resultant reduction in the number of persons disqualified as non-residents likely had the ultimate effect of allowing over 4,500 more District residents to appear in the master jury wheel than if the error had not occurred.

While the Sixth Amendment and JSSA analysis is fairly technical in nature, viewing how the jury selection process worked, from start to end, shows that this process yielded a fair jury for defendant.  Random selection was used in at least four separate parts of the process: (1) in construction of the master jury wheel through random selection of the 600,000 entries from the merged DMV and voter records to include in the wheel; and in generating (2) the summons list, (3) the directed-to-report list, and (4) the venire list.  Then, as detailed in Part I.C, *supra*, defendant arrived at trial presented with a venire of 65 qualified prospective jurors.  In the course of individual voir dire for 57 of those jurors, 24 jurors were excused for cause, with all but one of those excuses being requested *by defendant*, for reasons in all but one case entirely unrelated to the pandemic.  Those for-cause excuses, requested by defendant, disproportionately resulted in excusing Black jurors.  The parties then seated and approved a panel of 14 jurors, including two alternates, to hear this case, including a substantial cohort of 5 jurors identifying fully or partially as Black.

That being said, consideration of mechanisms to improve Black representation in jury pools and venires in this Court must be prioritized; today's holding that no Sixth Amendment or JSSA violation ensued in no way diminishes the importance of those efforts by the Court.  In the end, however, even despite the challenges posed by the pandemic, the system worked, producing the fairly selected, impartial, and reasonably representative jury to which defendant was entitled. Disturbing the verdict of that jury due to any of the reasons raised in defendant's pending motion is not legally required nor warranted.

## IV.    CONCLUSION

For the foregoing reasons, defendant's motion to dismiss the indictment against him as a result of a failure to comply with the provisions of the Jury Service and Selection Act, 28 U.S.C.

§ 1861 *et seq.*, and a violation of the fair cross section guarantee of the Sixth Amendment to the

U.S. Constitution, is DENIED.  Sentencing shall proceed as scheduled on February 25, 2022.

An Order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: February 11, 2022

_____

BERYL A. HOWELL
Chief Judge