**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.: 19-CR-324 (BAH)** |
| | : | |
| **v.** | : | |
| | : | |
| **JOSEPH SMITH** | : | **SENTENCING**: **February 25, 2022** |
| **Defendant.** | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits the following memorandum to assist the Court in issuing an appropriate sentence in this case. As set forth below, the defendant sexually abused and exploited his twelve-year-old stepdaughter for nearly a year. He used her body over and over again for his own sexual gratification and, unsatisfied with abusing her, he directed her to take photographs of the most intimate parts of her body and send them to him. Despite the overwhelming evidence of his crimes, the defendant has shown neither remorse nor responsibility for his victimization of A.S.

Accordingly, and for the reasons discussed herein, the government recommends that the Court sentence the defendant to a lifetime term of incarceration. This sentence, which the government acknowledges is severe, aligns with the recommendation made by the U.S. Probation Office, is within the U.S.S.S. Sentencing Guidelines, and appropriately weighs the sentencing factors under 18 U.S.C. §3553(a).  In support of this recommendation, the government relies on the following points and authorities, as well as such other points and authorities as may be cited at the sentencing hearing.

## I.      BACKGROUND

### A.      Procedural Posture

On October 27, 2021, after a five-day jury trial, the defendant was convicted of one count of Production of Child Pornography, in violation of 18 U.S.C. § 2251(a); one count of Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(4); one count of Enticing a Minor, in violation of 18 U.S.C. § 2242; five counts of First Degree Child Sexual Abuse (with Aggravating Circumstances), in violation of 22 D.C. Code §§ 3008, 3020(a)(2); and two counts of First Degree Sexual Abuse (with Aggravating Circumstances), in violation of 22 D.C. Code §§ 3002, 3020(a)(2). The Court has set a sentencing date of February 25, 2022.

### B.      Statement of Offenses

In August 2015, A.S., her mother W.S., and her younger sister L.G. moved to Washington, D.C. from Florida, following the death of L.G.'s biological father. At the time, A.S. was twelve years old. A.S., L.G., and W.S. moved directly into the defendant's one-bedroom apartment and, a few months later, W.S. married the defendant. As the defendant was well aware, W.S. was addicted to crack cocaine and alcohol and suffered from chronic asthma, which sent her to the hospital for frequent overnight stays.

A.S. testified that when she first began living with the defendant, he treated her with kindness and would frequently buy things for her. A.S. was being bullied at school and the defendant helped her to change her hair and her clothes in order to fit in. Nonetheless, the other students continued to harass A.S., and she had few friends at school.

The first indication of the defendant's predatory motives occurred when A.S. was looking for something in the hall closet. The defendant walked past and said to her, "soon you'll start sucking some dick." A.S. told her mother, who confronted the defendant. However, the defendant

denied the accusation and W.S. did not pursue it further. At that point, both the defendant and A.S. knew that her mother would not protect her against the defendant.

In May 2016, true to his word, the defendant began sexually abusing A.S. A.S. testified that the first time the abuse happened, her mother was in the hospital and her little sister was in the bath. The defendant approached her with his penis out and said, "put your pretty mouth on this." A.S. testified that she was scared, but obeyed him because she did not feel like she could say no. The defendant thrust his penis into her mouth multiple times and ejaculated in her mouth. A.S. remembered that she was crying and there was spit and mucus everywhere, even on her jacket. Afterwards, A.S. felt "unclean" and ashamed. She believed that she had broken a promise she had made to her mother years before, that she would not engage in any sexual activity.

The defendant continued to make A.S. suck his penis whenever her mother was in the hospital; eventually, the abuse occurred even when her mother was home, asleep. A.S. testified that the abuse occurred all over the apartment, including the bedroom, the living room, and in the hall closet. The defendant would frequently ejaculate in her mouth, and she would spit it out in either the bathroom or kitchen sink. A.S. testified that she remembered a particular incident where she bit the defendant's penis; in response, he hit her on the head.

The defendant told A.S. that if she told her mother about the abuse, her mother would not love her anymore and would put her in an "adoption home." If A.S. refused to give him oral sex, the defendant would take things from her, like her phone, and tell her that she had to suck his penis to get it back. At some point, the defendant began sleeping in the living room with A.S., while her little sister L.G. slept in the bedroom with her mother. The defendant told A.S. that he was arguing a lot with her mother, who was "not doing the things that [A.S.] did for him." A.S. testified that

once the defendant began sleeping in the living room, he would "mess" with her while she tried to sleep, taking from her one of the few places where she had previously "had peace."

In approximately August 2016, the defendant began putting his mouth on A.S.'s vagina. A.S. testified that the first time he did so, she tried to move backwards away from him, but he pulled her back towards him with his arms around her thighs, and she could not get away from him. A.S. testified that this form of abuse occurred in the bedroom and in the living room; the defendant would also make her sit on a dresser in the hallway while he crouched in front of her. A.S. recalled two additional specific incidents where the defendant put his mouth on her vagina: once, where he "nibbled" on her vagina, and another where her mother walked in on the abuse.

A.S. testified that the defendant sexually abused her multiple times per week, both at night when her mother was asleep, as well as during the day when her mother was at the hospital or picking up her little sister from school. On some occasions, the defendant would make A.S. masturbate while he watched her, masturbating himself. He kept track of her period, so that she could not use it as an excuse to avoid his abuse, even going so far as to look through the trash cans for her discarded pads.

The defendant frequently sent A.S. sexually explicit text messages, often setting up a "schedule" of what sexual activities she would have to do to him, or he was going to do to her. A sample of these messages is provided below:

- "I'm coming up there so you can take care of me" (Ex. 4)
- "I need my dk take care of tonight" (Ex. 4)
- "u need to suck my dk tomorrow n show me how much u love [HEART EMOJI] me" (Ex. 23)
- "when [the nickname of her younger sister] go in the bath get ready to suck some dk" (Ex. 23)
- "I want to eat ur pussy tonight" (Ex. 23)
- "can u suck a little for me" (Ex. 23)
- "can u sucking my dick when mommy is sleep" (Ex. 23A)

- "I'm going to eat ur pussy cause it's minded" (Ex. 4)
- "I moved things around so I can eat ur pussy tonight" (Ex. 4)
- "u might have to suck my dk really good so I can come."  (Ex. 4)
- "rub ur tits n play with pussy" (Ex. 23A).

In other messages, the defendant described past sexual conduct:

- "I really enjoyed u last night." (Ex. 23)
- "u never try to make me cum" (Ex. 22)

In several messages, the defendant threatened A.S. with future anal penetration:

- "I'm going to start putting my dk into ur beautiful ass" (Ex. 22)
- "I must be able to put my dk all the way into ur ass before I buy the shoes" (Ex. 4)
- "now go into the bathroom n put ur finger into ur ass cause when I start putting my dk into ur ass I want stop until I cum"  (Ex. 4)
- "u much open ur ass starting tomorrow cuz I'm going to start fucking u in ur ass next week promise."  (Ex. 23)
- "after I fuck ur ass good n com in ur ass you can get whatever you want as long as ur taking care of my dk" (Ex. 4)

The defendant would either order A.S. to delete these messages or take her phone from her and delete them himself, so that no one would see them.

A.S. testified that the defendant repeatedly threatened that he would have vaginal sex with her once she turned fourteen. A.S. told the defendant no and that she wanted to keep her virginity, but he ignored her. A.S. felt that she had to bargain with him, offering to give him oral sex so that he would let her keep her virginity. And, as indicated above, the defendant would also regularly tell A.S. that he was going to have anal sex with her; he would instruct her to do such things as put a numbing cream on her anus or put her fingers in her anus in order to "expand" herself for him.

The defendant repeatedly directed A.S. to produce, and send to him, sexually explicit images of herself. He made her go into the bathroom and use her cell phone to take up-close photographs of her vagina (as well as her breasts and anus) and text the photographs to him. He

would often tell her the photos were not good enough and make her retake them so that her vagina and/or anus was more exposed.

The defendant's sexual abuse continued until April 2017. After an argument between W.S. and the defendant, W.S. told A.S. and her little sister to pack their belongings. They fled to the home of A.S.'s best friend. After a few days, however, W.S. announced that they would be returning to the defendant's apartment. A.S. was scared and upset and she ran upstairs, away from her mother. Shortly thereafter, she disclosed the defendant's sexual abuse to her best friend's mother and, ultimately, to W.S. W.S. brought A.S. to the police station the following day, where she reported the abuse to MPD, which ultimately led to the defendant's arrest.

## II.   SENTENCING CALCULATION

### A.   Statutory Penalties

The parties do not dispute the statutory penalties set forth in the PSR. The Production of Child Pornography (Count One), in violation of 18 U.S.C. § 2251(a), carries a mandatory minimum sentence of 15 years' imprisonment and a maximum sentence of 30 years' imprisonment; a fine of up to $250,000; a term of supervised release of not less than five years and up to life; and a mandatory restitution order under 18 U.S.C. § 3633A.  *See* 18 U.S.C. §§ 2251(e), 3559, 3583(k), and 3571 and Presentence Report ("PSR") p. 1, ¶ 175.   Possession of Child Pornography (Count Two), in violation of 18 U.S.C. § 2252(a)(4)(B), carries a maximum sentence of 10 years' imprisonment; a fine of up to $250,000; a term of supervised release of not less than five years and up to life; and a mandatory restitution order under 18 U.S.C. § 3633A. *See* 18 U.S.C. §§ 2252(b)(2), 3559, 3583(k), and 3571 and PSR p. 1, ¶ 176. Enticement of a Minor (Count Three), in violation of 18 U.S.C. § 2422(b), carries a mandatory minimum sentence of ten years' imprisonment and a maximum sentence of life imprisonment; a fine of up to $250,000; a term of

supervised release of not less than five years and up to life; and a mandatory restitution order under 18 U.S.C. § 3633A. *See* 18 U.S.C. §§ 2422(b), 3559, 3583(k), and 3571 and PSR p.1, ¶ 177.

With respect to the D.C. Code crimes, First Degree Child Sexual Abuse with Aggravating Circumstances, in violation of D.C. Code §§ 22-3008, 3020 (Counts Four, Five, Six, Eight, and Ten) carries a maximum sentence of lifetime imprisonment; a fine of up to $125,000; and a maximum term of lifetime supervised release. *See* D.C. Code §§ 22-3008, 3020, 3571.01; 24-403.01(b)(4). First Degree Sexual Abuse with Aggravating Circumstances, in violation of D.C. Code §§ 22-3002, 3020 (Counts Seven and Nine) also carries a maximum sentence of lifetime imprisonment, a fine of up to $125,000, and a maximum term of lifetime supervised release. *See* D.C. Code §§ 22-3002, 3020, 3571.01; 24-403.01(b)(4).

Pursuant to 18 U.S.C. § 3013(a)(2)(A), there is a mandatory $100 special assessment fee for each felony conviction payable to the Clerk of the United States District Court for the District of Columbia. PSR ¶¶ 205, 207.

B.  Guidelines Ranges

1. *Federal Charges*

The parties agree with the PSR's Guidelines calculation, except for the applicability of a two-level adjustment for obstruction under U.S.S.G. § 3C1.1. The Government agrees with the U.S.S.G. calculations set forth in the PSR, which calculates a total offense level of 47 and equates to a lifetime term of imprisonment. PSR ¶ 71. At a total offense level of 47, the defendant's Guidelines are capped at a level 43, pursuant to U.S.S.G. Chapter 5, comment 2. PSR ¶ 73. Thus, even if the two-level dispute over the applicability of the obstruction adjustment is resolved in his favor, the defendant's total offense level will be a 45. Accordingly, it will not impact his ultimate sentence under the Guidelines.

The defendant's total offense level of 47 is arrived at through the following calculations. Because Counts One and Two group, the higher base offense level for Count One controls. U.S.S.G. §§ 3D1.2(b), 3D1.3(a); PSR ¶¶ 48-49. Count Three does not group. U.S.S.G. § 3D1.2(a); PSR ¶ 49. The defendant's base offense level under U.S.S.G. § 2G2.1(a) is 32. PSR ¶ 50. Pursuant to U.S.S.G. § 2G2.1(b)(1)(B), the defendant receives a two-level enhancement because A.S. was between the ages of 13 and 15 at the time. PSR ¶ 51. Pursuant to U.S.S.G. § 2G2.1(b)(5), the defendant receives a two-level enhancement because he was a stepparent and exercised custody, care, and/or supervisory control over A.S. PSR ¶ 52. Two levels are also added pursuant to U.S.S.G. § 2G2.1(b)(6)(B) because the offense involved the use of a computer or an interactive computer service to persuade, induce, entice, and/or coerce a minor to engage in sexually explicit conduct, or to otherwise solicit participation by a minor in such conduct. PSR ¶ 53. Here, the defendant used his cell phone to text his sexual demands and threats to A.S; he also used his cell phone to direct her to take sexually explicit photographs of herself and send them to him. A.S., at the defendant's direction, used her cell phone to take the sexually explicit photographs and to send them back to the defendant. To cover his tracks, the defendant repeatedly deleted the text messages and photographs and instructed A.S. to do the same.

Pursuant to U.S.S.G. § 3C1.1, the defendant receives a two-level adjustment for willfully obstructing justice because he willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the prosecution of the instant offense of conviction, and the obstructive conduct related to the offense of conviction and any relevant conduct or closely related offense. PSR ¶ 56. Application Note 4(B) makes clear that this adjustment applies to a defendant who committed perjury if "such perjury pertains to conduct that forms the basis of the offense of conviction." Here, the defendant testified at trial and willfully made numerous material

false statements. He denied any involvement in the alleged criminal conduct, (*See* Attachment 1, Redacted Trial Transcript Excerpt, p. 4, 18, 30, 41-42, 81) and he intimated that A.S. and/or W.S. planted the sexually explicit text messages and sexually explicit photographs and internet activity. (*Id.* at p. 42, 62, 78). He stated under oath that he never used the Motorola cell phone (on which four of the sexually explicit images of A.S. were recovered); rather, he first used a Samsung cell phone and then replaced his Samsung with an iPhone 6S Plus. (Transcript Excerpt p. 14-15, 57, 62, 65). He insisted that W.S. was the only person who used the Motorola phone.  (*Id.* at p. 14-15, 57, 62, 65).

These statements were material and patently false. With respect to the ownership of the Motorola phone, in its case-in-chief and again on rebuttal, the government introduced, through the sworn testimony of FBI Special Agent Danielle Schnur, voluminous text messages between the Motorola phone and the defendant's biological daughter; between the Motorola phone and W.S.; and between the Motorola phone and A.S. The content, phone numbers, and phone records made clear that the defendant was the sender of the messages and that he owned and controlled the cell phone. (Trial Ex. 116-121, 2-01). In addition, A.S. testified under oath in detail about the defendant's repeated sexual abuse and the sexually explicit photographs of herself that she took and sent him, at his direction.  Four of the six sexually explicit photographs of A.S. were found on the Motorola, and two were found on the Lenovo.

Under the multiple count enhancement/grouping analysis set forth in U.S.S.G. §3D1.4, an additional two-levels are applied because Count Three does not group, and the undisputed total offense level for that count is 38. PSR ¶ 66.

Finally, as set forth in U.S.S.G. § 4B1.5, a five-level adjustment applies because the defendant qualifies as a repeat/dangerous offender against minors. PSR ¶ 71. This, too, is not in dispute.

This brings the defendant's total offense level to a 47. As noted, under Chapter 5, he is capped at a total offense level 43. Draft PSR ¶ 73. The defendant does not dispute the PSR's calculation of his criminal history as a category III.  ¶ 98. Pursuant to U.S.S.G. § 4A1.1(a), the defendant received three criminal history points for his 2007 conviction in DeKalb County Georgia (06-CR-4363-10), where he was convicted after a jury trial of simple assault (lesser included of a forcible sodomy charge), false imprisonment, and theft by taking. He was sentenced to five years and was released from custody in 2011. He receives a fourth criminal history point under U.S.S.G. § 4A1.1(c) & 4A1.2(f) for his 2011 conviction in D.C. Superior Court of second degree theft.

Accordingly, the parties do not appear to dispute that the guidelines range for the defendant is life imprisonment.

   2.   *D.C. Code Charges*

The PSR calculates the defendant's D.C. Criminal History Score as 1.5, placing him in Criminal History Category B. However, the government believes that his correct score is 1.0, which would still place him in Criminal History Category B.[1] The government agrees that the defendant's D.C. Guideline range for Counts Seven and Nine (First Degree Sexual Abuse with

---

[1] The PSR writer awarded 1/2 point to the defendant's 1994 PG County conviction for Theft $300 Plus Value. ¶ 82. The government believes this conviction should be awarded 0 points. In the D.C. Code, First Degree Theft involves theft over $1000, while theft under $1000 is Second Degree Theft. *See* D.C. Code § 22-3212. Per the D.C. Voluntary Sentencing Guidelines, "if there is more than one possible D.C. statute that 'closely match' the out-of-District offense, select the least severe D.C. statute, whether that statute is a misdemeanor or felony." Rule 2.2.6(a)(4). Accordingly, the defendant's conviction should be treated as a D.C. Second Degree Theft conviction, which is a misdemeanor and, accordingly, not revived for the purposes of calculating the defendant's criminal history score.

Aggravating Circumstances) is 156 months to Life Without Release, and that his D.C. Guideline range for Counts Four, Five, Six, Eight, and Ten  (First Degree Child Sexual Abuse with Aggravating Circumstances) is 102 months to Life Without Release.

C.  Government's Recommendation for Sentencing Term and Conditions of Any Supervised Release

The Government recommends that the Court impose a lifetime sentence; however, if the Court imposes a lower sentence and the defendant is ultimately released from custody, the Government asks for the following term and conditions of his supervised release.

First, the Government suggests that any term of supervised release be for the defendant's lifetime. *See* U.S.S.G. § 5D1.2(b)(2) policy statement ("If the instant offense of conviction is a sex offense, . . . the statutory maximum term of supervised release is recommended."). Second, the Government recommends that he be ordered to participate in a sex offender treatment program. *See* U.S.S.G. § 5D1.3(d)(7)(A) ("Defendant <u>shall</u> participate in a sex offender treatment program."). Third, the government recommends that he be ordered to have no direct or indirect contact with minors.  *See U.S. v. Johnson*, 446 F.3d 272 (2nd Cir. 2006) ) ([No] direct contact with a person under the age of 18...[no] indirect contact with a person under the age of 18 through another person or through a device (including a telephone, computer, radio, or other means)...[to] reasonably avoid and remove yourself from situations in which you have any other form of contact with a minor...[and] not be in any area in which persons under the age of 18 are likely to congregate, such as school grounds, child care centers, or playgrounds..." In addition, as part of any supervised release, the Court is required to order as an explicit condition of supervised release for the defendant to register under the Sex Offender Registration and Notification Act ("SORNA"). *See* 18 U.S.C. § 3583. Finally, the government requests any and all of the remaining conditions of supervised release articulated in the PSR.

### III.    GOVERNMENT'S RECOMMENDATION

A.    Application of the Federal Sentencing Guidelines

In *United States v. Booker*, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 124 S. Ct. 2531 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1). *Booker*, 125 S. Ct. at 756.

In post-*Booker* cases, the Supreme Court has stated that a district court should begin all sentencing proceedings by correctly calculating the applicable guidelines range. *See United States v. Gall*, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."). After giving both parties an opportunity to argue for an appropriate sentence, the district court should then consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Id.* These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18 U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

B.      Basis for the Government's Recommendation

The government submits that a term of lifetime imprisonment is appropriate and warranted in the present case. The government does not make this recommendation lightly. However, the defendant does not merit a sentence outside the Guidelines, particularly given his conduct, the trauma he inflicted upon the victim, his perjurious testimony at trial, and his demonstrated lack of remorse. And, as discussed herein, the 18 U.S.C. § 3553(a) factors each support the Guidelines-compliant sentence of lifetime incarceration.

1.      The Nature and Circumstances of the Offense

The defendant's crimes warrant the maximum sentence. His conduct was calculated, predatory, and of the most abusive and devastating nature. He was a 58-year-old man who used his 12- and 13-year-old stepdaughter for his own sick sexual gratification, exploiting her obvious vulnerability and his unfettered access to her. Night after night, he violated her body and humiliated her spirit. He stole the last years of A.S.'s childhood from her, and he inflicted immeasurable and irreparable harm that will reverberate throughout the rest of her life, long after he serves whatever sentence the Court imposes.

The defendant's repeated sexual abuse, enticement, and production of child sexual abuse material, standing alone, is deserving of the most serious punishment. However, the true magnitude of his conduct cannot be grasped without first acknowledging the extent to which he manipulated A.S. in order to carry out the abuse. At the time the abuse began, A.S. was only twelve years old – a middle-schooler. The defendant was not only an adult, but he was her stepfather, with all the inherent authority of that position. Moreover, A.S. had no one to protect her: she had no close friends at school, no close family in D.C., and her mother, as the Court heard, was both incapacitated and willfully blind to the defendant's actions. The defendant exploited this youth

and vulnerability, cruelly manipulating her in ways that both enabled and exacerbated his sexual abuse.

He played upon A.S.'s deepest fears by telling her that her mother would not love her anymore and would put her in an 'adoption home' if A.S. told her about the abuse. He took advantage of her adolescent insecurities about her body, telling her that having sex with him would help her body develop, so that she would look more like the other girls at school. He told her that it was normal for stepparents to have sex with stepchildren, gaslighting her and making her second-guess her own resistance. When she told him no, or that she wanted him to leave her alone, he told her that she was the only reason he had not kicked her mother and little sister out of the apartment. He convinced her that she was single-handedly responsible for keeping her family fed, clothed, and housed. Other times he would take her phone, knowing that it was her most important possession – as she testified, it was the only thing "that brought [her] peace." He would keep it for days, even a week, refusing to give it back to her until she performed oral sex on him.

The different ways that the defendant manipulated A.S. show just how purposeful and calculated his sexual abuse and exploitation of her was. He knew exactly what her vulnerabilities were, and he intentionally exploited as many as he could in order to keep her compliant. In addition to its deliberateness, his manipulation is also staggering in its cruelty. He forced a thirteen-year-old girl to choose between sucking his penis or sending her family back to the homeless shelter. He toyed with her, taking her most important possession at will and making her suck his penis to earn it back. He joked to her about his sexual abuse, asking her when it would be "eat that ass day."  He made her believe that her mother would not love her if she knew the truth. For nearly a year, day in and day out, the defendant emotionally and psychologically manipulated A.S., creating an additional element of terror, misery, and humiliation for A.S. even beyond the hands-on abuse.

Even when the defendant was not actively abusing A.S., he used her to arouse and gratify himself. He constantly sent A.S. sexually explicit text messages, graphically describing the acts he wanted to do to her or have her do to him; the texts presented during the trial were merely a snippet of the messages that the defendant sent to A.S. during the period of abuse. He sent the messages to A.S. while she was in the apartment with him, where he could watch her as she received and read them. It is abundantly clear that the defendant took a sick pleasure in sending A.S. these pornographic messages and in watching her read them; they were another form of sexual gratification for him. They were also another form of abuse for A.S. – even when the defendant was not actually touching her, she faced an unrelenting onslaught of sexually explicit messages: threats about what the defendant was going to do to her when her mother fell asleep; explicit comments about her genitals; and repeated promises of anal penetration.

The defendant's sexual exploitation overwhelmed A.S.'s life. He created a constant environment of fear and intimidation in the place where A.S. should have felt the safest. He caused her to lose respect for herself, to be filled with shame, and to consider herself, at thirteen years old, as a 'whore' – a word that, to her, meant a female who has sex with a man who is married – in this case, to her own mother. He constantly threatened to vaginally and anally penetrate her, forcing her to try to bargain with him for her virginity. He made her – a middle-schooler – bear the weight of protecting her mother and little sister, convincing her that the only way she could keep them safe was to give him oral sex night after night. He made her create child sexual abuse material for him, images that can and did live on for years. And he irreparably damaged her relationship with her mother. As the Court heard, since the day A.S. reported the abuse to the police in 2017, she has only seen her mother once. Her mother did not attend her 16th birthday, her prom, her high

school graduation, or any other teenage milestone. A.S. has had to navigate the aftermath of the defendant's sexual exploitation without the one person who should have been there the most.

It is difficult, maybe impossible, to really capture the magnitude of the defendant's crime in words. He violated his 12-year-old stepdaughter in the deepest, most profound way; even more appallingly, it is clear that he *enjoyed* doing so – he relished having control over her and being gratuitously cruel to her. His statements to A.S., both orally and in his text messages, show that he felt not the slightest bit of guilt or shame about what he was doing to her. The defendant's sexual abuse and psychological manipulation devastated A.S.'s life and caused long-lasting harm – harm that the defendant, to this day, has failed to acknowledge and for which he has failed to accept responsibility.

A.S.'s written Victim Impact Statement will be submitted separately to the Court, and it is anticipated that she will appear by video teleconference at the upcoming sentencing hearing. Her resilience and hard work during years of therapy is evident in both her statement and her courtroom testimony. However, A.S.'s strength should not mask the trauma and scars inflicted by the defendant, nor diminish the monstrousness of his crimes. Any term of incarceration the Court imposes on the defendant, including a life sentence, will nonetheless be surpassed by the lifetime that A.S. will spend dealing with the effects of the defendant's sexual, emotional, and psychological abuse on her life.

        2.      *The History and Characteristics of the Defendant*

The recommended sentence also accounts for 1) the defendant's self-serving, perjurious testimony at trial; 2) his history of domestic violence with A.S.'s mother; and 3) his significant criminal history, including a prior conviction involving allegations of sexual assault of his then-girlfriend.

**Perjurious Testimony Under Oath**

The defendant made a mockery of the criminal justice system when he took the stand during trial. As noted in Part II.B.1, *supra*, the defendant made material, provable false statements under oath; moreover, he demonstrated a general lack of candor, lying about even arguably insignificant facts. For example, he testified that he was in the military for "approximately four years." (Trial Transcript Excerpt, p. 3 ¶¶ 1-2). However, he reported to the PSR writer that he did not even complete his 180-day basic training before ultimately receiving an honorable discharge. PSR p. 42 ¶ 163. The defendant also testified that he "never had a driver's license in my life" in an attempt to discredit A.S.'s testimony regarding the instance of sexual abuse in the U-Haul truck he rented. (Trial Transcript Excerpt, p. 30 ¶¶ 9-13). However, the PSR notes that the defendant has **four** separate convictions for Driving on a Suspended License (¶¶ 84, 87, 88, 89).

Furthermore, the defendant's attempt to vilify W.S. and paint A.S. as an unlikeable, lying child who "killed his fish" and "would just throw dishes in the sink and break them" is contemptible. In an example of the utmost irony, the defendant attempted to cast *himself* as the victim in this case, as a naïve, good-hearted elderly man taken advantage of by a drug-addicted woman and her scheming daughter. The defendant's explanation that either W.S. or A.S. took his cell phones and planted the evidence against him is as offensive as it is ridiculous.

The callousness with which the defendant repeatedly lied under oath and disparaged the child he sexually abused is appalling. Moreover, his behavior shows a lack of insight and acknowledgment of his sexually predatory behavior that makes him a continued danger to the community.

**Domestic Violence and Criminal History**

In addition to his sexual abuse of A.S., the defendant physically abused her mother W.S., often in front of A.S. A.S. recounted the abuse in her forensic interview, describing how the defendant slapped W.S. and would try to fight her "like she's a man." ECF 43 (Attachment filed under seal, p. 42). A.S. would leave the room or put the covers over her head in order to escape. *Id.*

Indeed, the defendant was arrested for domestic violence against W.S. on January 15, 2016. According to the Gerstein affidavit filed in that case, an MPD officer responded to the defendant's apartment after a dropped 911 call. *See* PSR ¶ 128. W.S. opened the door and then abruptly shut it; the officer heard W.S. begin to scream inside the apartment and the defendant yell at her. As the officer radioed for additional backup, W.S. came out of the apartment with A.S. and L.G. According to the officer, W.S. was hysterically crying and reluctant to discuss what occurred. Eventually, W.S. reported that the defendant had come home drunk and lain down on the bed. When W.S. tried to nudge him, he began punching her legs with a closed fist. W.S. tried to defend herself, and the defendant grabbed her neck. Officers observed redness and swelling on W.S.'s neck where the defendant had grabbed her. The defendant was arrested and charged with Simple Assault (D.C. Superior Court case 2016 DVM 35). However, W.S. failed to appear for trial and the case was dismissed.

Such violence towards his romantic partners is not new. Notably, the defendant's 2005 Dekalb County, Georgia, convictions for False Imprisonment, Simple Assault, and Theft By Taking involve allegations of domestic physical and sexual assault. According to the police report in that case, *see* Exh. 2, the defendant demanded sex from his then-girlfriend after they returned to their hotel room from a Halloween party. When she refused because she was on her period, the

defendant told her, "one way or the other you're gonna have sex with me. You can do it orally or anal." The defendant forced the victim to have anal sex with him and, when he could not ejaculate, he pushed her away and told her to get out. However, he then took her wallet and keys and refused to let her leave the hotel room. He struck her in the mouth and, when she managed to get out of the room, he chased her as she fled. The defendant was ultimately arrested and indicted on charges of aggravated sodomy, false imprisonment, family violence battery, and theft. He was subsequently convicted at trial of false imprisonment, theft, and simple assault (the lesser included offense on the aggravated sodomy count) and sentenced to 10 years' imprisonment, execution suspended as to all but five years, followed by five years of probation. According to the PSR, the defendant was released from custody on December 20, 2011, which suggests that he began his sexual abuse of A.S. mere months after completing his probation in the Georgia case.

In 2015, a different romantic partner filed a Civil Protection Order against the defendant in Washington, D.C., alleging multiple incidents of domestic violence (2015 CPO 3169). PSR ¶ 131. On one occasion, the defendant accosted the petitioner while she was in the shower and demanded sex from her. When she refused, he grabbed her by the neck and refused to let her leave the bedroom. The CPO case was dismissed, however, when the petitioner failed to appear for the hearing.

In addition to these specific incidents, the PSR reveals a lengthy criminal history, with 28 criminal convictions, spanning from 1980 to the present. Many of the defendant's convictions involved violent conduct or weapons, including convictions for assault; assault with a deadly weapon; attempted burglary; possession of a prohibited weapon (knife); carrying a concealed weapon; assault & battery; and, as noted above, false imprisonment. This record reveals an ongoing, apparently life-long, disregard for the law and a lack of deterrence by punishment.

Moreover, the defendant's history shows that the inexcusable – and dangerous – mentality he demonstrated in the present case is not an anomaly; rather, the defendant fundamentally believes that he is entitled to sex and that he can take it from a female, whether a child or an adult, against her will.

**In sum,** the defendant's history and characteristics – including his lack of candor under oath; his victim-shaming testimony; his extensive record of violent and sexually predatory behavior, including a prior allegation of rape; and his lack of any remorse or acceptance of responsibility for his conduct in this case – all support the lifetime incarceration recommended by the United States.

### 3. *Punishment, Deterrence, Protection, and Correction*

A sentencing court "shall impose a sentence sufficient, but not greater than necessary" to comply with the need for a sentence: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

The government's recommended sentence is sufficient, but not greater than necessary in the context of this particular case. The defendant's conduct has inflicted extreme harm on A.S. The community, and most especially vulnerable young children like the victim, must be protected from the kind of ongoing, calculated, and abusive conduct engaged in by the defendant. His blatant lies on the stand and the ease with which he disparaged A.S. show that he either does not believe, or does not care, that his behavior is wrong; his failure to express any sort of remorse or responsibility for his conduct only further highlights his likelihood of reoffending. The defendant has shown himself to be a dangerous sexual predator who will offend again if he is released. The

recommended lifetime sentence not only incapacitates him from committing such behavior, but also punishes him appropriately for his conduct.

Although the defendant may point to his age or alleged infirmities as some sort of indication that he does not pose a significant threat to the community, such a claim is patently belied by the record. At 58 years old, the defendant was not only sexually abusing A.S. multiple times per week, but he was threatening to engage in even more penetrative sexual acts in the future. Moreover, his age certainly has no effect on his continued ability to force vulnerable children to produce child pornography for him, just as he did to A.S. In other words, any claim by the defendant that his age somehow minimizes the danger he poses is plainly undercut by his own actions and words in this case.

####        4.        *Available Sentences and the Need to Avoid Unwarranted Disparities*

The Guidelines sentence applicable to the defendant is lifetime incarceration and, as discussed above, the 18 U.S.C. § 3553(a) factors also support this sentence. A review of recently-sentenced comparable cases from this courthouse does not alter this determination. For example:

- In <u>United States v. Franklin Torres</u>, 15-CR-135 (Huvelle), Torres was convicted at trial of one count of Production of Child Pornography, one count of Distribution of Child Pornography, one count of Possession of Child Pornography, and one count of First Degree Sexual Abuse of a Minor under the D.C. Code.  Torres lived in the home of the 16-year-old male victim, and on a single occasion, sexually abused the child and produced sexually explicit images of the boy, one of which he distributed via Facebook.  Torres was sentenced to 252 months (21 years) for Production, 120 months (10 years) on Counts 2, and 60 months (5 years) on Count 4, all run concurrently, followed by lifetime supervised release. In that case, the defendant's conduct all occurred on a single day, involving a single victim, during the course of a single course of sexual abuse and exploitation.

21

- In <u>United States v. Rolando De La Rocha</u>, 15-CR-94 (Boasberg), De La Rocha pled guilty pre-indictment to one count of Production of Child Pornography and one count of First Degree Child Sexual abuse under the D.C. Code for repeatedly filming himself performing oral sex on his girlfriend's 12-year-old daughter. De La Rocha accepted full responsibility for his conduct, pled guilty early, and was sentenced to 22.5 years' incarceration.

- In <u>United States v. Eric Toth</u>, 13-CR-313 (Contreras), Toth pled guilty before indictment to three counts of Production of Child Pornography and identity-theft related offenses. Toth, a third-grade teacher, produced and possessed child pornography in Washington, D.C., and Maryland involving students at the school. Pursuant to Fed. Rule Crim. P. 11(c)(1)(C), Toth was sentenced to 25 years' incarceration and a lifetime of supervised release.

- In <u>United States v. Andre Drew</u>, 07-007 (Kessler), the defendant was convicted after trial of one count of Production of Child Pornography and one count of First Degree Child Sexual Abuse relating to two young boys ages 8 and 13 whom he met and paid. The defendant had two prior convictions for sexually assaulting underage boys. The defendant was sentenced to a total term of incarceration of 543 months (45.25 years).

- In <u>United States v. Hillie</u>, 17-cr-030 (Jackson), which was reversed in part on appeal, the defendant was convicted after trial of Production and Possession of Child Pornography, one count of First Degree Child Sexual Abuse (with Aggravating Circumstances) and multiple counts Second Degree Child Sexual Abuse (with Aggravating Circumstances) relating to his girlfriend's two daughters. Hillie's production charges stemmed from his making surreptitious recordings of the victims while they undressed and groomed

themselves. Hillie, who was also a criminal history category III, was sentenced to 354 months (29.5 years) and lifetime supervision.

While these cases are instructive as points of reference, each differs in significant ways from the instant case.  The closest analogous case is United States v. Hillie, insofar as the defendant was convicted after trial of both sexual abuse and production of child pornography of a child with whom he lived (in Hillie's case, two children). However, Hillie is distinct in key ways: first, Hillie was not charged with, or convicted of, enticement of a minor, in violation of 18 U.S.C. § 2242, which has a maximum sentence of lifetime imprisonment; instead Hillie's federal charges carried a 30-year statutory maximum. Moreover, Hillie made surreptitious recordings of the victims while they undressed and groomed themselves, whereas the defendant here affirmatively directed A.S. to take close-up photographs of her genitals, to spread herself open, and to touch herself. Putting aside the different images involved, affirmatively directing a child victim to take photographs of themselves is markedly more injurious than using a hidden camera to record them. In addition, Hillie involved only a single instance of First Degree Child Sexual Abuse, whereas the present case involves repeated instances of oral sex – some including force – multiple times per week, for nearly a year.

In United States v. Torres, the defendant similarly went to trial, though the scope of his conduct was less far-reaching.  There was a single act of sexual assault for which defendant was convicted, after which the defendant took pornographic images of the victim. In addition, the defendant did not have any parental or custodial responsibility for the victim and had no criminal history.

In Toth and De La Rocha, both defendants engaged in egregious acts of sexual abuse and production of child pornography. However, they are distinct from the defendant in this case insofar

as Toth and De La Rocha accepted responsibility for and entered guilty pleas for their conduct at the earliest stages, before indictment, sparing the young child victims the trauma of testifying at trial.  Here, the defendant continues to deny responsibility for his actions, even after conviction at trial.

**In sum**, there is nothing about the defendant's background, his offense, or his conduct throughout this case that either weighs in his favor or mitigates the seriousness of his crimes. There is simply no basis to diverge from the Guidelines sentence of life imprisonment; indeed, for all of the reasons outlined above, such a sentence is wholly appropriate.

### 5.   *Restitution*

The victim and her older sister have been advised of their right to seek restitution in this case. Should the government receive a request for restitution between the date of this filing and the end of the 90-day statutory period post-sentencing during which the Court may make a final determination of any victim's losses pursuant to 18 U.S.C. § 3664, the government will submit that restitution request to the Court.

## IV.   SUMMARY OF THE GOVERNMENT'S RECOMMENDED SENTENCE BY COUNT

To conclude, the government recommends the following sentence on each count:

- Count One: 30 years' imprisonment; a fine of $250,000; lifetime term of supervised release

- Count Two: 10 years' imprisonment; a fine of $250,000; lifetime term of supervised release

- Count Three: Lifetime imprisonment; a fine of $250,000; if applicable, lifetime term of supervised release

Counts One through Three to be served concurrently, pursuant to U.S.S. G. 5G1.2(C) and Draft PSR at Para. 181.

- Counts Four—Ten: Lifetime imprisonment; a fine of $125,000; if applicable, lifetime term of supervised release.

Counts Four through Ten to be served concurrently with one another and concurrently with Counts One—Three.[2]

## V.   CONCLUSION

WHEREFORE, for all of the reasons set forth herein, the government recommends that the Court sentence the defendant to a term of lifetime imprisonment.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY

_/s/ Caroline Burrell_
AUSA Caroline Burrell
SAUSA Mona Sedky, D.C. Bar 447968
555 Fourth Street, N.W.
Washington, D.C. 20530
(202)252-6950; Caroline.Burrell@usdoj.gov
(202)262-7122; Mona.Sedky2@usdoj.gov and
Mona.Sedky@usdoj.gov

---

[2] The PSR correctly notes that per the D.C. Voluntary Sentencing Guidelines, when there is one victim in multiple events sentenced the same day, the sentences should run consecutively. *See* Rule 6.1, 7.10. However, in the present case, the government believes it is appropriate to run the defendant's sentences on Counts 4--10 concurrently, given that the offenses represent an ongoing, repeated pattern of similar abuse.

<u>Certificate of Service</u>

I hereby certify that I have caused a copy of the foregoing to be sent by email to counsel for the defendant this 11th day of February 2022.

<u>/s/ *Caroline Burrell*</u>
Caroline Burrell
Assistant United States Attorney